# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

---

## CASE NO.  4:15-CV-00564

---

### E.M., by next friend S.M. and C.S.,
*Plaintiff*

*v.*

### LEWISVILLE INDEPENDENT SCHOOL DISTRICT,
*Defendant*

---

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD

---

YVONNILDA MUÑIZ

Attorney-in-Charge
TEXAS BAR NO. 24007717

LAW OFFICE OF YVONNILDA MUÑIZ, P.C.
P.O. BOX 92018
Austin, TX  78709
Tel.  (512) 288-4279
Fax  (888) 398-8808
E-mail:  ymuniz@austin.rr.com

MARTIN J. CIRKIEL

**CIRKIEL & ASSOCIATES, P.C.**
1901 E. Palm Valley Blvd.
Round Rock, Texas  78664
(512) 244-6658 (Tel.)
(512) 244-6014 (Fax)
marty@cirkielaw.com [Email]

***Attorneys for Plaintiff***

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………..iv-vi

STATEMENT OF ISSUES…………………………………………………....1

STATEMENT OF UNDISPUTED FACTS……………………….…….2

STANDARD OF REVIEW IN THE DISTRICT COURT…...............................10

DISCUSSION……………………….........................................................................

Issue:  Hearing Officer's Credibility Determinations Are Not Supported by Non-Testimonial Evidence …………………………………………………...…11

Issue:  Hearing Officer's Findings of Fact Do Not Warrant Deference.………...16

Issue:  Appropriate Subject Matter of a Due Process Hearing…………………35

Issue:  Failure To Consider Peer-Reviewed Recommendations Denial Of FAPE..36

CONCLUSION……………………………………………………………..39

PRAYER FOR RELIEF..............................................................................................39

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Board of Educ. v. Rowley*, 458 U.S.176 (1982)…………………………………..16

*Caldwell Indep. Sch. Dist. v. L.P.,* 994 F.Supp.2d 811 (2012), *affirmed* No. 12-51105 (5th Cir. 2014)…………………………………………………………………..10

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). 11

*Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995), *cert. denied*, 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed. 2d 544 (1996)…………………………10, 11 ….

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F*., 118 F.3d 245, (5th Cir. 1997)……………………………………………………………………………………10

*Endrew F. v. Douglas County Sch. Dist. RE-1*, 69 IDELR 174 (U.S. 2017) 10., 38, 39

*Heather S. v. State of Wis*., 125 F.3d 1045, 1053 (7th Cir. 1997)………………...11

*Houston Indep. Sch. Dist. v. V.P*., 582 F.3d 576, 583 (5th Cir. 2009) …………11

*K.S. v. Fremont Unified Sch. Dist*, 545 F. SUPP.2d 995

 (DC ND California, 2008)……………………………………………………..  12, 13

*M.C. v. Antelope Valley Union High School District*, No. 14-56344, (9th Cir. 2017)

*Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1474 (9th Cir. 1993)…………...11

*Schaffer v. Weast*, 126 S.Ct. 528, 546 U.S. 49 (2005)…………………………..39

*Stanley v. M.S.D. of Southwest Allen County Schools*, 628 F.Supp.2d 902, 923 (N.D. Indiana, 2008)…………………………………………….………………...11

*Susan N. v. Wilson Sch. Dist*., 70 F.3d 751, 762 (3d Cir. 1995)…………………..44

*Teague Indep. Sch. Dist. v. Todd L*., 999 F.2d 127, 131 (5th Cir. 1993)….10, 11, 24

*Union Sch. Dist. v. Smith*, 15 F.3d 1529, 1526 (9th Cir. 1994)…………………..32

**FEDERAL RULES**

20 U.S.C. §1232g(b)(6)………………………………………………………..35

20 U.S.C. §1415(c)(E)(i)……………………………………………………35

20 U.S.C. §1415(c)(E)(i)(I)…………………………………………………35

20 U.S.C. §1415(c)(E)(i)(II) …………………………………………………36

20 U.S.C. §1415(f)(3)(B)…………………………………………………...35

20 U.S.C. § 1415(j)…………………………………………………….....28

29 U.S.C. §794, <u>et seq</u>……………………………………………………35

42 U.S.C. §1983………………………………………………………..35

42 U.S.C. §12101, et seq……………………………………………………35

**STATUTES, REGULATIONS AND RULES**

**OTHER AUTHORITIES**

<u>http://www.asha.org/policy/TR2007-00278.htm</u>.” ………...................................37

E.M., by next friends,                §
    S.M. AND C.S.,                  §
       Plaintiff,                §
                 §
v.                                    §        CASE NO.  4:15-CV-00564
                 §
LEWISVILLE INDEPENDENT             §
    SCHOOL DISTRICT                 §
       Defendant.                §

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff, E.M., by next friends S.M. and C.S. ("Student" or "Parents"), Plaintiff, file this her Motion for Judgment on the Record against the Lewisville Independent School District ("LISD" or "Defendant"), and shows the following:

## STATEMENT OF ISSUES

Plaintiff E.M., by next friends S.M. and C.S. are seeking judgment on the record to reverse the finding that as a child with Autism and Apraxia discontinuing speech therapy to address her articulation directly at the school is not individualized to meet her unique and specialized needs and would deny her a Free Appropriate Public Education (FAPE).  E.M. raises the following issues:

    (1)    The Hearing Officer's Credibility Determinations were not supported by Non-Testimonial Evidence;
    (2)    The Hearing Officer's Findings of Fact did not warrant deference;
    (3)    The Appropriate Subject Matter of a Due Process Hearing; and,
    (4)    Failure to Consider Peer-Reviewed Recommendations is a Denial of FAPE.

Based on the arguments and authorities presented below, E.M. is requesting the court grant her Motion for Judgment on the Record and find that LISD denied her a FAPE.

## STATEMENT OF UNDISPUTED FACTS

1.     On April 14, 2014, E.M. filed a due process complaint against the Lewisville Independent School District (LISD) with the Texas Education Agency.  The complaint was styled *E.M. b/n/f S.M. & C.S. vs. Lewisville Independent School District*, Docket 209-SE-0414.

2.     At the time the due process complaint was filed during the 2013-14 school year, E.M. was a nine year old student in the third grade at Independent Elementary School in the LISD. E.M. is eligible for special education and related services under the IDEA pursuant to 20 U.S.C. §1400, *et seq*, as amended, as a child with a disability.  VOL. I:0006; Findings of Fact (FOF) 4. At all relevant times, E.M. and her family have lived within the LISD jurisdiction.  VOL I:0006: FOF 1.  E.M. withdrew from the District at the beginning of the Spring semester in January 2015, at which time she began receiving private educational services. At the time of the administrative hearing, E.M. was a ten year old student receiving private ABA services, private speech therapy.

3.     Under the IDEA, E.M. is eligible for special education and related services as a student with Autism, a Speech Impairment, Orthopedic Impairment, and, in November 2013, Intellectual Disability.  VOL. II(a):657.  E.M. is also diagnosed with Childhood Apraxia of Speech (CAS) and after the due process complaint was filed, Dysarthia.  VOL. II(a):605; 0687.

4.     While enrolled in the District, E.M.'s placement was in a Communication class, a structured language acquisition classroom setting for students with communication issues.  VOL. II(a):0658.  In addition to speech, occupational, and physical therapy, E.M. received adaptive physical education, assistive technology and in-home parent training.  VOL. II(a):0657.  The District recommended a "Total Communication" approach while instructing E.M., which supports verbal language, sign language, and the use of an augmentative communication device.

5.     According to a November 2013 Full and Individual Evaluation (FIE), completed by LISD, E.M. was non-verbal.  VOL. II(a):0678.  She used gestures, sign language and Word Wizard on an iPhone to communicate with various speaking partners.  *Id.*  She initially used approximated signs or gestures to communicate, generally producing one to two word phrases. *Id.*  She did not attempt word approximations unless prompted.  *Id.*  Her vocalizations were only understood with support of non-linguistic context.  *Id.*  Her breathing pattern and phonation control appeared to support speech at that time.  *Id.*  Socially, E.M. communicated using sign and assistive technology with staff, instructors, and with prompts, general education peers. VOL. II(a):0681.  The FIE recommended a structured classroom schedule with minimal instructed time, staff to student ratio that allowed for high level of support, a Behavioral Intervention Plan, goals and objectives to increase socialization, direct Speech Therapy services, consult Physical Therapy, direct Occupational Therapy, among other recommendations.  VOL. II(a):0682-84.

6.     On November 21, 2013, the ARD committee convened to discuss E.M.'s annual ARD and review the FIE recently completed.  VOL. II(a):569.  Each evaluator discussed their portion of the FIE including the campus diagnostician, the occupational therapist, the campus interventionist, the Auditory Impaired teacher, the LSSP (Licensed Specialist in School Psychology), and the speech language pathologist (SLP).  VOL. II(a):0604-05.  The committee added an eligibility of intellectual disabled.  VOL. II(A):0604.  The SLP reviewed her portion of the evaluation.  VOL. II(a):0605.  It was reported E.M. was working on sound production only. *Id*.  Fluency could not be evaluated.  *Id*.  E.M. had an outside diagnosis of Childhood Apraxia Disorder (CAS) and the FIE supported that E.M. had some characteristics associated with CAS. *Id*.  The SLP reported that E.M. had obtained several target sounds but attempts to increase sound productions had met limited success.  *Id*.  Based on the evaluation, E.M. qualified as a

student with a Severe Language Impairment in Expressive, Receptive and Pragmatic speech.  *Id.*
The SLP informed the committee that the standardized scores reported should be viewed with
caution because standardization groups did not include students like E.M. *Id*.  The SLP who
administered the Assistive Technology (AT) reviewed that portion of the evaluation.  Id.  E.M.
used technology successfully.  Gestures and vocalizations would still be encouraged but E.M.
would need continued support to expand her use with technological devices.  *Id.*  The ARD
meeting ended and re-convened on December 17.  VOL. II(a):606.

7.      On December 17, 2013, the ARD committee re-convened to continue review of the
assessment.  VOL. II(a):0606.  The committee recommended Extended School Year (ESY)
services.  *Id.*  The Behavior Improvement Plan (BIP) was reviewed and accepted.  *Id*.  The
committee began to review the Autism Supplement. *Id.*; VOL II(a):0579 – 0583. E.M.'s mother
questioned the recommendations in regards to E.M.'s sign language needs.  VOL. II(a):0606.
The committee reviewed data that indicated that E.M. had not increased the use of her signs.  Id.
School members of the ARD committee believed that E.M. did not require sign language
interpretation in the classroom.  VOL. II(a):0607.  The committee agreed with E.M.'s mother
request that the SLP receive training in Apraxia.  *Id.* The committee reviewed the proposed IEP
goals, made a few corrections, and accepted the IEP goals.  *Id*.  The ARD committee, including
the parents, agreed to implement new academic IEPs.  Id.  The SLP would continue to work on
the speech goals agreed to in the last ARD meeting.  *Id.*  The classroom teacher would
implement the integrated speech goals, but the SLP would not.  *Id.*  The ARD committee agreed
to continue the ARD meeting in January.  *Id.*

8.      The ARD committee re-convened on January 15, 2014.  VOL. II(a):0608.  The
committee discussed different modes of communication and future functional communication

goals for E.M.  *Id.*  The committee reviewed goals previously agreed to and added language to allow E.M. to respond in any modality of communication.  *Id.* The SLP recommended several goals and explained that articulation goals were not recommended due to lack of progress with articulation skills. VOL. II(a):0609. Instead, she recommended integrative speech goals.  *Id.* The SLP further explained that E.M. made limited progress and was very prompt dependent.  *Id.*

9.    The ARD committee re-convened on February 3, 2014.   VOL. II(a):0610.   The discussion at this meeting centered around the speech goals.  *Id.*   E.M.'s mother requested the data that supports the recommendation to discontinue direct therapy of articulation goals.  *Id.* The SLP believed that the amount of time E.M. was out of the classroom for direct speech therapy was no longer appropriate. VOL. II(a):0611.  The SLP's recommendation was to support augmentative communication, based on American Speech and Hearing Association (ASHA) guidelines, and discontinue the articulation goals.  *Id.*   According to the SLP, the articulation goals had not been worked on in the classroom because the isolated sounds had not been mastered in speech therapy but the sounds had been addressed in the classroom as well as in therapy.  *Id.* E.M.'s mother disagreed with the Present Levels of Academic and Functional Performance (PLAAFP) for speech.  *Id.*  The meeting was to continue on February 26, 2014.  *Id.*

10.    The meeting was continued on March 21, 2014.  VOL. II(a):0612.  E.M.'s mother presented a PLAAFP statement to be added to the LISD's PLAAFP.  *Id.*   Because the ARD committee would not include her PLAAFP with their PLAAFP but instead included it as an attachment at the end of the document, E.M.'s mother believed she was denied input into the meeting. VOL. II(a):0612-0613.  The next recommendation was to provide speech therapy in a group setting, instead of one-on-one. VOL. II(a): 0613.  This contradicted the requirement that E.M. acquired skills in a 1:1 or 1:3 teacher to student to teacher ratio, as found in the autism

supplement.  *Id*.: VOL. II(a):0582.  E.M.'s mother requested LISD provide research articles to support their position.  VOL. II(a):0613.  LISD claimed decisions were based on evaluation, observation, PLAAFP and speech language guidelines.  VOL. II(a):0613.  According to the SLP, LISD would focus on language development and communication in the educational setting and continue to work on E.M.'s communication goals within the educational setting.  *Id*.  LISD members agreed the focus was on E.M.'s strength.  *Id*.  When E.M.'s father shared ASHA guidelines and treatment recommendations with the ARD committee.  *Id*.  School members pointed out that E.M. is a child with multiple disabilities and stated that they observed all ASHA guidelines.  *Id*.  After reviewing a letter from Dr. Carbone, LISD continued to maintain that their goal was to focus on E.M.'s demonstrated strengths and support her communications skills in the educational setting.  *Id.*  Upon E.M.'s mother request, the AT SLP reviewed technology that would be provided to E.M., the ongoing need for training for LISD staff and parents, and monitoring and modifying vocabulary on the voice output device.  VOL. II(a):0614.  Although E.M.'s parents previously agreed with the portion of the FIE related to the Speech Language Assessment, they now disagreed and request an independent education evaluation at public expense.  *Id*.  This ARD meeting ended in disagreement and the ARD committee would re-convene in ten days.  *Id.*

11.     The ARD committee re-convened on April 4, 2014. VOL. II(a):0615.  In response to E.M.'s mother request for clarification of direct services and how many students were served during direct services, it was explained that direct services can be provided in a small group setting and the AU supplement addressed staff to student ratio.  *Id*.  One of the OT goals was revised and changes were made to the PLAAFP and the BIP.  VOL. II(a):0615-16.  Despite these

agreements, E.M.'s parents continued to disagree over the provision of speech language therapy. VOL. II(a):0616.

12.     On April 14, 2014, E.M.'s parents filed a due process complaint on with the Texas Education Agency.  VOL. I:0017-0036.

13.     E.M.'s parents requested an independent speech evaluation at public expense on February 20, 2014.  VOL. III: 3096.  On February 25, 2014, LISD granted E.M.'s parents request for an Independent Educational Evaluation (IEE) at public expense in Speech. VOL. III:3099.  Due to contractual problems, the IEE was finally completed in August 2015 by Jenny McGlothlin, Speech Language Pathologist at UT Dallas-Callier Center. VOL. II(a):0685-0692.  Ms. McGlothlin's vita is found at VOL. II(a):0693-0697.

14.     Based on her evaluation of E.M., Ms. McGlothlin found the prognosis for E.M. to produce a core verbal vocabulary of 10-15 single words with high intelligibility to an unfamiliar listener was good, with appropriate intervention and given her progress in therapy over the last year.  VOL. II(a):0690.  The prognosis for production of intelligible short practiced phrases was fair.  *Id*.  The prognosis for speech as a primary mode of communication was poor given the severity of her neurologically-based disorders.  *Id*.  The prognosis for improved total communication via speech production, improved augmentative communication skills (including typing and use of symbols/pictures), more precise sign language skills, and improved spontaneous repair strategies when communication breaks down was good with appropriate intervention and support at school throughout the day.  *Id*.

15.     Ms. McGlothlin recommended the following:

    1.   continuing speech-language therapy through LISD, targeting total communication skills via specific and ongoing training with an augmentative communication specialist using a dedicated device and the LAMP system;

2. continued provision of sign language interpreter until E.M. is competently and quickly communicating via her SGD (speech-generating device) and then transition to a less skilled professional;

3. continued support of recently improved speech sound production skills through modeling of core vocabulary and requests for a verbal attempt of words that E.M. types or signs during structured activities to include intense and frequent individual therapy for children with CAS, which is supported by research (ASHA) and provide multi-modal cueing to include auditory cues, visual cues, verbal cues, and tactile and rhythmic cues;

4. provide support for respiratory, phonatory, and articulatory systems through attention to adequate postural position (no slouching when seated), prompting to take a deep breath prior to speaking and over-articulation of speech attempts, continue outside therapy services to facilitate improvement in above areas as well as gross and fine motor skills;

5. Continue outside therapy to facilitate improvement in the above areas as well as gross and fine motor skills;

6. Possible Goals of Treatment:
   - Slowing the rat of speech
   - Improving the breath support so the person can speak more loudly
   - Strengthening muscles
   - Increasing mouth, tongue, and lip movement
   - Improving articulation so that speech is more clear
   - Teaching caregivers, family members, and teachers strategies to better communicate with the person with dysarthria
   - In severe cases, learning to use alternative means of communication (e.g. simple gestures, alphabet boards, or electronic or computer-based equipment)
   VOL. II(b):0690-92.

16.    An ARD committee meeting convened on September 21, 2014 to discuss the results of the IEE.   VOL. II(b):0863-76.  The independent SLP who conducted the IEE reviewed her evaluation results.  VOL. II(b):0867.  Results indicated that E.M. has to use motor planning, such as LAMP strategies, and executive skills to produce sounds.  *Id*.  The independent SLP recommended a total communication system, supported by cueing and prompting to be the focus of therapy with E.M.  *Id*.; VOL. IV(a):3643.  She also recommended whole word production and

that E.M. continue to be supported with sign language while she transitions to the LAMP system. VOL. II(b): 0867.  She did not recommend expanding signs with E.M. as that would not be the best use of time in the classroom. VOL. II(b):0867.   The independent SLP reviewed her recommendation that E.M continue to receive private speech therapy for sound production and the school continue to support vocal communication with core vocabulary and prompting for word productions for known words.  *Id.*  One of E.M.'s private speech therapists explained that E.M. requires various levels of cueing including tactile and visual to be successful with the production of sounds and words in direct speech therapy.  *Id.*  Her private BCBA recommended data collection to determine the level of progress regarding articulation. *Id.* The LISD Executive Director explained the area of disagreement between LISD and the parents was when to move on and focus on the most effective way to maximize E.M.'s learning in the educational setting. VOL. II(b):0868.  LISD claimed they would continue to provide speech services to support language and communication development but according to E.M.'s private BCBA, the disagreement hinged on LISD discontinuing articulation speech therapy goals.  *Id.*  The three speech therapy goals proposed at this ARD were all special education teacher integrated which mean that E.M. would no longer have direct speech therapy but the special education teacher would "integrate" the goals into the classroom routine.  VOL. II(b):0866.  Thus, the speech therapist would no longer provide any direct articulation therapy to E.M.  LISD did agree to add one goal to produce vocal approximations of 8 high frequency words but the LISD SLP would not collect data on the goal.  Because of the disagreement over the high frequency words, the parents requested more time to review the goal and reconvene at a later time.  *Id.*

## STANDARD OF REVIEW IN THE DISTRICT COURT

According to 20 U.S.C. §1415(i)(2)(C), the federal district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  "Under the IDEA, a federal district court's review of a state hearing officer's decision is 'virtually de novo.'" *Teague Indep. Sch. Dist. v. Todd L*., 999 F.2d 127, 131 (5th Cir. 1993); *see also Caldwell Indep. Sch. Dist. v. L.P.,* 994 F.Supp.2d 811 (2012), *affirmed.*.  "Although the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F*., 118 F.3d 245, 252 (5th Cir. 1997).  Thus, under the IDEA, the district court's "review" of the hearing officer's decision is "virtually de novo."  *Id.*, see also *Caldwell Indep. Sch. Dist. v. L.P.,* 994 F.Supp.2d 811 (2012), *affirmed* No. 12-51105 (5th Cir. 2014).   What the Fifth Circuit has described as a virtually *de novo* review is still limited by deference to the hearing officer.  *Endrew F*., 2017 WL 1066260 at \*3.  However, the IDEA "does not state that the district court must defer to the [the IHO's] findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts."  *Teague*, 999 F.2d at 131.  Even though district courts "must give considerable weight to any credibility determinations made by the first hearing officer; but an "IHO's credibility findings do not deserve due weight if non-testimonial, extrinsic evidence in the record justifies a contrary conclusion or if the record read in its entirety compels a contrary conclusion."  *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995), *cert. denied*, 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed. 2d 544 (1996).  are required to give "due weight" to the decisions of the hearing officers, they must nevertheless "independently evaluate … the

testimony of witnesses [and] the evidence – both of which the court must independently evaluate…" *Heather S. v. State of Wis*., 125 F.3d 1045, 1053 (7th Cir. 1997).  The Third Circuit concluded "…that a district court should give 'due weight' to the appeals panel's decision when it reverses the hearing officer's conclusions of law, inferences from proven facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision." *Carlisle*, 62 F.3d at 529.  However, the IDEA "does not state that the district court must defer to the [the IHO's] findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts." *Teague Indep. Sch. Dist*., 999 F.2d at 131.  Thus, an IHO's credibility findings do not deserve due weight if non-testimonial extrinsic evidence in the record justifies a contrary conclusion or if the record read in its entirety compels a contrary conclusion." *Stanley v. M.S.D. of Southwest Allen County Schools*, 628 F.Supp.2d 902, 923 (N.D. Indiana, 2008).  Ultimately, the degree of deference to give the hearing officer's determination is a matter of district court discretion.  *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1474 (9th Cir. 1993).  "When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings.  The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995).  The Fifth Circuit does not require deference if the hearing officer incorrectly assessed the facts but it does not appear to have further clarified the level of deference due.  *Id.*, *Houston Indep. Sch. Dist. v. V.P.*, 582 F.3d 576, 583 (5th Cir. 2009)

### HEARING OFFICER' CREDIBILITY DETERMINATION OF EXPERTS ARE NOT SUPPORTED BY NON-TESTIMONIAL EVIDENCE

In his decision, the IHO specifically stated that "[t]he crucial conclusions here are based on credibility of expert witnesses."  VOL. I:0013.  Although he stated the expert testimony about

what was appropriate for E.M. was conflicting, but then found the "credible testimony of experts for the district's proposed plans for the student."  He then stated the testimony of experts for the district supports the district's proposed plans for the student while at school, the district conducted appropriate evaluations for the student, the district provided independent evaluation of the student, district personnel conferred with the parents and private evaluators and providers for the student, and the district provided and now offers a free appropriate public education for the student."  VOL. I:0012-13.

Although a district court has discretion to the degree of deference it gives an IHO's decision, nevertheless, "[i]f the views of school personnel regarding an appropriate educational placement for a disabled child were conclusive, then administrative hearings conducted by an impartial decisionmaker would be unnecessary." *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1474-1476 (9th Cir. 1993).  An "ALJ's determination that witnesses who had opinions contrary to the District's position were less credible was improper because the District's position is the root of the controversy between the parties.  Finding witnesses more credible simply because they agree with the District's position constitutes a serious error in reasoning." *K.S. v. Fremont Unified Sch. Dist*, 545 F. SUPP.2d 995 (DC ND California, 2008).  In *K.S. v. Fremont Unified Sch. Dist.*, the court found

> "Here, the ALJ's determination that witnesses who had opinions contrary to the District's position were less credible was improper because the District's position is the root of the controversy between the parties.  Finding witnesses more credible simply because they agree with the District's position constitutes a serious error in reasoning.
>
> Plaintiff further contends, and the Court agrees, that the ALJ's reasoning that the lack of extensive personal contact between parents' witnesses and plaintiff made their analysis of the record less credible, was arbitrary and capricious because it applied a separate and higher standard to plaintiffs witnesses. *Common sense*

*dictates that witnesses on both sides should be held to the same standards.* Plaintiff points out that Dr. Clare, the District witness whom the ALJ found most credible, had no contact whatsoever with plaintiff and based her analysis entirely on the school record. Plaintiff asserts, and the Court agrees for reasons stated above, that the ALJ's rationalization for this inconsistency – that Dr. Clare's analysis was consistent with the record created by the District and the opinions of other District witnesses – is illegitimate. As plaintiff states, 'if such reasoning was a legitimate basis for a credibility determination, then no student would ever be able to prevail against a school district because school districts would merely hire experts to corroborate the school district's version.'…*Furthermore, district staff will nearly always have had substantially more personal interaction with students than any independent evaluator will have, and the ALJ's rationale would essentially 'doom every student case*.'"

Finally, "the ALJ's negative credibility determination of plaintiffs father based on his role as advocate for his daughter was inappropriate because all parents who take part in the IEP process are advocates for their child, and under the IDEA, are rightly so….The Court agrees with plaintiff and further notes that the ALJ's determination was arbitrary and capricious because he did not apply the same standard equally to the District's witnesses, who were advocating for the Districts program. All of the District's witnesses aside from Dr. Clare were part of the team that either developed or implemented the IEPs, or both, and had an interest in showing that their efforts as educators were effective. In other words, these witnesses were advocating on behalf of the District, but the ALJ did not find them less credible on this ground."

*K.S. v. Fremont Unified Sch. Dist*, 545 F. SUPP.2d 995 (DC ND California, 2008) (Emphasis added.)

E.M. complains that the IHO's credibility determinations of the witnesses that testified in at the due process hearing were improper. The IHO applied different standards to the parties' witnesses. He based his credibility determinations of Petitioner's witnesses on incorrect conclusions. He ignored the testimony of E.M.'s private speech providers and her private Board Certified Behavior Analyst (BCBA) who have worked with E.M. extensively for many years. He gave credence to the testimony of a District witness (Bobbye Records) who supported the

LISD's position even though Ms. Records had not even reviewed all of Respondent's exhibits (only Exhibits 1-30 of 39), did not review Petitioner's exhibits, viewed some video snippets and a video from 2012.  VOL. IV (c):4179.  Ms. Records never met E.M. or observed her.  VOL. IV(c):4224.  Ms. Records did not consult or speak with any of the District's SLP who worked with E.M.  VOL. IV(c):4232.  Nor did Ms. Records consult or speak with any of E.M.'s private therapists.  VOL. IV(c):4221.  Ms. Records never observed E.M. in any setting and only viewed videos snippets of E.M.'s private speech therapy. VOL. IV(c): 4179; 4232.  Ms. Records never saw any of the goals the private therapists were working on with E.M.  VOL. IV(c):4252.  Ms. Records did not remember reviewing any of the private Assistive Technology progress reports.  VOL. IV(c):4233.  She was the only District witness that produced her vita.  VOL. III:3270.  Ms. Records limited knowledge of E.M. was watching a few video snippets recorded by E.M.'s mother of her private speech therapy sessions and of a 2012 video of an evaluation by a BCBA.  The IHO's reliance on her testimony was arbitrary and capricious and should receive no deference.

In addition to Ms. Records, the District designated two other witnesses as experts.  LISD did not offer a vita for either Laura Reed or Traci White.  Laura Reed is LISD's assistive technology facilitator and a speech supervisor.  VOL. IV(c):4006.  Her involvement with E.M. in 2011 and 2013 was to look at possible augmentative communication solutions for her.  VOL. IV(c):4007; 4026.  She did not provide E.M. speech therapy.  ARD documents show that other than the time she spent with E.M. evaluating her, Reed had limited, if any, contact with E.M. *See* VOL. II(a):0527 and 0602 which show no time scheduled for assistive technology services in 2012-13 or in 2013-14 school years.  Thus, the time Reed spent with E.M. revolved around the 2011 FIE and the 2013 FIE looking at augmentative communication solutions, not speech

therapy.  Therefore, Reed had limited physical contact time with E.M. as a LISD assistive technology facilitator and no time with E.M. as her speech therapist.

Traci White, the LISD lead speech language pathologist, was also designated as an expert.  VOL. IV(d):4392.  She had no contact with E.M. VOL. IV(d): 4292-93.  She played a supervisor's role over others involved with E.M.  *Id.*  She reviewed a video tape of E.M. being evaluated by Dr. Carbone which occurred in July 2012 and other video snippets of E.M.'s private therapy sessions.  She did not attend the ARD meetings in question that began in November 2013 and concluded in April 2104.  VOL. II(a):0618.  She attended an ARD meeting held for E.M. on September 24, 2014 to review the IEE, five months after E.M.'s parents filed a due process complaint.  VOL II(b):0869-0870.  Although she testified that she observed Brandon over a year and a half providing speech therapy to E.M. but could not account for how many times she observed her, when she observed her and for how long she observed her.  VOL. IV(d):4447-48.  She conceded she did not take any notes nor was her presence noted on any of Brandon's therapy notes.  VOL. IV(d):4448.

In contrast, the independent evaluator the IHO discredited in FOFs No. 23 and 24 actually evaluated E.M., reviewed school records, consulted with E.M.'s private speech therapists and interviewed E.M.'s parents.  VOL. II(a):0693; VOL. II(a):0685-092

FINDING OF FACT NO. 23:  In FOF No. 23, the IHO stated that an SLP for the District testified credibly that E.M. may develop a core vocabulary of ten to fifteen words "but that such acquisition of vocabulary could take as much as fifteen years."  This finding was in response to the independent speech therapist evaluator's prognosis.  VOL. II(a):0690.  Specifically, the independent speech therapist evaluator stated "Given her progress in therapy over the last year, the prognosis for [E.M.] to produce a core verbal vocabulary of 10-15 single words with high

intelligibility to an unfamiliar listener is good, with appropriate intervention."  The independent speech therapist explained, "So when I evaluated E., I felt like her prognosis for producing some core vocabulary words, which means words that she can produce in a way that's understandable to other people, that are going to be high-frequency words, things that she needs to say on a general daily basis, you know, very good, solid words for wants and needs, that that was good with appropriate intervention given what I saw in the evaluation."  VOL. IV(a):3584.  Clearly, the independent SLP made a recommendation based on her evaluation of E.M., her interaction with E.M. and all the information she reviewed and consultations with her private providers. The District expert's opinion was based solely on records provided to her by the District.  She had no contact with E.M., had not evaluate E.M., nor did she have any contact with anybody that worked with E.M.  Thus, clearly, the IHO's reasoning is flawed.  Finding the District expert's testimony credible when her testimony is based solely on records provided to her by the District is in error.

### HEARING OFFICER'S FINDINGS OF FACT DO NOT <u>WARRANT DEFERENCE</u>

In *Teague Independent School District v. Todd L.*, the Fifth Circuit adopted the view that the district court's review of the hearing officer's decision is virtually de novo.  999 F.2d 127 (5th Cir. 1993).  "Although the district court is directed by statute to give the hearing officer's findings "due weight," *Rowley*, 458 U.S. at 206, 120 S.Ct. at 3051, the statute does not state that the district court must defer to those findings when its own review of the evidence indicates that hearing officer erroneously assessed the facts or erroneously applied the law to the facts." *Teague Indep. Sch. Dist.*, 999 F.2d at 131.  Such is the case here.  The IHO gave weight to testimony by school witnesses that was not supported by extrinsic, non-testimonial evidence in

24

the record.  Below are the Findings of Fact where the IHO erroneously assessed the facts which undermines his findings of fact and do not deserve deference due a hearing officer's decision.

**FINDING OF FACT NO. 15**.  In FOF No. 15, the IHO makes a broad statement that is in error. He states that the parents want sign language to be utilized as a means of communication for the student but the student's cerebral palsy[1] inhibits the ability to produce accepted signs of American Sign Language.  VOL. I:009.  However, the parents along with the school district personnel are recommending total communication which is defined by using speech, sign and augmentative communication device.  It is undisputed that the District and the parents agree total communication should be E.M.'s preferred mode of communication.  When LISD assessed E.M.'s language functioning in May 2011, her parents provided a list of 145 signs E.M. was familiar with.  VOL. II(a):0654.  A LISD SLP assessed the precision of E.M.'s sign formation and divided words into three charts by signs E.M. signed accurately without modeling (approximately 35 signs), signs she produced approximations without modeling (approximately 100 signs), and signs she would not produce unless prompted and given model (approximately 8 signs).  VOL. II(a):0654-55.

**FINDING OF FACT NO. 16**.  In FOF No. 16, the IHO states "Outside evaluation by Our Children's House at Baylor – Frisco in February 2013 showed the student's use of an AAC was more likely to provide functional language for the student than further work on articulation.  The evaluation recommended the use of an AAC for the student during ST – as the district had recommended. [VOL. III:3212; VOL. IV(a):3516; VOL. IV(d):4409 & VOL. IV(d): 4439]." VOL I:009.  The only correct fact in FOF No. 16 is that the document at VOL. III:3212, is a speech-language initial evaluation by Our Children's House at Baylor-Frisco (OCH), dated

---

[11] E.M. has a mild form of cerebral palsy.  VOL. II(a):0572.

February 19, 2013.   At that time, the February 2013 speech-language in initial evaluation conducted by OCH was recommending speech therapy intervention.   VOL. IV(d):4407.   Further, in an email dated May 21, 2013, the therapists at OCH continued to recommend continuing speech therapy.   *Id.*   They would be willing to focus on verbal sounds or production of verbal sounds *for four to six months before recommending aug comm evaluation at their clinic*.   *Id*. Thus, in May 2013, the therapists at OCH had yet to conduct an augmentative communication evaluation.   It was not until six months later – in November 2013 – that the focus of E.M.'s therapy was on the functional use of Alternative Augmentative Communication (AAC) to communicate.   Further, at that time the district did not recommended the use of an AAC device or propose any goals until November 2014 despite recommendations in the District's November 2013 FIE that E.M. utilize a high technology device.   VOL. II(a):0679.   E.M. had been working on an AT device at OCH for over a year before the District proposed an IEP goal to address use of an AT device at the September 24, 2014 ARD meeting. VOL. III:3349. The AT goals were to use prediction strategies and to turn sound on, volume up/down on her communication device. VOL. II(b):0866.    Compare the level of expectation from the two LISD goals and what she was capable of doing at her private speech therapy sessions.   At OCH, she "demonstrate[d] excellent ability to perform all of the user functions of the [LAMP] program (i.e. locating the application and opening it, identifying specific icons, using the message window, using the 'clear' function and navigating to 2-3 layered pages."   VOL. III:3349.   "She can use her AAC program to access specific language to request, tell about herself and answer simple questions.   Her speech therapy at OCH is focused on functional communication goals utilizing a total communication approach that combines use verbal approximations, nonverbal language, signs, typed words and the icon-based LAMP app on an ipad mini in order to aid [E.M.]'s language use and development."   *Id.*

26

Short term goals to use verbs to describe actions in simple present tense with 80% accuracy over 3 sessions and use verbs to describe actions in present-progressive with 80% accuracy over 3 sessions had been met.  *Id*.  Examples of additional short term goals included will initiate interaction with communication partner via greeting, comment, exclamatory word at least 10 times per session over 3 sessions, will answer simple 'wh'- questions approximately using AAC program in 80% of opportunities over 3 sessions.  *Id*.  Comparing the complexity of the two goals proposed by LISD at the September 24, 2014 ARD meeting with the eight goals E.M. was working on in private speech therapy, clearly the two goals proposed by LISD were at a much lower skill level then she was demonstrating on the LAMP app on her ipad mini, her preferred AAC device, at her private speech therapy sessions.  The PLAAFPs included at the September 24, 2014 ARD included one PLAAFP that addressed E.M.'s abilities to use an AAC device which was type words on her communication device.  Vol. II(b):0865.  Without further data, LISD developed the two proposed goals to address her AAC goals.  Clearly, they were inappropriate and did not reflect E.M.'s capabilities.

*FINDING OF FACT NO. 17.*  It is true that the student has used an iTouch, an iPhone and an iPad with different applications for communication at school – all provided by her parents.  The student uses LAMP Words for Life (an application for teaching vocabulary used for communication) at home and in private therapy. The District SLP (Brandon) did not have her own iPad with the LAMP program and had to use E.M.'s parent provided iPad in her speech therapy sessions.  VOL. IV(a):3444. Brandon was not trained on the LAMP program until six months after she began providing E.M. speech therapy.  VOL. IV(a):3444.  According to the District's Assistive Technology Facilitator, even though the ARD committee agreed E.M. needed

27

an iPad mini with the LAMP Words for Life application because of the provisions of stay-put, the District did not provide it to her.  VOL. IV(c):4034.

Regarding stay-put, during the pendency of any proceedings, unless the local education agency and the parents otherwise agree, "the child shall remain in the then-current educational placement of the child…".  20 U.S.C. §1415(j).  At the December 17, 2013 ARD meeting E.M.'s mother agreed to implement all of the IEP goals and objectives except for the speech language goals proposed at the November 21, 2013 ARD.  VOL. II(a):0607; VOL. II(d):1552.  The SLP was to continue working on speech language goals adopted at the November 30, 2012 ARD meeting.  Even though E.M.'s teachers had been working on new IEP goals and objectives for close to four months, when E.M.'s parents filed the due process complaint, it was the District's counsel that refused to implement any of the goals and objectives E.M.'s parents had agreed to on December 17, 2013 and her teachers had implemented.  VOL. IV(c):4148-4148.  E.M.'s teacher and her related service providers began to work on goals and objectives from the 2012-2013 school year, many of which E.M. had already mastered.  VOL. II(d):1552; VOL. IV(c):4149.  When her mother received E.M.'s first progress report in the Fall of 2014, according to her mother's analysis, E.M. regressed on 40 percent of her previously mastered goals.  VOL. IV(c):4150.  It was at that point that her parents decided that the District was no longer interested in collaborating with them, and decided to educate E.M. privately.

It is true E.M. preferred her iPad or iPhone because she wanted to listen to songs.  VOL. IV(d):4378. Interestingly, when commenting on one of the videos that EM was working with her private speech therapist, the District's lead speech therapist criticized E.M. private speech therapist for not "celebrating" spontaneous communication when E.M. requested her iPad in the middle of a private speech therapy session, without understanding that E.M. was inappropriately

requesting Ms. Sekhon's iPad which is loaded with games as a reward for working. VOL. IV(d):3799: 4431. That's why her private speech therapist would ignore E.M.'s requests.

**FINDING OF FACT NO. 19**:  FOF No. 19 was the reason E.M.'s parents filed a due process complaint.  The LISD SLPs believed that continuing to focus on articulation in speech therapy was not an efficient way to increase E.M.'s communication skills.  According to Heather Brandon (Brandon), the LISD SLP who began working with E.M. in September 2013, E.M. showed very little progress in working on her articulation goals and, combined with results on the speech evaluation portion of the FIE, Brandon recommended at an Admission, Review and Dismissal (ARD) committee meeting held on November 21, 2013 that E.M. should no longer work on articulation in speech therapy at school.  VOL. II(a): 0591.  Her parents, along with her private speech therapists and the independent speech therapist who evaluated E.M. disagreed with discontinuing working on articulation in speech therapy.  The IHO found the LISD's speech therapists' recommendation more credible than the recommendation from E.M.'s two private speech therapists and the independent speech therapist evaluator to continue working on articulation at school.

The IHO's finding that LISD's recommendation to terminate articulation was more credible than the recommendation from E.M.'s private speech therapists and the independent SLP to continue working on articulation at school is not supported by the evidence in the records.  First, the LISD SLPs who made this recommendation had limited contact, if any, contact with E.M.  On November 21, 2013, the date of E.M.'s annual ARD meeting, LISD SLP Brandon had worked with E.M. for less than 3 months (September – November 21, 2013) and at least one month of that time was spent administering the evaluations, not in speech therapy.  Any LISD SLPs that provided E.M. speech therapy for longer than 3 months was not included in this

ARD meeting, discussion or its recommendations.  LISD SLP Laura Reed was present at this ARD meeting but she provided E.M. A.T. services.  LISD SLP Kellen Brown was present as Brandon's supervisor.  The LISD lead SLP, Traci White, never provided speech therapy to E.M. nor did she participate in the Nov. 21, 2013 – April 3, 2014 ARD meetings at issue. VOL.IV(d):4449; VOL. II(a):0618.

Of all the SLPs that worked with E.M., LISD SLP Brandon had the least experience.  In September 2013, when Brandon began working with E.M., she had just begun her clinical fellowship year as a SLP (an intern who has to be supervised for 36 weeks).[2]  VOL. IV(a):3429. During the 2013-14 school year, Brandon worked with 45 to 55 students.  *Id*.  E.M was the first student Brandon worked with that had autism.  VOL. IV(a): 3435.  E.M was the first student Brandon worked with that had autism and apraxia.  VOL. IV(a): 3435-36.  The first Assistive Technology (AT) evaluation Brandon conducted was for E.M. VOL. IV(a):3431.   Brandon never spoke to the LISD SLP that worked with E.M. during the 2012-13 school year.  VOL. IV(a):3436.   Brandon never spoke to the LISD's interventionist regarding E.M.'s behavior issues.  VOL. IV(a):3437.  Brandon never reviewed E.M.'s behavior intervention plan (BIP). VOL. IV(a):3437. Brandon participated in E.M.'s full and individual evaluation but all standardized assessments administered had to be interpreted with caution because E.M.'s combination of disabilities was not represented in the normative sample and alterations were made to recommended administration guidelines.  VOL. II (a):0664 – 0665.

Until Brandon began working with E.M. in September 2013, speech therapy notes from the LISD speech therapists that previously worked with E.M. reported E.M. was making progress to mastery of the goal.  In fact, LISD Speech Language Pathologist O'Malley worked

---

[2] Even a year later, at the ARD held on September 24, 2014, Brandon was still identifying herself as an Intern.  See VOL. II(b):0869.

with E.M. on the same articulation goal as late as July of 2013, two months before Brandon began providing E.M. speech therapy.   Examples are found at VOL. II (b): 0900 – 0908. O'Malley reported E.M. was making progress on the same goal Brandon reported on September 9, 2013 that E.M. was making little to no progress on.   VOL. II(b):0955.   O'Malley, an experienced speech language pathologist with the LISD, had worked with E.M. since June 2011 while Brandon, a speech language pathologist intern, had been working with E.M. less than 2 weeks when Brandon reported E.M. stopped making progress, even though both speech language pathologists were working on the same articulation goal.   Brandon testified that the shift from verbal speech to an AT device was based on E.M.'s inconsistent progress and lack of motivation. VOL. IV(a):3473.   However, a review of the Weekly Speech Communication Form completed by Brandon indicates that from September 2013 to June 6, 2014, there was only one time that Brandon wrote that E.M. was a little tired today during the week of May 12 – 16, 2014.   VOL. II(b):1029.   Every entry, other than that one, lists E.M.'s participation as good engagement, good participation, great engagement or great participation.   VOL. II(b):1004 – 33.   Brandon provided E.M. speech therapy 4 times a week.

***FINDING OF FACT NO. 22***.   In FOF No. 22, the evaluator who conducted the independent educational evaluation did diagnose E.M. with Dysarthria, which was described as a motor speech disorder characterized by muscle weakness and poor coordination for speech production was incorrect.   VOL. III:3166.   The evaluator recommended support for respiratory, phonatory, and articulatory systems through attention to adequate postural positioning (no slouching when seated), use of prompting to take a deep breath prior to speaking, and over-articulation of speech attempts to facilitated more precise and strong articulatory contacts.   VOL. III:3170.

The IHO incorrectly stated the evaluator's recommendations.  He falsely claimed that the evaluator did not recommend continued direct speech therapy services to acquire new articulation sounds but instead recommended a goal of producing word approximations with sounds already within the abilities of the student.  The private evaluator actually recommended intense and frequent individual therapy which is supported by research for students with apraxia. VOL. III:3169.  The IHO only correctly stated one of the evaluator recommendations – continued training with the AAC and the LAMP program.  Actually, the evaluator who conducted the independent educational evaluation recommended continuing speech-language therapy through the District, targeting total communication including working with the LAMP system, continued provision of a sign language interpreter until E.M. is competently and quickly communicating using a speech generating device, continue support of speech sound production skills through the modeling of core vocabulary and requests for a verbal attempt of words that E.M. either types or signs during structured activities, intense and frequent individual therapy, provide multi-modal cuing, provide support for respiratory phonatory and articulatory systems through attention to adequate postural positioning; and, continue outside therapy services. VOL. III: 3169-3170.  According to the independent evaluator, "[t]he prognosis for improved total communication via speech production, improved augmentative communication skills (including typing and use of symbols/pictures), more precise sign language skills, and improved spontaneous repair strategies when communication breaks down is good with appropriate intervention and support at school throughout the day."  VOL. III:3169.  E.M.'s signing abilities supported LISD 2011 recommendations that E.M.'s intervention focused on utilizing vocalization, sign language, and augmentative communication to assist in the development of E.M.'s full communication abilities.  VOL. II(a):0655.  Two years later, the LISD FIE did not

recommend supporting E.M.'s sign language even though it was reported she was currently communicating using sign approximation, voice output communication aide, and gestures. VOL. II(a):0665; 0683.  Her performance on a receptive sign language evaluation indicated she demonstrated 81% accuracy in her receptive sign skills and correctly identified 168/208 pictures after the sign was given without any verbal prompting.  VOL. II(a):0663-64.

*FINDING OF FACT NO. 23*.  In FOF No. 23, the IHO states that "[a]n SLP (Speech Language Pathologist) for the district testified credibly that the student may develop a core vocabulary of ten to fifteen words but that such acquisition of vocabulary could take as much as fifteen years. [VOL. III: 3164; VOL. IV(c):4209-4210]."  The SLP referred to is Bobbye Records, the District's paid expert.  As to her credibility, prior to her testimony, as noted above, Ms. Records had not even reviewed all of Respondent's exhibits (only Exhibits 1-30 of 39), did not review Petitioner's exhibits, viewed some video snippets and a video from 2012.  VOL. IV (c):4179. Ms. Records never met E.M. or observed her.  VOL. IV(c):4224.  Ms. Records did not consult or speak with any of the District's SLP who worked with E.M.  VOL. IV(c):4232.  Nor did Ms. Records consult or speak with any of E.M.'s private therapists.  VOL. IV(c):4221.  Ms. Records never observed E.M. in any setting and only viewed videos snippets of E.M.'s private speech therapy. VOL. IV(c): 4179; 4232.  Ms. Records never saw any of the goals the private therapists were working on with E.M.  VOL. IV(c):4252.  Ms. Records did not remember reviewing any of the private Assistive Technology progress reports.  VOL. IV(c):4233.  She was the only District witness that produced her vita.  VOL. III:3270.

In contrast to Ms. Records opinion, the independent evaluator, who actually evaluated E.M., spoke with her private speech therapists, viewed school records, reviewed videos and spoke with her parents, opined that with appropriate intervention, given E.M.'s progress in

speech therapy over the last year, the prognosis for E.M. to produce a core verbal vocabulary of 10-15 single words with high intelligibility to an unfamiliar listener was good.[3]  VOL. III:3169.

***FINDING OF FACT NO. 24***.  In FOF NO. 24, the IHO stated that the evaluator (independent SLP) was not credible because she "believed that sign language was a primary mode of communication for the student. "  VOL. I:0010.   The IHO then discredits the independent evaluator's credibility on this misinformation.  As noted above, the independent evaluator did not believe sign language was a primary mode of communication.  VOL. III:3169.It appears this mis-assumption is founded on LISD Lead SLP Traci White's testimony.   Specifically, in response to the question "And what do you recall as to why the other members of the ARD committee did not agree with the recommendation regarding a sign language interpreter or facilitator, LISD's Lead Speech Therapist Traci White responded, "As I understood Ms. McGlothlin in her recommendation, she indicated that the support with a sign language interpreter, she recognized it as being one of her primary modes of communication; and felt that until other modes were strong enough for her to communicate, that she wanted to make sure that she had a sign language facilitator or interpreter available for access for all of her curriculum within her educational environment."  VOL. IV(d):4396.  However, a review of the independent SLP's Report of Speech Evaluation does not support this assumption.  VOL. II(a):0690.  In her report, the independent SLP specifically stated, "The prognosis for speech as primary mode of communication, however, is poor given the severity of her neurologically-based disorders."  VOL. II(a):0690.  There is no rational or supportable reason why the IHO relied on the District expert's testimony interpreting the Independent SLP's Report of Speech Evaluation instead of

---

[3] Given the prolonged contract approval process, the contract for the IEE was not approved until the summertime although E.M.'s parents requested the IEE in February 2014.  Thus, the private evaluator did not have access to E.M.'s school teachers or speech therapist.  VOL. III:3094-95.

looking at the Report of Speech Evaluation.  The evidence is clear the Independent SLP did **not** believe that sign language was a primary mode of communication for E.M.   The basis for the IHO's credibility determination is false and is a serious error.

*FINDING OF FACT NO. 25.*  The IHO claims that on the recommendation of the independent SLP, LISD agreed to include some goals for producing intelligible oral communication of high frequency works with the use of the AAC. He misstates what occurred at the September 24, 2014 ARD meeting.  At the September 24, 2014 ARD, LISD agreed to add one goal out of three proposed speech therapy goals to focus on responding to a verbal prompt with vocal approximations of high frequency words.  VOL. II(b):0866.  The classroom teacher would be collecting data, not the speech therapist, because it was an integrated goal.  The hearing officer claimed this was supported by "credible" opinions from LISD.  First, it was one goal, not some goals that did not include the use of her AAC device.  The IHO relied on SLP Brandon's opinion, the inexperienced intern, and Records' opinion which was based solely on a review of records.  VOL. IV(c):4213.  The IHO's credibility determinations are faulty.  Had either Brandon or Records actually reviewed all the records, they would have seen that E.M. had long ago mastered the two proposed goals addressing the use of the AAC in her private speech therapy sessions.  The second of three goals was to use word prediction strategies on her communication device to tack ten actions with 2 word phrases for 3 consecutive first trial probes.  Vol. II(b):0866.  The third goal was to reactivate the functions on her communication device such as sound on, volume up/down.  In response to the appropriateness of the first goal targeting high frequency words, E.M. had been working on a list of approximately 75 target words for vocal speech with her private speech therapist since November 20, 2013.  VOL. II(b):0827-28. In response to the second proposed goal, E.M. started AAC training in private therapy on July 12,

2013.  At the time the due process complaint was filed, E.M. did not have a single A.T. goal in her IEP.  VOL. II(a): 0512-0519; 0585-90.

**FINDING OF FACT NO. 26**.  In FOF No. 26, the IHO claimed the district's recommendations were based on the credible opinions of expert personnel within the district without providing any supporting reasoning for such conclusion.  The IHO cited to the ARD meeting held on the September 24, 2014 ARD meeting, Brandon's testimony, and Records' testimony.  VOL.I: 0010; 3172-3195.  The IHO's reliance on the September 24, 2014 ARD meeting is misplaced.  This ARD meeting occurred five months after E.M.'s parents filed their due process complaint and nine months after the November 2013 ARD meeting where Brandon recommended discontinuing articulation speech therapy.  In each ARD meeting held after the due process complaint was filed, the LISD was playing "Monday Morning Quarterbacking" to address issues raised in the due process complaint.  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995).  The court must be careful and not use after-acquired evidence the District relies on to embellish what is in the record when it evaluates the appropriateness of E.M.'s speech program.

He failed to identify which recommendations, which opinions, and which the expert personnel.  Of the three designated LISD experts, Bobbye Records was the only one to provide a *vitae*.  VOL. III:3270.  Her testimony lacks credibility because, prior to her testimony, Ms. Records did not reviewed all of Respondent's exhibits (only Exhibits 1-30 out of 39), did not review Petitioner's exhibits, and viewed some video snippets and a video from 2012.  VOL. IV (c):4179.  Ms. Records never met E.M. or observed her.  VOL. IV(c):4224.  Ms. Records did not consult or speak with any of the District SLPs who worked with E.M.  VOL. IV(c):4232.  Nor did Ms. Records consult or speak with any of E.M.'s private speech therapists.  VOL. IV(c):4221.  Ms. Records never observed E.M. in any setting. VOL. IV(c): 4179; 4232.  Ms.

Records never saw any of the speech goals the private therapists were working on with E.M. VOL. IV(c):4252.  Ms. Records did not remember reviewing any of the private Assistive Technology progress reports.  VOL. IV(c):4233.  The IHO's credibility determination that Records' testimony was credible is problematic because she only reviewed LISD records without even consulting with LISD SLPs who had contact or had evaluated E.M.  Thus, the IHO's reliance on Records' testimony and opinions in making his credibility determination is in error and is due no deference.

Further, the IHO ignored the testimony of E.M.'s private speech therapists who had worked with E.M. for many years prior to this due process hearing. All her private therapists had extensive experience in working with E.M. and children with multiple disabilities like her. Specifically, the IHO ignored the testimony and non-testimonial evidence provided by Lori Sekhon (speech language pathologist), Gail Wayman (Board Certified Behavior Analyst since 2001), and Kristi Rollins (speech language pathologist – vita found at VOL. II(b):00861-62. E.M. had worked weekly with Ms. Sekhon since November of 2011. VOL. II(b):0805 -0845.  At the time of the hearing, Ms. Sekhon has 30 years of experience as a speech therapist and probably 15 to 20 years specifically working with children with apraxia. VOL. IV(b):3693.  Ms. Rollins has worked weekly with E.M. since late December of 2010.  VOL. II(b):0846-60.   At the time of the hearing, E.M. had worked with Ms. Wayman for four and a half years.  VOL. IV(c):4071. Wayman's vita can be found at VOL. II(d):1475-1476.  Wayman attended many ARD meetings regarding E.M. since at least November 30, 2012.  VOL.II(a):0529; 0530; 0611; VOL. II(b):0867.

Thus, the IHO's finding that Ms. Records' testimony was more credible than E.M.'s witnesses and his reliance on her opinion to make his determination that LISD provided E.M. a

FAPE when it recommended terminate her articulation goals was not supported by the record. Because of her limited scope of the facts in this case, E.M asserts Ms. Records' testimony and opinions should be discredited entirely.

***FINDING OF FACT NO. 27***.  In FOF No. 27, the IHO found that the student's parents did not agree to the proposed educational program offered by the district and declined to meet again with the ARD committee after a ten day recess.  VOL. I:0011.  The record reflects that after the September 24, 2014 ARD meeting ended in disagreement, "[t]he district agreed to work with [E.M.]'s private therapist to develop a goal with agreed upon words and cueing and data collection for the core vocabulary goal.  The ARD-C also agreed to develop new goals to address [E.M.]'s use of her assistive technology."  Vol. II(b):0868.  The reconvened ARD meeting was scheduled for October 3, 2014.  *Id.*

After the ARD meeting, Brandon recalled she and Sekhon emailed and spoke trying to come to some agreement over the goal.  VOL. IV(a):3471-72; VOL. II(i):2662-63.  Sekhon recalled receiving an email from Brandon after the September ARD meeting and she responded with suggestions of other words.  VOL. IV(b):3813-14.  The two spoke to discuss why Sekhon did not believe some of the words were appropriate, and followed up the telephone conversation with a long email.  VOL. IV(b):3814.  Sekhon expressed her surprise because she never heard back from Brandon or any other LISD speech therapist, despite the expressed willingness to work together at the ARD meeting.  VOL. IV(b):3815.  White testified that neither she nor Brandon had any further questions for Sekhon they needed to have answered.  VOL. IV(d):4401-4402.  Thus, the LISD quit collaborating with E.M.'s private speech therapist and there was never an agreement on the "high frequency words" goal.  On October 1, 2014, LISD counsel sent draft goals to E.M.'s counsel.  VOL. III:3277.  On that same day, E.M. counsel replied:

"I don't know if you all realize this but the campus speech therapist Heather Brandon and Lori Sekhon [private speech therapist] have been working together through email to come with the 7 words in the first goal.  I don't think these are the same words they were discussing.  Some might be but there were other words.  Anyway, Mrs. [S.] is requesting that the District's AC person – Laura Reed? and [E.M.]'s private provider Kristi Rollins do the same.  If this can be done by email, it would save all of use a lot of time.    With that said, I don't think we are at the point where returning to ARD would be productive.  Mrs. [S.] would like to waive the 10 day ARD scheduled for this Friday.  If there is an agreement on these goals, I suggest scheduling a Brief ARD in the near future to put these goals in place.  It would save everybody a lot of time and money."
VOL. III:3277.

Because Brandon, or any other LISD speech therapist, never responded to Sekhon's email, a Brief ARD meeting was never scheduled to implement the speech goals.

**FINDING OF FACT NO. 28**:  The IHO states "The district then proposed an IEP amendment to include additional goals in articulation of developing articulation of high frequency words and the use of the AAC.   The student's parents did not agree to the amendment."  A careful review of the "additional goals in articulation of developing articulation of high frequency words and the use of the AAC" reveals that these are the same exact goals presented to E.M.'s parents at the September 24, 2014 ARD meeting.  Compare VOL. II(b):0866 with VOL. III:3198.  The goals are exactly the same.  These are not "additional goals."  Why would E.M.'s parents agree to the goals they had already disagreed with?   And, during this time, LISD SLP Brandon was "working" with Sekhon to develop an appropriate articulation goal?  Brandon testified what happened next was E.M.'s parents sent a list of goals they had drafted in response to the goals sent home.  VOL. IV(a):3501.  In fact, E.M.'s mother did not sent her parent proposed goals until October 30, 2014, which were never considered by an ARD committee.  VOL II(f):1887 - 1889.  The difference in the schedule of services offered in the October 3, 2014 agreement and the April 4, 2014 schedule of services was 30 minutes of assistive technology *consult* services a

week.  Compare P EX 6:034 with VOL. III:3199.  Thus, FOF No. 28 is in error because LISD did not propose additional goals in articulation or on the use of the AAC.

***FINDING OF FACT NO. 29***:  The IHO mistakenly found that the ARD committee met for two days in November 2014 but actually the meetings were held on November 14 and December 11, 2014.  VOL. I:0011; VOL. II(h):2529 -30; VOL. II(h):2531-2533.  What is troublesome about this fact is that it was established at the due process hearing that LISD's version of the ARD meetings was different from the version provided to E.M.'s mother on the day of the ARD meeting.   The most significant difference is the level of Speech Therapy listed on E.M.'s Schedule of Services.   On the copy of the November 14, 2014 ARD meeting Ms. S. was provided, it is clear that the level of speech services for the 2014-15 school year would be direct services 30 minutes twice a week and consult services 20 minutes per week.  VOL. II(h):2527.  Compare that same Schedule of Services in LISD's copy of this same ARD meeting, E.M. would receive direct speech therapy services four times a week and consult services 20 minutes per week.   VOL. III:3326.   LISD Lead SLP White offered that Ms. S. must have received a "DRAFT" copy but that was shown to not be true. VOL. IV(d): 4449-51.  The other glaring difference is the minutes from the December 11, 2014 ARD meeting are missing from LISD's copy of this ARD meeting.  LISD is not entitled to make unilateral changes to an IEP document "any more than may any other party to a contract."  *M.C. v. Antelope Valley Union High School District*, No. 14-56344 (9th Cir. 2017).  The IEP is a "formal, written offer [that] creates a clear record that will do much to eliminate troublesome factual disputes … about when placements are offered, what placements are offered, and what additional education assistance was offered to supplement a placement, if any."  *Union Sch. Dist. v. Smith*, 15 F.3d 1529, 1526 (9th Cir. 1994) as cited in *M.C. v. Antelope Valley Union High School District*, No. 14-56344 (9th Cir. 2017).

Further, "an IEP is a contract.  It is signed by the child's parents and the school's representatives, and thus embodies a binding commitment.  It also provides notice to both parties as to what services will be provided to the student during the period covered by the IEP."  *Id*.

Contrary to what the IHO stated, the parents did not receive the additional goals prior to the ARD meetings.  VOL. II(h):2531.  The IHO was also mistaken when he stated that the goals included additional speech therapy.  The parents' copy of the schedule of service did not include additional speech therapy.  Compare VOL. II(h):2527 with VOL. III:3326. Further, as noted in the deliberations in the parent's copy, the LISD campus SLP explained that Direct Speech Therapy services could be 1:3 ratio.  VOL. II(h):2532.  As noted in the deliberations, "Currently [E.M.] receives and demonstrates a need for one-on-one services for her Direct Speech Services."  VOL. II(h):2532.  These December 11, 2014 deliberations are missing from LISD's version of this ARD meeting. Another difference noted in the parents' copy of the deliberations, missing in LISD's copy, is that the AT SLP recommends that E.M. would require one-on-an service for implementation of the assistive technology proposed goals.  *Id*.  However, the time for AT services on E.M.'s schedule of services is 30 minutes of consult services a week.  VOL. II(h):2527.  Regarding the progress E.M. was making on her speech therapy goals, the progress noted on the ESY speech articulation goals was inconsistent with the no-progress shown on the speech articulation goals worked during the school year with Brandon as the speech therapist. VOL. II(h):2529.

Because the IHO only looked at LISD's version of the November 14, 2014 ARD meeting, he also missed another page that was missing from LISD's copy of the ARD meeting. There appears to be misinformation on this page, at VOL. II(h):2486 – that LISD submitted two additional speech goals on October 3, 2014, which as noted above did not happen.  More

importantly, though is the statement that "The district continues to implement the goals and objectives that were agreed upon 1/24/13." *Id.*  While that is what the mother agreed to once the due process complaint was filed, however LISD would not implement the IEP goals agreed to on 1/24/13 but reverted to the goals accepted at the 11/23/2012 ARD meeting.

***FINDING OF FACT NO. 30***.  In this FOF, the IHO found that E.M. made educational progress in reading, spelling, listening comprehension, math, and fine motor skills.  In a formal speech evaluation, E.M. showed progress and developed abilities in the use of assistive technology in speech augmentation.   However, the evidence shows that E.M. did not make educational progress in any subject area.  In fact, her mother reported that when E.M. got her first progress report on the 2012/13 goals during the 2014/15 school year, Ms. S.'s review of the progress across time on those goals, for between 10 to 20 of the goals, roughly 40 percent of the goals, E.M. had made no progress or had regressed in her demonstrated progress.  VOL. IV(c):4150; VOL. II(h):2531.  Ms. S. requested her Parental Input be included with the November 14, 2014 ARD meeting.  VOL. II(h):2546-47.   In this document, she informs the ARD committee the IEP progress report, dated 10/24/14, indicate that E.M. has regressed in her performance on 10 of the 27 goals from the November 2012 ARD meeting.  VOL. II(h):2546.  Of the 5 speech goals the LISD SLP worked on during the same period, the LISD SLP continued to report that E.M. is not able to master these goals – or even demonstrate the performance that was noted as her baseline on the goals.  *Id.*  Again, this is a document that is conveniently missing in LISD's copy of the November 14, 2014 ARD meeting.

In summary, the IHO made numerous errors in his Findings of Fact and failed to support his findings with non-testimonial and extrinsic evidence in the record.  His Findings of Fact do not deserve due deference and should be stricken.   These errors were instrumental in his

conclusion that E.M. made progress in all areas of her educational programming and that LISD

provided her a FAPE.  Based on the *Michael F.* factors regarding whether a child has received a

FAPE, the IHO's decision should be reversed.

## APPROPRIATE SUBJECT MATTER OF HEARING

When a party requests a due process hearing under the IDEA, the party is prohibited from

raising issues at the due process hearing that were not raised in the initial complaint, unless the

other party agrees otherwise.  20 U.S.C. §1415(f)(3)(B).  In her due process complaint, filed on

April 14, 2013, E.M. complained about the following issues:

> A. LISD failed to provide/propose an appropriate educational program individualized to meet her communication needs during the 2013-14 school year and 2014-15 school year;
> B. Restricting her least restrictive environment placement by failing to address her vocal communication needs;
> C. Failing to propose appropriate levels of speech therapy;
> D. Failing to provide her with appropriate level of direct speech therapy services (direct versus small group);
> E. Failing to provide Elinor with speech goals and objectives that are measurable and individualized to meet her unique needs;
> F. Failing to provide Elinor goals and objectives that are uniquely tailored to meet her individualized needs;
> G. Making decisions outside of the ARD committee.

VOL I: 0030 -0031.

On May 28, 2014, the Hearing Officer dismissed claims that fell under Section 504 of the

Rehabilitation Act (29 U.S.C. §794, et seq.), the Americans with Disabilities Act (42 U.S.C.

§12101, et seq.), 42 U.S.C. §1983, and the Family Educational Rights and Privacy Act (20

U.S.C. §1232g(b)(6)).  VOL. I:059.

According to 20 U.S.C. §1415(c)(E)(i), there are two instances when a party may amend

a complaint.  The first is with the written consent of the other party.  20 U.S.C. §1415(c)(E)(i)(I).

The second is with hearing officer permission, but not less than 5 days before the due process

hearing occurs.  20 U.S.C. §1415(c)(E)(i)(II).  E.M. never requested to amend the due process complaint.  *See* VOL.I:0030-0321.

Thus, the issues presented in the due process complaint filed on April 14, 2013 were the issues to be decided at the due process hearing.

When an issue arose on the second day of the due process hearing, March 24, 2014, regarding reimbursement for private placement including services, LISD complained that to address the issue of reimbursement, E.M. had to amended her complaint.  Opposing counsel objected to amending the due process complaint to include that as an issue and the law did not allow the hearing officer to grant permission to amend the due process complaint because the issue arose on the second day of hearing.  But E.M. was not looking to include another issue to be heard, she was seeking reimbursement as relief for all the private services her parents had paid.  Further, E.M. had produced statements for private therapy services to LISD.  Thus, the question regarding reimbursement was ripe for the hearing – even if the finding is for provide therapy services provided during the applicable timeline of the proceedings.

## FAILURE TO CONSIDER PEER-REVIEWED
## RECOMMENDATIONS DENIAL OF FAPE

Pursuant to 20 U.S.C. §1414(d)(1)(A)(i)(IV), an IEP must include, among other things, "a statement of the special education and related services and supplementary aids and services based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child."  In *L.M.H. v. Ariz. Dept. of Educ.*, 2016 U.S. Dist. LEXIS 93893 (D. Ariz. July 19, 2016), parents complained that their child's speech therapy was inadequate because it did not follow peer-reviewed recommendations and thus, denied their son a FAPE.  At the hearing, an ASHA certified speech language pathologist testified that children

with apraxia need three to five individual sessions per week, as recommended by peer-reviewed research by the ASHA Technical Report.   [ASHA stands for American Speech-Language Hearing Association].   The court held that while the school district was not bound by ASHA recommendations, the school district was bound to consider some peer-reviewed recommendations.   The record showed that the school district did not cite or reference any peer-reviewed research for the methods employed in the Student's IEP.   The school district's speech therapist testified that she used her professional knowledge and courses she took to determine that the level of service was appropriate.   She stated, "I do know it's appropriate for children with various communication disorders."   The court found that this recommendation was in stark contrast to IDEA's requirement that IEPs be individually tailored to the unique needs of each child.   The court found that Deer Valley failed to provide the child with adequate speech services and reversed the ALJ's decision.   The court held that although the school district was not required to maximize the education of the child, "by not following the suggested standards under any peer-reviewed research, Deer Valley only provided an opportunity for minimal academic advancement, which violates IDEA."

Such is the case here.   All private speech therapists and her BCBA that testified on behalf of E.M. all recommended continued articulation therapy.   In her Report of Speech-Language Evaluation, in addition to other recommendations, the Independent SLP recommended "continued support of recently improved speech sound production skills through modeling of core vocabulary and requests for a verbal attempt of words that [E.M.] either types of signs during structured activities."   VOL. II(a):690.   Further, she stated that "research supports the need for intense and frequent individual therapy for children with CAS (ASHA).

http://www.asha.org/policy/TR2007-00278.htm.”  VOL. II(a):690.  She also recommended that E.M. be provided multi-modal cueing.

Even Brandon, LISD's campus SLP, testified that "Treatment is always based on a client's needs.  ASHA recommends frequent and intensive therapy."  VOL. IV(a):3481.  She also stated that the prognosis for a client always depends on their motivation to speak verbally.  *Id.*  As shown above, on the Weekly Speech Communication Form, completed by Brandon from September 2013 to June 6, 2014, safe one therapy session, Brandon listed E.M.'s participation as good or great engagement or good or great participation.  VOL. II(b):1004.  With that type of a record, it is harder to think of anybody more motivated to speak verbally than E.M.

Records, one of LISD's experts, testified that it was very appropriate to discontinue articulation therapy because of a lack of progress over 2 years. VOL. IV(c)4201.  That is not what the evidence shows.  The evidence shows that until Brandon began providing articulation therapy to E.M. she failed to make progress.  E.M. had made progress with every other LISD SLP she worked with and with her private speech therapists.  The only speech therapist that E.M. failed to make progress was was with Brandon.

Another factor is the method Brandon used to scoring the trials when she worked with E.M..  She only took data on the initial five trials.  This form of data collection was not individualized to meet E.M.'s needs and resulted in the failure to show progress was the way.  This form of data collection was not individualized to meet E.M.'s specialized and unique needs under the IDEA.  The IEP must be appropriately ambitious in light of E.M.'s circumstances.  *Endrew F. v. Douglas County Sch. Dist. RE-1*, 69 IDELR 174 (U.S. 2017).  Discontinuing her articulation therapy, especially when she was enjoying a burst in progress, would be a denial of FAPE.  VOL. II(b):845.

## CONCLUSION

In conclusion, the purpose of an Individualized Education Program is to develop an educational plan for a student with a disability that describes the child's individual needs and proscribes the proper placement and services designed to meet the child's unique needs. *Schaffer v. Weast*, 126 S.Ct. 528, 546 U.S. 49 (2005).  To meet IDEA obligations, the child's IEP must be reasonably calculated to enable to make progress appropriate in light of the child's circumstances.  *Endrew F. v. Douglas County Sch. Dist. RE-1*, 69 IDELR 174 (U.S. 2017). E.M.'s prayers that this court finds that continuing with articulation therapy goals at school was was reasonably calculated to enable to her to make progress appropriate in light of her circumstances, as a child with CAS and autism.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs E.M. and her parents requests judgment as follows:

(1)     This Court take jurisdiction of this matter;

(2)     That the Court enter an order granting E.M.'s Motion for Judgment on the Record and reverse the Hearing Officer's findings in the Decision of the Hearing Officer, issued on May 22, 2015;

(3)     That the Court enter an order finding the Hearing Officer failed to conduct an analysis under the standards established in *Michael F*. and a finding that E.M was denied a FAPE;

(4)     That the Court find that the Defendant denied E.M. a FAPE by failing to individualize her educational program regarding speech services based on appropriate assessment and performance data, and national practices and guidelines set by ASHA;

(5)     That the Court find that Defendant denied E.M. a FAPE because the key stakeholders failed to work in a coordinated and collaborative manner;

(6)     That the Court find that the Hearing Officer made significant errors of fact in his Findings of Fact and are not supported by non-testimonial and extrinsic evidence in the record and such errors were critical and affected substantive issues in this case, leading to errors in his Conclusions of Law, thus denying E.M. a FAPE;

(7)     That the Court find the Hearing Officer's credibility determinations do not warrant due deference;

(8)     That the Hearing Officer made significant errors of law that were critical to the procedural issues in this case and thus denied Plaintiff E.M. a FAPE;

(9)     That the Court enter an order that Plaintiff was denied a FAPE and an award of compensatory services is an appropriate form of relief for such a denial;

(10)    That the Court grant Plaintiff prevailing party status and grant an award of reasonable attorneys' fees and costs for this action and the administrative proceedings against Defendant in an amount determined at the discretion of this Court as authorized by 20 U.S.C. §1415(i)(3)(B); and,

(11)    That the Court grant Plaintiff E.M. such other, further, and additional relief as the Court may deem just, proper and appropriate.


                              Respectfully submitted,

                              By:     _/s/Yvonnilda Muñiz_____

                              YVONNILDA MUÑIZ
                              Attorney-in-Charge
                              TEXAS BAR NO. 24007717

                              LAW OFFICE OF YVONNILDA MUÑIZ, P.C.
                              P.O. BOX 92018
                              Austin, TX  78709
                              Tel.  (512) 288-4279
                              Fax  (888) 398-8808

E-mail:  ymuniz@austin.rr.com


**Mr. Martin J. Cirkiel**
Texas Bar No. 00783829

**Cirkiel & Associates, P.C.**
1901 E. Palm Valley Blvd
Round Rock, Texas  78664
(512) 244-6658 (Tel.)
(512) 244-6014 (Fax)
marty@cirkielaw.com [Email]

ATTORNEYS FOR PLAINTIFFS