## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

---

### CASE NO.  4:15-CV-00564

---

### E.M., by next friend S.M. and C.S.,
### *Plaintiff*

*v.*

### LEWISVILLE INDEPENDENT SCHOOL DISTRICT,
### *Defendant*

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO RESPONDENT'S
### MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

---

YVONNILDA MUÑIZ

Attorney-in-Charge
TEXAS BAR NO. 24007717

**LAW OFFICE OF YVONNILDA MUÑIZ, P.C.**
P.O. BOX 92018
Austin, TX  78709
Tel.  (512) 288-4279
Fax  (888) 398-8808
E-mail:  ymuniz@austin.rr.com

**MARTIN J. CIRKIEL**

**CIRKIEL & ASSOCIATES, P.C.**
1901 E. Palm Valley Blvd.
Round Rock, Texas  78664
(512) 244-6658 (Tel.)
(512) 244-6014 (Fax)
marty@cirkielaw.com [Email]

# Table Of Contents

**1.** Table Of Authorities…………………………………………………………v

**2.** Motion    For    Judgment    On    The    Record    Incorporated
Herein……………………………………………………….…1

3. Summary Of Issues……………………………………………............1

    A. Childhood Apraxia Of Speech………………………………….…..4

4. Argument And Authorities………………………………………………..5

    A.  E.M.'S Educational Program Was Not Individualized On The Basis Of
    Assessment And Performance……………………………………………8

    B. Implementation Of 2nd Grade IEP Was Not Appropriate Stay-Put
    Placement……………………………………………………………10

    C. E.M.'S Individualized Education Program Was Not Administered In her
    Least Restrictive Environment…………………………………………11

    D. E.M.'S Services Were Not Provided In A Coordinated And Collaborative
    Manner By The Key Stakeholders …………………………………..…16

    E. E.M. Did Not Demonstrate Positive Academic And Non-Academic
    Benefits Under Her Individualized Education Plan……………..…...18

    F. The Special Education Hearing Officer Did Not Appropriately Apply
    The *Michael F.* Factors In Determining That LISD Provided E.M. A Free
    Appropriate Public Education…………………………………...…21

    G. The Special Education Hearing Officer Erred In Relying On The
    Credibility Of LISD SLP Intern……………………………….…..22

    H. The Special Education Hearing Officer's Findings Of Fact Are Not
    Supported    By    The    Evidence    In    The    Administrative
    Record……………………………………………………….…..25

5. Disputed Facts………………………………………….………..26

6.  Summary…………………………………………………………..51

7.  Prayer For Relief…………………………………………………..51

8.  Certificate Of Service……………………………………………53

9.  Certificate Of Conference………………………………………...53

10. Certificate Of Compliance………………………………………..54

# TABLE OF AUTHORITIES

## CASES

*Anchorage Sch. Dist. v. M.P.*, 680 F.3d 1047 (9th Cir. 2012) ...................................................... 36

*Board of Ed. of Henrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176 (1982). ............................................................................................................................................ 29

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245 (5th Cir. 1997) ......... 30, 31. 46

*Dirocco v. Bd of Educ. of Beacon City Sch. Dist.*, No. 11 Civ. 3897 (ER), 2013 WL 25959, at *22 (S.D.N.Y. Jan. 2, 2013). ........................................................................................................ 50

*Endrew F. v. Douglas County Sch. Dist. RE-1,* 137 S.Ct. 988 (2017), ........................... 29, 30, 46

## STATUTES

20 U.S.C. §1401(d)(1)(A) ........................................................................................................... 28

20 U.S.C. §1401(d)(29). .............................................................................................................. 28

20 U.S.C. §§1414(d)(1)(A)(i)(I)-(III) ........................................................................................ 29

## OTHER AUTHORITIES

Commentary in the Federal Register, page 46664 ....................................................................... 33

## REGULATIONS

34 C.F.R. §300.39(a)(2). ............................................................................................................. 28

34 C.F.R. §300.39(b)(3)(i) .......................................................................................................... 29

34 C.F.R. §300.300(d)(3) ............................................................................................................ 37

34 C.F.R. §300.506 ..................................................................................................................... 38

34 C.F.R. §300.507 ..................................................................................................................... 38

34 C.F.R. §300.516 ..................................................................................................................... 38

34 C.F.R. §300.518(a) ................................................................................................................. 37

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff, E.M., by next friends S.M. and C.S. ("E.M.") file this Response In Opposition to Defendant's Motion for Judgment on the Administrative Record and respectfully shows the following:

### I.    Plaintiff's Motion for Judgment on the Record Incorporated Herein

Plaintiff herein incorporates the legal authorities and arguments cited in Plaintiff's Motion for Judgment on the Record that was filed May 12, 2017.  See Doc. 37.

### II.    Plaintiff's Summary of Issues

At issue in this case is LISD's decision to discontinue articulation speech therapy to E.M., a child with Autism, Apraxia, Intellectual Disability, Cerebral Palsy (mild).  The decision was made after LISD conducted an FIE in 2013.  The LISD speech-language therapist (SLP Intern) who provided E.M. therapy at the time had only worked with E.M. for approximately two months and was an intern, with little to no experience working with or evaluating students with apraxia and autism.  Her recommendation contradicted E.M.'s three private experienced speech language therapists, her private BCBA, and a private BCBA evaluator who conducted a comprehensive evaluation in 2012.  An independent SLP expert also recommended continued intensive articulation therapy and continuation of a sign language facilitator while E.M. transitioned to an augmentative communication device (ACD).  Despite all E.M.'s parents' efforts at several ARD meetings, LISD would not relent and continued to propose discontinuing articulation therapy and her sign language support.  Her parents filed a due process hearing request complaining about the discontinuation of articulation therapy and sign language support.

LISD admits E.M. made no progress on articulation goals.  Doc. 36, pg. 30.  However, E.M. was making progress on articulation goals in her private speech therapies as follows:

According to Kristi Rollins, E.M.'s private SLP with Monkey Mouths, in a 11/20/2013 report, E.M. was making "slow but steady improvement with sounds and sound combination as well as with oral motor movement."  AR 0855.  Rollins reported E.M. "has benefitted greatly from consistent speech therapy in order to increase muscle memory for speech sound production, as well as carryover to other environments."  AR 0856.

In a 12/4/2013 report, Lori Sekhon, one of E.M.'s private SLPs, reported that E.M. had made "significant progress" over the last 15 months of therapy.  AR 0826.

In a 3/4/2015 report, Kristi Bledsoe, one of E.M.'s private SLPs, recommended "individual therapy (specifically AAC training) should be in conjunction with her continued speech therapy in her educational setting to promote carryover of communication skills with the LAMP program to functional contexts with peers/caregivers.  Treatment for apraxia and continued general language development should be supported as well to all [E.M.] to grow/develop more functional language use in her educational community setting."  AR 3351.

In March 2014, Dr. Vincent Carbone, an private BCBA, also recommended educational efforts focus on improving speech production in the context of functional use of language during manual sign language requests (mand) sessions.  AR 0729.

All these opinions were collaborated by an independent speech therapist from UT Callier Center for Communication Disorders.  In a 8/12/2014  Report of Speech-Language Evaluation, the independent speech therapist evaluator, Jenny McGlothlin, reported findings of her evaluation of E.M. and recommended continued speech–language through LISD targeting total communication skills via: (i) specific and ongoing training with an augmentative communication

2

specialist using a dedicated device with LAMP; (ii) continued provision of a sign language interpreter to facilitate E.M.'s communication in the classroom until she is competently and quickly communicating with her SGD (speech generating device); (iii) continued support of speech sound production skills by modeling of core vocabulary and requests for a verbal attempt of words that E.M. types or signs through intense and frequent individual therapy and the use of multi-modal cueing. AR 0690. McGlothlin has extensive experience in communication disorders as documented in her curriculum vitae and over the years has treated over a hundred students for speech communication disorders and conducted more evaluations than that. AR 0693-97; 3639.

Thus, all of E.M.'s experienced private speech therapists who have provided E.M. speech therapy for years recommended continued articulation therapy in her educational environment. The two private evaluators - the independent speech therapist who conducted the independent education evaluation and an independent BCBA also recommended continued articulation therapy and continuance of the sign language facilitator until E.M. was competent on an ACD. None of the LISD speech therapists or their expert consultant recommended continuing articulation therapy but only one of the LISD speech therapist, the SLP Intern, had actually worked with E.M. At the time the SLP intern recommended discontinuing articulation therapy and focusing solely on an ACD, she had worked with E.M. for less than three months. Based on the arguments below, E.M. was denied a FAPE during her 3RD grade school year when the SLP Intern recommended discontinuing articulation therapy and focusing solely on an ACD.

Since E.M. was in kindergarten, LISD's own 2011 FIE recommended providing her access to an ACD. AR 0646. Since kindergarten, her parents have privately paid for 3 private speech therapy lessons a week, up to 10 hours of Applied Behavior Analysis training a week, at

3

times private OT and PT therapy, and provided ACDs and applications they paid for.  It was not until the LISD SLP Intern began providing E.M. speech therapy at school and conducted an evaluation that the recommendation was made to discontinue articulation speech therapy at school and until after her parents filed a due process complaint, that LISD revised its position that signing was E.M.'s primary mode of communication and decided that "typing" was E.M.'s primary mode of communication.  Furthermore, there were no 2ND grade or 3RD grade IEP goals to address instruction on an ACD, no AT services, direct or consult, and no training on an ACD during her 2ND grade or her 3RD grade.  AR 3525; 0602.  The only instruction E.M. received on an ACD was provided privately by her parents through Our Children's House at Baylor since July 2013.  AR 3349.  Thus, LISD never provided E.M. with instruction on an ACD yet that is the only direction LISD proposed to take with E.M.'s communication when she was in the 3rd grade.  Based on peer reviewed research and evidence-based practices, her parents did not agree and pursued a due process hearing.

**A.**     ***Childhood Apraxia of Speech (CAS).***     LISD completed a Full Individual Evaluation (FIE) on November 23, 2013.  AR 0657-0684.  The FIE conducted by LISD and an Independent Educational Evaluation (IEE) demonstrated E.M. has the following nonverbal characteristics associated with CAS:  difficulty producing volitional oral movements (puckering) than non-volitional movements (swallowing), difficulty altering motion rates of the tongue, and lacks significant weakness or paralysis of oral facial structures associated with CAS.  AR 0663[1].  Further, her verbal characteristics were difficult to ascertain due to her limited skills in verbal communication.  AR 0663.  Additional characteristics included: slow progress in speech therapy, limited response to "traditional" speech therapy, and limited self-correcting skills.  AR 0663.

---

[1] Citations to the Certified Administrative Record are denoted as follows:  Administrative Record XXXX which will be shown as "AR 0000. "

E.M. was also eligible for special education services as a student with Autism and Cerebral Palsy, both disabilities having an impact on the development of communication.  AR 0663.  Thus it was difficult to determine the primary contributor to explain E.M.'s communication barriers. AR 0663.  There was no dispute in the due process hearing that E.M. has CAS, contrary to LISD's allegation.  Doc. 36, pg. 10, ftn. 25.

<u>**ARGUMENT AND AUTHORITIES**</u>

The Individuals with Disabilities Education Act (IDEA) requires States "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."   20 U.S.C. §1401(d)(1)(A).  Special education is "specially designed instruction at no cost to parents, to meet the unique needs of a child with a disability."  20 U.S.C. §1401(d)(29).  It includes speech –language pathology services, or other related service, if the service is considered special education rather than a related service under State standards.   34 C.F.R. §300.39(a)(2). "Specially designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction – (i) to address the unique needs of the child that result from the child's disability…"  34 C.F.R. §300.39(b)(3)(i).  "The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged.   §§1414(d)(1)(A)(i)(I)-(III)."

The first time the Supreme Court addressed the FAPE provision in the IDEA was in *Board of Ed. of Henrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176 (1982).  According to the IDEA, "a 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188.  "Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public education' as defined by the Act."  Rowley, 458 U.S. at 189.  A court should make two inquiries.  "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  *Rowley*, 458 U.S. at 206-07  In *Endrew F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988 (2017), the Court held that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 999, "An IEP must aim to enable the child to make progress, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement.  And, the degree of progress contemplated by the IEP must be appropriate in light of the child's circumstances, which should come as no surprise.  This reflects the focus on the particular child that is the core of the IDEA, and the directive that States offer instruction 'specially designed' to meet a child's '*unique* needs' through an '*[i]ndividualized* education program."  *Endrew F.*, 137 S. Ct. at 1000.  A child's IEP must be appropriately ambitious in light of his circumstances…every child should have the chance to meet challenging objectives."  *Endrew F.*, 137 S. Ct. at  999.  It is not a form

6

document but is "constructed only after careful consideration of the child's present levels of achievement, disability, and *potential for growth*." *Endrew F*., 137 S. Ct. at 1000 (Emphasis added.)  Thus, the adequacy of a given IEP turns on the unique circumstances of the child for whom it was created.

Under the standards set forth the Fifth Circuit in *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F*., 118 F.3d 245 (5th Cir. 1997), the educational benefit to which the IDEA refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*, rather, an IEP must be likely to produce progress, not regression or trivial educational advancement.  A district must provide its disabled student with "'meaningful' educational benefit." *Michael F*., 118 F.3d at 248.  *Michael F*. clearly addresses the substantive prong of the *Rowley* test.  According to *Michael F*., the Fifth Circuit considers four factors as "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA" whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment, (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'"; and (4) positive academic and non-academic benefits are demonstrated." *Michael F*., 118 F.3d at 253.

E.M. asserts that the Hearing Officer failed to conduct an analysis of the four *Michael F*. factors and shows as follows:

A.      **E.M.'s educational program was not individualized on the basis of assessment and performance.**

The 2013 FIE was first discussed by the ARDC at the Nov. 21, 2013 Annual ARD meeting, held to discuss E.M.'s 3rd grade programming. AR 0604-05.

On December 17, 2013, the second meeting of the Annual ARD, the ARDC agreed to all the 3rd grade academic IEP goals and objectives.   AR 0606-07.   The parents agreed with

implementation of the academic IEP goals and objectives but did not agree with the changes to E.M.'s speech therapy goals and services.  AR 0607; 1552.  The ARD committee agreed the speech therapist would continue to work on the goals from the 2012 Annual ARD.  AR 0607.

On January 15, 2014, the ARDC reconvened and confirmed the 3rd grade academic IEP goals were previously approved.  AR 0608.

On February 3, 2014, the ARDC reconvened to discuss the proposed speech goals.  AR 0610.  E.M.'s mother requested the data that supported the discontinuation of  articulation goals for direct speech therapy.  AR 0610.  The data was not provided.  E.M.'s mother and her private Board Certified Behavior Analyst (BCBA) argued that without data to support discontinuation of the articulation speech therapy goals no changes could be made.  AR 0610.  The reason given for discontinuing the articulation goal was that two and a half to three years of articulation goals had produced no carryover into the classroom. AR 0610.  Despite recommendations from her private speech therapists to continue the articulation therapy goals at school, LISD's recommendation was to support augmentation communication (machine produced sounds).  AR 0611.  However, no IEP goals or objectives were proposed to address augmentation communication nor was time allotted for assistive technology services.  AR 0585-91; 0602.

In a February 19 2014 letter to the principal, E.M.'s mother requested the data taken by E.M.'s teachers and therapists on E.M.'s speech goals.  AR 1586.  LISD never provided the requested data.

On March 21, 2014, the ARD committee met to discuss E.M.'s speech goals.  AR 0612-14.  E.M.'s parents presented a letter from Dr. Carbone, a private therapist, dated March 18, 2014.  AR 0729-30.  Based on Dr. Carbone's 2012 evaluation of E.M. and recent school and home data, including videos of private speech therapy sessions, Dr. Carbone recommended

improving speech production in the context of functional use of language when the therapists makes requests of E.M. and her young age "mandated" continued efforts to support her production of speech,.  AR 0729.  Dr. Carbone provided two research articles published in the Journal of Applied Behavior Analysis that supported his recommendations.  See AR 0718-728.  One of the research articles focused on children with developmental disabilities who failed to demonstrate a consistent or functional vocal responding repertoire, similar to E.M.  AR 0719.  The students were provided twice daily sessions consisting of 50 trials that focused on vocal production paired with sign language.  AR 0719.  The results supported the conclusion that prompt delay and vocal prompting with manual sign language produced an increase in vocal responses in children with developmental disabilities who emit few vocal responses.  AR 0720-22.  The second study focused on the use of echoic chaining with students with autism with very limited vocal sounds.  AR 0723-28.  The results indicated that a chaining procedure can be effective for increasing the length of echoics in children with autism.  AR 0725.

LISD staff offered no research studies or peer reviewed evidence that contradicted the studies' results.  Instead, they explained that decisions they made were based on evaluation, observation, PLAAFP [Present Levels of Academic Achievement and Functional Performance], and speech language guidelines.  AR 0613.  But, IDEA requires that educational services provided to a student are based on peer-reviewed research to the extent practicable. 20 U.S.C. §1414(d)(1)(A)(i)(IV).  Congress defines "'Peer reviewed research'… "generally refers to research that is reviewed by qualified and independent reviewers to ensure that the quality of the information meets the standards of the field before the research is published…"  Commentary in the Federal Register, page 46664.  LISD's decision to discontinue articulation therapy and the

sign language support was not based on peer-reviewed research and fails to meet the legal requirements of the IDEA.

**B.     Implementation of 2ND Grade IEP was not Appropriate Stay-Put Placement.**

On April 14, 2014, E.M.'s parents filed a due process hearing request.  As noted above, on 12/17/2013, the ARD committee agreed to implement all academic and related services 3rd grade IEP goals, expect for the proposed discontinuation of articulation speech therapy and support from the sign language facilitator, and were implemented in January 2014, upon return from the 2013 winter holiday.  AR 0606-07.  However, once the parents filed the due process hearing, LISD insisted that E.M.'s 2ND grade IEP goals were her "stay put" placement.  AR 2486.  The 2nd grade program was agreed to two years earlier in November 2012.  LISD claimed that the 3RD grade goals previously agreed to and implemented were not E.M.'s "stay-put" placement.  AR 2486.

Under 34 CFR §300.518(a), "…, during the pendency of any administrative or judicial proceeding regarding a due process complaint notice requesting a due process hearing under §300.507, unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement."  The parents and the ARD committee had agreed to implement the 3rd grade academic goals.  On April 21, 2014, a week after the due process complaint was filed, LISD's attorney sent an email to E.M.'s attorney seeking application of the stay-put rule.  AR 1601.  LISD attorney acknowledged that E.M.'s parents had been in agreement with many of the 3rd grade IEP goals and objectives in the ARD meeting completed on April 4, 2014.  AR 1601.  In response, E.M.'s attorney replied that E.M.'s mother agreed to all the 3rd grade IEP goals and objectives discussed at the 12/17/2013 ARD meeting except for the goal labeled "Speech Therapy Goal #1."  AR 1602.  LISD attorney

responded that she was "unclear" as to whether LISD had agreement to implement the other changes made in the IEP at the annual ARD committee meeting.  AR 1602.  Further, LISD attorney stated that it might be easiest to let her know what E.M.'s mother did not agree for LISD to implement.  AR 1602.

On May 2, 2014, E.M.'s mother emailed E.M.'s teacher and let her know which 3rd grade goals she was in agreement with to implement.  AR 1606.  Since the 2/28/2014 progress reports showed a few of the 3rd grade IEP objectives had already been master, there was no need to implement those IEP objectives.  AR 1606.  On May 3, 2014, LISD attorney rejected E.M.'s mother's agreement to implement the new 3RD grade IEP goals and stated LISD would continue to follow the 2ND grade IEP goals, in its entirety, unless some agreement could be reached.  AR 1604.  LISD attorney offered two options – (1) to continue to implement the old 2ND grade IEP goals, in their entirety, or agree to implement the old 2ND grade IEP goals, in their entirety, with the exception of the implementation of all of the new 3RD grade goals, and implementation of the iPad mini.  AR 1604.  That second option offered would implement the disputed speech therapy goal and discontinue the sign language support that were the reasons her parents filed a due process hearing request.  Why would they agree to implement the disputed speech therapy goal and discontinuation of the sign language facilitator support they were complaining of?  The only option LISD offered would require the parents to waive a procedural safeguard to ensure their child was able to progress educationally.  Even more concerning is that at the 12/17/2013 ARD meeting, the ARD committee members, including E.M.'s parents, agreed to implement new academic 3rd grade IEPs.  AR 0607.  From January 2014 to soon after April 14, 2014, the 3rd grade academic IEP goals were implemented, a period of over three and a half months.  See AR 2648-2654 – IEP Progress Reports for 1/17/2014 and 3/28/2014.  Then, because LISD would not

agree to changes to "stay-put," E.M.'s teachers and related services quit working on the 3RD grade goals and reverted to the 2ND grade IEP goals.

The choice LISD's attorney offered E.M.'s parents is considered a "Hobson choice." *Anchorage Sch. Dist. v. M.P.*, 680 F.3d 1047 (9th Cir. 2012). M.P.'s parents were faced with the option to either accept the District's proposed 3RD grade IEP in its entirety despite its deficiencies or forego modest improvements to M.P.'s educational program and continue with the 2ND grade IEP goals. *M.P.*, 680 F.3d at 1056. The Ninth Circuit found that endorsing such an outcome would force M.P.'s parents to make a "Hobson choice." *M.P.*, 680 F.3d at 1056. The Ninth Circuit held this "take it or leave it" approach contravened the purposes of the IDEA. *M.P.*, 680 F.3d 1056. Further, the Ninth Circuit held "that updating an eligible student's present level of academic achievement and functional performance and establishing corresponding goals and objectives does not qualify as a change to a student's educational placement, as long as such revisions do not involve changes to the academic setting in which instruction is provided or constitute significant changes in the student's educational program. *M.P.*, 680 F.3d at 1057. In *M.P.*, the Ninth Circuit held that the district court erred by declining to consider whether M.P. received a FAPE because his parents were equally or more at fault for the absence of an updated IEP. *M.P.*, 680 F.3d at 1055.

Like in *M.P.*, LISD refused to implement the 3RD grade IEP goals and objectives. Contrary to *M.P.*, E.M.'s parents had agreed to their implementation almost 4 months earlier and her teacher and related service providers had been implementing the 3RD grade IEP goals and objectives since January 2014 but once they filed for a due process hearing complaint, LISD refused to continue implementing the 3rd grade IEP goals and objectives and reverted to her 2nd grade IEP goals. LISD's position was an "all or nothing" option – implement all the 3RD grade

IEP goals, including the one E.M.'s parents disagreed with, or revert to the 2ND grade IEP goals. Her teacher and related service providers reverted to the 2ND grade IEP goals and E.M. paid the price.  By the 4th grade Annual ARD meeting held on December 11, 2014, E.M. had been working on her 2ND grade IEP goals and objectives for two years.  AR 2532.  E.M.'s mother expressed her concern about E.M.'s regression on the "stay-put" goals. AR 2532.  E.M.'s mother was concerned that data collection showed that E.M. showed either no regression or no progress on 40 % her goals.  AR 4421-22.  LISD staff also expressed concern because E.M. was bored with the material that she continued to work on.  AR 2532; AR 4421-22.  See AR 1874-1883.

In addition to the "stay-put" provisions in 34 C.F.R. §300.518(a), according to 34 C.F.R. §300.300(d)(3), "a public agency may not use a parent's refusal to consent to one service or activity under paragraphs (a) or (d)(2) of this section to deny the parent or child any other service, benefit, activity of the public agency, except as required by this part."  LISD did exactly this.  They denied E.M. implementation of the agreed to 3RD grade IEP goals and objectives and as a result she lost a year of education.  Because the LISD refused to agree to a change in "stay-put" IEP and refused to implement the 3rd grade academic IEP goals and objectives previously agreed, because her parents did not consent to the proposed speech therapy services, she was denied a FAPE during the 2013-14 school year and 2014-15 school year by LISD.

Thus, LISD's failure to implement the 3rd grade IEP goals and objectives and reverting to her 2nd grade IEP goals and objectives as stay-put, E.M.'s program was not individualized to meet her unique needs and she failed to make academic progress.  By its very actions, LISD denied E.M. a FAPE.

C.      **E.M.'s Individualized Education Program was not Administered in her Least Restrictive Environment**.

E.M. argues that if her sign language support had been discontinued during the 3RD grade, she would not have been as engaged in her inclusion general education classroom as she was when she had sign language support.  As noted above, the sign language facilitator provided E.M. sign language support during morning announcements and during her inclusion time in the general education classroom – a reading class and her specials – science, art, music and gym, and lunchtime.  AR 4337.  In the general education classroom, E.M. required prompting from the paraprofessional to greet peers with a vocalization and gesture.  AR 2882.  E.M. engaged in vocal stimulation more frequently in the general education classroom and joined in games with her peers, such as hangman.  AR  2882.  Before leaving the general education classroom, E.M would be prompted to say bye to her peers which she did using gestures and signs for their names.  AR 2882.  Even her 3rd grade general education teacher reported that E.M. signed to communicate with her.  AR 0629.

As noted, the observations of those who opined the sign language facilitator support should be discontinued occurred only in E.M.'s special education classroom.  Nobody, including the SLP Intern, observed E.M. in her inclusion general education classroom.  The SLP Intern even admitted she never spoke to E.M.'s regular education teachers or observed E.M. in any other setting other than the special education classroom.  AR 3525.  Those whose opinions were relied to terminate the sign language support had never observed E.M. in the setting the sign language facilitator was to provide support.

LISD does not understand what both McGlothlin and Carbone, the IEE SLP and E.M.'s private therapist, recommended.  Both McGlothlin and Carbone recommended E.M.'s sign language continue to be supported "…until she is competently and quickly communicating via her SGD (speech-generating device)."  AR 0690.  Carbone stated, "It will be important to

14

continue to develop her mand repertoire through signs …While signing will be more practical and functional for [E.M.] at the moment, as her language becomes more sophisticated a voice output device will enable the complexity of her language…"  AR  0717.  Thus, both McGlothlin and Carbone recommend continuing to support and develop her language development through sign language until E.M. successfully transitions to an AAC device.

D.   **E.M.'s Services were not Provided in a Coordinated and Collaborative Manner by the key Stakeholders**.

To begin with, because LISD would not agree to implement E.M.'s 3rd grade IEP goals and objectives during stay-put, none of the interactions between the parties could be considered coordination or collaboration.  LISD refused to implement E.M.'s 3RD grade academic IEP goals that had been implemented by her teachers for over four months.  Once her parents filed a due process complaint on April 14, 2014 and invoked "stay-put" to ensure LISD did not implement the speech goal they disagreed with and discontinue the sign language support, LISD insisted "stay-put" meant E.M.'s 2ND grade IEP goals had to be implemented.  Despite several attempts by E.M.'s parents to re-instate the 3RD grade academic goals, LISD refused to agree and gave them only two options – either implement the 2ND grade IEP goals in their entirety or continue to implement the previous IEP, in its entirety, with the exception of the implementation of all the new goals and objectives and implementation of the iPad mini.  AR 1605.  Since accepting the second option would mean accepting the speech therapy goal and the discontinuation of the sign language facilitator support and undermine the reason the filed a due process complaint, her parents were forced to allow LISD implement the 2ND grade IEP goals.  Regardless at all the alleged cooperation and collaboration involved in developing E.M.'s 3RD grade IEP goals, the lack of cooperation over the stay-put IEP goals and objectives negates all those efforts.

Over several ARD meetings, E.M.'s mother reminded the ARDC that it had identified sign, sign approximation, typing and emerging vocalizations as E.M.'s primary forms of communication and that there should be speech goals to support each of those forms of communication.  AR 0582; AR 4141-42.  E.M.'s mother testified, "There was such futility – I experienced such futility in those discussions, because suggestions, ideas, anecdotes, research – nothing – no tool that I offered – would allow the committee, the members of the committee to give weight to my belief, supported by what I was showing and demonstrating through other means, that she should continue to have sign language support and vocalization support in order to create this total communication program."  AR 4142.

She and her husband "didn't feel like we had any --- that we felt like our hands were tied; we either accepted an inappropriate program for our daughter that we felt would lead to a more restricted lifestyle and that would not take advantage of the emerging skills that we had worked tirelessly to support her getting to that – the maturity – the bodily maturity that she needed to support the breath control and the muscle control and the execution of those sounds – we worked for that for so many years.  We were getting some new stuff."  AR 4144.

On January 6, 2014, E.M.'s mother sent a letter to the Principal offering to work collaboratively with the ARD committee members.  AR 1583-84.  She shared her concern that while E.M. had made progress in her private speech therapy sessions over the past 15 months, the progress reports from school indicated that E.M. was not making progress at school, and in fact, was not even reaching baseline expectations.  AR 1583.  E.M.'s mother noted that although she had signed consent forms to allow the SLP Intern access to E.M.'s private therapists, the SLP intern had not reached out to any of E.M.'s private therapists for records.  AR 1583.  E.M.'s mother attached reports from E.M.'s private speech therapists indicating the progress she had

made over the past year and the American-Speech-Language-Hearing Association Position Statement on Childhood Apraxia of Speech.  AR 1584; See AR 0822-29 and 0855-56.

Despite her request at the February 3, 2014 ARD meeting and in a letter sent to the principal dated February 19, 2014, E.M.'s mother was never provided the data upon which LISD claimed it based its decision to discontinue E.M.'s articulation speech therapy.  AR 0610; AR1586.  E.M.'s mother has always collaborated with the LISD SLPs, signing consent forms to confer with E.M.'s private speech therapists, sharing E.M.'s private speech therapy progress reports and providing video snippets of E.M.'s progress – which were used against her in the due process hearing.  AR 1583-84.

Thus, LISD did not cooperate or collaborate with E.M.'s mother or father during the 2013-14 school year and because of LISD's position not to implement the 3RD grade IEP goals during "stay-put,"  E.M. suffered academically.

E.     **E.M. did not Demonstrate Positive Academic and Non-Academic Benefits under her Individualized Education Plan**.

LISD's claimed that E.M. demonstrated positive academic and non-academic benefits during the 2013-14 school year is not supported by the evidence.  To begin with, LISD implemented E.M.'s 2ND grade IEP goals due to an inability to come to an agreement with E.M.'s parents on "stay-put."  Further, many of her 2ND grade IEP goals had already been mastered.  After the 2ND grade IEP goals were re-implemented after the due process hearing was filed on April 14, 2014, her IEP progress reports indicated that E.M. began to regress on goals she had previously mastered.  At the December 2014 ARD, LISD's attorney stated, "Some of the staff have shared with me at some point in time that what they're seeing is that when they take probes on the goals and objectives that we've been working on for such a long period of time, that [E.M.] has essentially become completely bored with those."  AR 3336.  E.M.'s mother had

seen the same thing when she compared E.M.'s IEP progress reports.   Comparing the IEP Progress Reports for the 5/30/2014 and 10/24/2014 grading periods confirmed that E.M. was either regressing or making little to no progress on previously mastered IEP goals.  AR 2635-41. Even though E.M. had previously mastered 13 of the 2nd grade academic goals because of LISD's disagreement over "stay-put" E.M. continued to work on the same goals during the 3RD grade.  AR 2635-41.  Comparing the 10/25/2013 grading period with the 10/24/2014 grading period, E.M. regressed or made no progress on 8 2ND grade academic goals.  AR 2635-41. Thus, because of "stay-put," E.M.'s 2nd grade IEP goals and objectives were re-implemented during her 3RD grade year.    During her 3rd grade school year, E.M. made little or no progress on approximately twenty-one 2ND grade "stay-put" academic IEP goals and actually regressed on many of them.  She was denied a FAPE due to LISD's failure to agree with her parents, or for that matter with the ARD committee, regarding her "stay-put" IEP goals.

LISD depends on anecdotal evidence to make claims of E.M.'s progress.  A review of the Nov. 2014 PLAAFP's do not support LISD's claims of progress.  For example, LISD claimed that in Dec. 2014, E.M. was counting from 1 to 13, improving from 1 to 5.  However, that skill is not listed as a present skill nor as a goal in Nov. 2014.  AR 2511-12.  Further, in Nov. 2013, according to her 3RD grade PLAAFPs, E.M. could already count to 11.  AR 0584.  Thus, E.M. did not make as much progress as LISD claimed.  LISD also claimed that when E.M. withdrew in Dec. 2014, E.M. was doing simple addition problems, such as five plus seven.  However, according to her Nov. 2014 PLAAFPs, E.M would be working on addition problems that included numbers 1-10 using manipulatives in the 4TH grade.  AR 2511.  Further evidence that she was not doing simple addition problems were the baselines the two short-term objectives: 1/5 for addition problems including numbers 1-5 and 0/5 for addition problems including 6-10.  AR

2512.  It is highly unlikely that E.M. was able to do simple addition problems, like 5 + 7, considering it was an academic goal identified to work on during her 4TH grade year and the reported baseline numbers for the objectives.

Further, LISD claimed E.M. made progress on her IEP goals.  LISD takes credit for "progress" made on her 2ND grade IEP goals, which she worked on for two school years.  AR 2994-3007; 3018-25; 3034-3049.  E.M. had already mastered many of those skills in November 2013 such as the ability to write her first and last name with inconsistent legibility, form her phone number with 5 out of 7 legible numbers, typing 6 words per minute, cutting, buttoning, and zipping.  AR 0584.

LISD claimed that E.M. made progress on a social skills goal because she used her AAC device to communicate with her general education peers.  However, this is misleading.  The 2013 FIE reported that E.M. engaged in vocal stimulation more frequently in the inclusion general education classroom with her non-disabled peers.  AR  0666.  The 2ND grade social skills goal that was in effect during her 3RD grade year did not include the use of an AAC device.  AR 0517.  Specifically, her only social skills goal stated, "[E.M.] will give an appropriate response to the intraverbal question of a peer 5 times for 3 consecutive probe days* probes taken once a week."  AR 0517.  However, her 3RD grade IEP goal for social skills stated E.M. would type or sign a response but that goal should not have been implemented because of "stay-put."  AR 0590.  There was no data in the record to support LISD's claim of E.M. made progress in socialization because of her AAC device.  Other than in a classroom, it is hard to imagine the usefulness of an AAC device when E.M. was at lunch because it could not be heard over the loud sounds in the cafeteria, on the playground during recess (hard to swing holding onto an AAC device), or even

in P.E. (hard to run holding an AAC device).  AR 4141.  Thus, LISD's claim that E.M. made

social skills progress using her AAC device is not supported by the evidence.

F.      **The Special Education Hearing Officer did not Appropriately Apply the *Michael F.* factors in determining that LISD provided E.M. a Free  Appropriate Public  Education.**

Since the Hearing Officer's decision was rendered, the Supreme Court decided *Endrew*

*F. v.. Douglas County Sch. Dist. RE-1* which is relevant to the provision of a Free Appropriate

Public Education (FAPE) to a child with a disability, such as E.M.  The Supreme Court found

that "[T]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably

calculated to enable a child to make progress appropriate in light of the child's circumstances."

*Endrew F. v. Douglas Sch. Dist. RE-1.*  The child's IEP "must aim to enable the child to make

progress.  After all, the essential function of an IEP is to set out a plan for pursuing academic and

functional advancement."  Endrew F. at 1000.

The Hearing Officer relied on a speech evaluation that showed E.M. made progress and

developed abilities in the use of assistive technology in speech augmentation.  AR 0011.

However, he failed to identify which speech evaluation he relied on.  AR 0011.  E.M. contends

there is not a LISD speech evaluation in the record that supports this finding.  LISD never

provided E.M. instruction in assistive technology while she was enrolled in LISD.  AR 0585-

0589.  After her parents filed a due process complaint, at a Nov. 14, 2014 ARD meeting, LISD

proposed goals to support E.M.'s use of an ACD but the goals were never implemented.  AR

2516-17.  In fact, at the Sept. 24, 2014 ARD meeting, the Executive Director "explained that the

district is not opposed to developing goals to address [E.M.]'s use of assistive technology."  AR

0868.  Further, LISD never provided E.M. with an ACD or instruction.  Her parents sought

instruction on an ACD from a private SLP in July 2013.  AR 3349.  Thus, LISD's proposal to

discontinue articulation therapy and sign language support is not related to whether not LISD denied E.M. a FAPE because she failed to make educational progress in reading, spelling, listening comprehension, math and fine motor skills. The question is whether or not LISD could discontinue providing articulation therapy and sign language support for a child with CAS and focus solely on augmentative communication for a child in the 3RD grade.  Based on peer-reviewed research, three private speech therapists' opinions all recommended continuing articulation therapy along with sign language facilitator support.  Two private BCBAs also supported continuing articulation therapy and sign language facilitator support.  Then, after the filing of a due process hearing, an independent SLP therapist with vast experience in communicator disorders who evaluated E.M. recommended continuing articulation therapy and sign language facilitator support until E.M. could use an ACD competently and quickly.  Despite all this expertise provided by her parents, all who had worked with E.M., LISD supported the SLP Intern proposed discontinuation.  The SLP Intern was the only LISD SLP who testified provided E.M. speech therapy for less than three months when she made that recommendation. Everybody else involved from LISD provided supervisory support or, in the case of LISD's expert consultant, who only reviewed school records.

G.     **The Special Education Hearing Officer Erred in Relying on the Credibility of LISD SLP Intern**.

E.M. incorporates by reference the section in Doc. 37, entitled Hearing Officer's Credibility Determinations of Experts is not Supported by Non-testimonial Evidence.  E.M. reurges previous arguments made, particularly the arguments related to the LISD SLP Intern. LISD's claim that the LISD SLP Intern recommendations are comparable to IEE SLP McGlothlin's recommendations is not supported by the evidence in the record.  LISD SLP Intern and McGlothlin both recommended a total communication approach but the similarities end

there.  McGlothlin recommended LISD continue frequent and intense speech therapy to E.M.
AR 0690.  SLP Intern recommended discontinuing articulation therapy and sign language
facilitator support.  She offered one speech therapy goal – to select the correct picture given an
array of 4 pictures and verbal descriptive sentence.  AR 0592.  She offered no assistive
technology instruction.  AR 0602.  McGlothlin recommended continued speech-language
therapy through LISD, targeting total communication skills via (a) specific and ongoing training
for E.M., her parents, and appropriate professionals with an augmentative communication
specialist using a dedicated device and the LAMP system; (b) continued provision of a sign
language interpreter to facilitate E.M.'s communications in the classroom until she is
competently and quickly communicating via her augmentative communication device; (c)
continued support of recently improved speech sound production skills through modeling of core
vocabulary and requests for a verbal attempt of words that E.M. either types or signs during
structured activities supported by intense and frequent individual therapy, provide multi-modal
cueing, and to address characteristics of dysarthria, provide support for respiratory, phonatory,
and articulatory systems through attention to adequate postural positioning when seated.  AR
0690-91.  McGlothlin is an experienced SLP who has worked with and evaluated students as
complex as E.M. and is nationally known and published in this area.  AR 0693-97.  LISD
provided no vita for SLP Intern.  McGlothlin provided information regarding the treatment of
CAS and Dysarthria including several websites and possible goals of treatment and
recommended continued outside therapy services to facilitate improvement in speech and gross
and fine motor skills.  AR 0690-91.

    LISD claimed that McGlothlin's recommendation to continue the sign language
facilitator support was based on her conclusion that E.M.'s primary mode of communication was

sign language.  E.M. herein incorporates by reference the arguments raised in Finding of Fact No. 24, Doc. 37 and in this brief.  McGlothlin did not conclude in her evaluation that E.M.'s primary mode of communication was sign language.  In contrast, LISD's own documents, including the 2011 and 2013 FIE and ARD meetings held since 11/30/2012 until the 11/14/2014 ARD meeting reference sign language as E.M.'s primary mode of communication.  *See* AR 0507; AR 0582; AR 0642; AR 0678..  After the due process complaint was filed, despite conducting no new assessments or evaluations, the 11/14/2014 ARD Committee revised the Current Mode of Communication so that E.M.'s primary mode of communication was typing (AAC).  AR 2497.  Thus, until the November 2014 ARD committee revised E.M.'s primary mode of communication, LISD is the one who believed E.M.'s primary mode of communication was sign language.

To support its position that its staff and expert's credibility deserved the Hearing Officer's deference, LISD cited to a case that found "the Court was not at liberty to favor Dr. Mattis' opinion, that of a privately hired expert, over the deference that should appropriately be accorded to the District in matters of educational policy."  *Dirocco v. Bd. of Educ. of Beacon City Sch. Dist.*, No. 11 Civ. 3897 (ER), 2013 WL 25959, at *22 (S.D.N.Y. Jan. 2, 2013).  However, as in this case, "[d]ocuments or objective evident may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."  *Anderson  v. Bessemer City*, 470 U.S. 564, 575 (1985).  E.M.'s private speech therapists were not privately hired experts for this hearing.  They had provided speech therapy services to E.M. for several years.  Their written reports and Sekhon and Wayman's testimony supported E.M.'s parents' position that articulation therapy should not be discontinued nor should the support of the sign language facilitator be discontinued.  Their

23

positions deserve deference.   However, IEE SLP McGlothlin was in an unique position.

McGlothlin was chosen by the parents to conduct an independent speech evaluation.  AR 3094.

LISD paid her as an independent evaluator.  AR  3094–3163.  LISD also paid for her to attend

the ARD held on 9/24/2014 to discuss the IEE report.  AR 3642.  So, McGlothlin was not a

"privately paid expert" because LISD paid her to conduct the evaluation and to attend the ARD

meeting to discuss the IEE report.   Thus, McGlothlin was truly an independent expert SLP

therapist whose recommendations ran counter to those of the LISD.   Her recommendations

deserved deference by the Hearing Officer.

H.      **The Special Education Hearing Officer's Findings of Fact are not Supported by the Evidence in the Administrative Record**.

E.M. incorporates the arguments referenced in Doc. 37.  In Doc. 37, E.M. outlined the

errors the Hearing Officer made in the Findings of Fact.  E.M. specifically referenced errors in

the record that were not supported by the Hearing Officer's Findings of Fact.  Interestingly,

LISD claimed E.M. exhibited progress on a social skills goal because she used her AAC device

to communicate with her general education peers.  However, the 2ND grade social skills goal that

was in effect did not mention the use of an AAC device.  AR 0517.  Specifically, that goal states,

"[E.M.] will give an appropriate response to the intraverbal question of a peer 5 times for 3

consecutive probe days* probes taken once a week."  AR 0517.  Her 3RD grade IEP social skills

goal stated she would type or sign a response.  AR 0590.  However, because of the effect of

"stay-put," E.M.'s 3rd grade IEP goal should never have been implemented.  Other than the

classroom, it is hard to imagine the usefulness of an AAC device when E.M. was at lunch

because it would not be heard or when she was on the playground during recess. AR  4141.  The

appropriateness of focusing solely on an ACD is flawed.

What's most confusing is LISD's sudden focus on providing E.M. instruction on an ACD when E.M. was in the 3RD grade.  At the 11/21/13 ARD meeting when discussing communication interventions for the 3rd grade, the ARDC reported "Based on FIE and observation, [E.M.] presents with expressive and receptive language impairment.  She requires speech therapy and instructional support within her classroom to increase communication.  Her primary mode of communication is sign/sign approx./typing and emerging vocal approx.   Communication instruction should be facilitated using ABA/Verbal Behavior principles" which was the same as the prior ARD meetings.  AR 0582.

## DISPUTED FACTS

The following are disputed facts challenged by Plaintiff E.M.  Record citations to the correct facts are included herein:

**DISPUTED FACT:  LISD claimed that due to E.M.'s significant disabilities, including her inability to verbally communicate, no reading assessment exists that can accurately measure E.M.'s reading skills.  Doc. 36 pg. 13**

LISD claimed that due to E.M.'s significant disabilities and her lack of verbal communication, an accurate assessment of E.M.'s reading skills is not possible.  E.M.'s 2ND grade special education teacher, testified that E.M. has really splintered skills in reading.  AR 3911.  She has hyperlexia and "is really great at sight words and decoding and spelling and things like that."  AR 3911.  LISD's assessment indicated that in the second grade, E.M. was reading and spelling second-grade words.  AR 3911-12.  This was also true for the third grade.  AR 3911-12.  In second and third grade, E.M. made progress with her peers in reading and spelling.  AR 3912.  LISD's reading comprehension assessment showed she struggled but was able to match a picture to a sentence.  AR 3912.  LISD claimed that no reading assessment exists for students like E.M., but see a list of reading assessments for non-verbal students at Exhibit A.

According to E.M.'s 2nd grade special education teacher, portions of three different assessments were used to assess her reading skills - the DRA (Diagnostic Reading Assessment), DIBELS (Dynamic Indicators of Basic Early Literacy Skills) and CLASS (Classroom Assessment Scoring System).  These three assessments are problematic for students with communication issues or are non-verbal.  The DRA is appropriate for only one special population – students that are English Language Learners (Google Search).  The DIBELS generally excludes students who are deaf, who stutter, who are completely nonverbal or have severe phonological difficulties. (https://dibels.uoregon.edu/help/faq/).  Finally, according to the manual for the CLASS, it has not been validated in self-contained special education classrooms, such as E.M.'s special education classroom.[2]  Thus, LISD's claim is unsupported, the reading assessment was inappropriate and failed to measure E.M.'s reading comprehension skills.

**DISPUTED FACT**:  **LISD claimed that decisions made at the May 23 2013 ARD meeting were made solely to accommodate E.M.'s mother's requests**.

The May 23 2013 ARD meeting was held to correct errors in the Annual ARD which began on 11/30/2012 (hereinafter 2012-13 Annual ARD), amend a reading comprehension goal and review Extended School Year Services (ESY).  AR 2835; 2845-46.  E.M.'s mother requested this meeting to seek correction of many errors in the 2012-13 Annual ARD meeting.  AR 2834; 2845-46.  E.M.'s mother pointed out the following errors:  (1) E.M.'s academic and achievement levels were wrong; (2) LISD failed to designate an IEP goal for ESY services; (3) the start dates for all the related services were wrong; (4) the related services were to begin on 11/30/2012 but the ARD committee (ARDC) did not agree to implement those services until 1/25/2013; (5) information was missing from the ARD minutes; (6) pages were missing from the ARD document; (7) a mistake regarding ESY services needed to be corrected; (8) an ESY goal need to

---

[2] https://www.vbgrowsmart.com/providers/Documents/CLASSImplementationGuide.pdf
- pg. 60.

be designated and corrected; and (9) ESY service time needed to be re-allocated to accommodate E.M.'s lack of speech progress since 1/25/2013.. AR 2834; 2845-46; Compare AR 2766-67 with 2836-37.  Contrary to LISD's statement, the provision of ESY services had previously been agreed to at the 2012-13 Annual ARD meeting.  AR 2766-67.

Further, LISD falsely claimed that E.M.'s mother requested the support of a sign language interpreter during ESY.  The sign language interpreter support was previously approved at the 2012-13 Annual ARD meeting.  AR 2767.

Furthermore, LISD claimed that E.M.'s outside therapist did not understand the 5/23/2013 reading goal.  Prior to the 5/23/2013 ARD meeting, her mother met with LISD staff members including a reading interventionist to review the reading assessment conducted by LISD, dispute its appropriateness, and develop an additional goal.  AR 2834; 2846.  At the 5/23/2013 ARD meeting, the ARDC agreed that due to a lack of progress, the previous reading goal was discontinued and replaced with "a very broad standards based goal."  AR 2834.  The ARDC replaced the reading comprehension IEP goal because the LISD reading interventionist developed a new goal.  AR 2841; 2846.  The LISD interventionist explained that the new goal targeted reading skills to help develop visual organization for the text E.M. read.  AR 2846.

LISD falsely claimed that at this meeting E.M.'s mother provided a summary of E.M.'s progress in articulation which showed little to no progress on her speech goals for over two years.  At this ARD meeting, E.M.'s mother expressed concern about the lack of progress on her speech goals since 1/25/2013 and provided a chart tracking E.M.'s progress on her IEP speech goals.  AR 2846; 2854-57.  The chart compared E.M.'s speech baseline skills with progress reports issued on 1/25/2013, 3/1/2013 and 4/19/2013.  AR 2854-57.  The chart showed little to no progress on her five speech therapy goals since 1/25/2013 and E.M.'s failure to even meet the

IEP baseline skill levels.  AR 2846; 2854-57.  E.M.'s mother requested additional speech therapy to address her lack of progress.  AR 2847.  Thus, the chart summarized E.M.'s progress on her speech goals between 1/25/2013 to 4/19/2013.   The chart never addressed articulation skills **since 2011**, as LISD claimed.

**DISPUTED FACT: LISD claimed that E.M. would not likely demonstrate functional communication.**

LISD's claim that E.M.'s sound production repertoire would not likely result in functional communication, "…because the sound approximations produced…. were the results of tactile, visual, and verbal prompts."  This claim was contradicted by LISD's outside expert.  Addressing E.M.'s sound production repertoire, LISD expert Records testified, "Those are just a few of the sounds we need to talk," and "I think using verbal, visual, and tactile prompts are okay."  AR 4189-90.  Thus, LISD's claim is unsupported by its own expert.

**DISPUTED FACT: LISD claimed that E.M. did not demonstrate spontaneous sign language.**

LISD claimed that E.M. did not demonstrate spontaneous sign language during the testing observations, other than signing to request her iPad.  During the 2013 FIE Autism assessment, E.M. was observed in her special education communications classroom only on two occasions, as well as during inclusion in the general education classroom, and while she was assessed.  AR 2882.  During those observations, the evaluator observed E.M. did not engage with other students in her special education classroom but used spontaneous signs with her special education teacher to request, respond to questions, and refuse items she did not want.  AR 2882.  In the general education classroom, the evaluator observed E.M. required prompting from the paraprofessional to greet peers with a vocalization and gesture.  AR 2882.  E.M. engaged in vocal stimulation more frequently in the general education classroom and played different games

with her peers, including but not limited to hangman and a game involving synonyms.  AR 2882; AR 3910.  When she left the general education classroom, E.M used gestures to say bye to her peers and signed their names, when prompted by her sign language facilitator.  AR 2882.  E.M. even signed with her 3rd grade general education teacher.  AR 0629.  There was clearly a difference in the amount of signing E.M. did in her general education classroom as opposed to her special education classroom.

Furthermore, when she conducted the receptive sign language evaluation, the Auditory Impairment (AI) teacher observed E.M. in only one setting - the special education classroom. AR 2882.  She observed E.M. working on a puzzle with her paraprofessional and one-on-one with her teacher. AR 2882.  Neither situation lent itself to much communication.  The AI teacher did not observe E.M. interact or communicate with her special education classmates.  AR 2882. Most importantly, the AI teacher did not observe E.M. in her inclusion general education classroom or any other setting where E.M. interacted with her non-disabled peers.  AR 2882.

Thus, LISD's claim that E.M. did not demonstrate spontaneous sign language is not supported by observations by the Autism team or the flawed observation by the AI teacher.

LISD also argued that sign language support should be discontinued because E.M. is not deaf and her use of sign language had not increased.  AR 0606-07.  LISD did not develop any IEP goals during her second grade school year to add additional signs.  AR 0515.  LISD recommended E.M. use "total communication" which includes sign language and vocalizations but does not want to support either vocalizations or sign language.  AR 0607; 0611.

**DISPUTED FACT**:  **LISD misrepresented Dr. Carbone's recommendations.**

LISD claimed that Dr. Carbone's 2012 report recommended the use of an AAC device to enable functional communication.  Doc. 36, pg. 12.  However, Dr. Carbone recommended the continued use of sign language.  Specifically, he recommended:

> "It will be important to continue to develop her mand repertoire through signs however it is recommended that to fully benefit [E.M.] that her response form should also be developed through spelling and the use of a voice output devices.  *While signing will be more practical and functional for [E.M.] at the moment, as her language becomes more sophisticated a voice output device will enable the complexity of her language skills to be understood by others, enable [E.M.] to fully convey her needs and develop conversational skills and interact socially with others with more proficiency*."  [Emphasis added].  AR 3249.

This recommendation was also supported by McGlothlin, E.M.'s expert SLP, who recommended to continue to support E.M.'s sign language "until she is competently and quickly communicating via her SGD (sound generating device)." AR 0690.

In a more recent March 18, 2014 communication with Dr. Carbone, based on his review of recent school and home data and data obtained by Lori Sekhon, SLP-CCC, E.M.'s private SLP related to progress in E.M.'s speech production, he suggested "that educational efforts focus on improving speech production in the context of functional use of language during manual sign language request (mand) sessions."  AR 3264.  His conclusion was also based on E.M.'s young age and the "extraordinary benefit" that any level of intelligible speech brings to a person with autism.  AR 3264.  Thus, LISD's claim that Dr. Carbone supported the sole use of an AAC device is not supported by the evidence.

**DISPUTED FACT**:  **LISD claimed that the 2013 FIE speech and language assessments revealed that E.M. is a nonverbal communicator who is not understood by listeners when she attempted to vocalize**.

Actually, it was not the 2013 FIE speech and language assessments that revealed E.M. is a nonverbal communicator who is not understood by listeners when she attempted to vocalize.  This information was "revealed" in the LISD's **2011** FIE speech and language assessments.  The

2011 FIE speech and language assessments indicated that E.M.'s verbal skills were not sufficient to communicate effectively in the educational environment without the assistance of an aided augmentative communication system.  AR  0645.  Based upon previous and current evaluations, observations, and therapy data, the 2011 FIE reported E.M. demonstrated a severe impairment in receptive and expressive language and at that time it was determined that E.M would benefit from Speech Therapy services to make progress on her IEP goals and objectives.  AR 0645. Although the 2011 FIE recommended use of an ACD to assist E.M. in communicating within her educational environment, it never provided an ACD or instruction on an ACD.  AR 0645.  Based on evaluation data, specific recommendations made in the 2011 FIE were to:

a. Encourage and model vocal approximations for E.M. to imitate.
b. Provide interventions to enhance comprehension of communication from others.
c. Provide E.M. with a verbal output device to enhance communication.
d. Encourage E.M. to access the verbal output device in all educational environments.
e. Provide E.M. with appropriate sign language for new vocabulary.
f. Utilize multiple, shorter length therapy sessions, rather than fewer, longer length sessions.
g. Ongoing consult with classroom staff.

AR 0646.

Even though there was no change in E.M.'s status as a nonverbal communicator between the 2011 FIE and the 2013 FIE, LISD based its recommendation to discontinue articulation therapy and focus solely on an ACD on the results of the 2013 FIE claiming the recent speech and language assessments "revealed" E.M. was a nonverbal communicator who was not understood by listeners when she attempted to vocalize.  If this was the true reason why LISD recommended discontinuing articulation therapy and focusing solely on an ACD, LISD should have started E.M. on an ACD after the completion of the 2011 FIE.

Further, as recent as an ARDC at a meeting held on 11/30/2012, LISD listed E.M.'s primary mode of communication as sign/sign approximation/typing and emerging vocal

approximations.  AR 0507.  E.M. required the following communication interventions:  speech therapy and instructional support within her classroom to increase communication, communication instruction would be facilitated using ABA/Verbal Behavior principles including intensive direct teaching, Natural Environment Teacher, augmentative communication using sign and VOCA with differential reinforcement of vocalization.  AR 0507.  Although a voice output system with access to a keyboard was determined necessary by the ARDC, no assistive technology services were determined necessary for E.M.  AR 0521;  0527.  Further, the ARDC failed to develop any 2012-13 IEP goals or objectives that addressed assistive technology.  AR 0512-0519.  It did however develop five IEP goals that addressed articulation skills with three levels of cueing and prompts.  AR 0518-19.  The ARDC developed IEP goals that addressed articulation skills even though E.M. had a limited sound repertoire.  AR 0643.  Thus, comparing the 2011 and 2013 FIEs, there was no difference in the assessment results for articulation or E.M.'s limited sound repertoire yet it was not until 2013 that LISD proposed discontinuing articulation therapy and focusing solely on an ACD.

**DISPUTED FACT:   LISD claimed that without cueing E.M.'s articulation accuracy decreased even further.**

In response to the LISD statement that without cueing E.M.'s articulation accuracy decreased even further, there was no data presented to support this claim.  Each of the five speech therapy goals for the 2012-13 school year included data sessions with tactile, visual and verbal prompts, visual and verbal prompts, and verbal prompts.  AR 0518-19.  All of the IEP speech therapy goals for the 2012-13 school year included data sessions with prompts.  AR 0518-19.  However, the LISD SLP Intern testified that she did not take any notes on cueing.  AR 3454.  Thus, there is no data or evidence in the record to support LISD's claim.  Except for a few data sheets, the SLP Intern failed to take any data that distinguished what type of prompt she

provided.  AR 1034 -1050.  Thus, because the SLP Intern took no data on cueing, it cannot be determined what type of prompt was successful or not.

Even though LISD claimed that E.M.'s articulation accuracy decreased with cueing, the 2013 FIE supported the use of cueing.  AR 2880.  Specifically, the 2013 FIE stated "Her greatest success in articulatory productions required a combination of cueing, including tactile, visual, and verbal support."  AR 2880.  Thus, according to data taken during the 2013 FIE, E.M.'s articulatory productions were most successful when combining tactile, visual and verbal support cueing but without supporting data on the 2nd and 3rd grade IEP speech goals it would be impossible to determine whether the data gathered by the SLP Intern supported this conclusion.

**DISPUTED FACT:  LISD provided E.M with intensive and frequent speech therapy focused on articulation and sound production.**

It is undisputed that E.M. has CAS.  CAS is defined as a "neurologic speech disorder in which the musculature around the articulators is fine and unimpaired, but the client is unable to produce correct speech sounds.  AR 3481.  Further, ASHA [American Speech-Language-Hearing Association] recommends frequent and intensive therapy.  AR 3481.  E.M. demonstrated many characteristics of CAS.  AR 2879.  When asked if E.M. had been receiving intensive therapy from LISD, the LISD SLP Intern testified that E.M. received two and a half years of therapy targeting articulation but never testified that this met ASHA's definition of intensive therapy for a child with CAS.  AR 3517.  The SLP LISD hired as an expert testified that "[a]ll those speech disabilities would require intensive therapy, certainly something where you want to explore for a good solid six months intensive therapy, and then build on that progress to get that child some functional communication skills."  AR 4192-93.  LISD only provided E.M. with 30 minutes of direct speech therapy a week which would hardly qualify as intensive or frequent.  AR 3517.

**DISPUTED FACT:  LISD claimed E.M. has a severe cognitive disability**.  Doc. 36, pg. 15

Prior to the 2013 FIE, E.M. did not have a cognitive disability.  As reported in the 2011 LISD FIE, E.M.'s performance on the Leiter, a nonverbal measure of fluid reasoning and visualizations, indicated that she "demonstrated average to low average abilities on tasks that assessed her ability to discriminate essential from nonessential details and match and visually compare items in complete pictures.  AR 0644.  She scored in the average range on tasks measuring completing patterns, processing, and sequencing, reasoning and problem solving in novel situations (Fluid Reasoning Composite SS=84, Brief IQ Composite SS=83)."  AR 0644. Three measures of E.M.'s current cognitive abilities reported in the 2013 FIE indicated that E.M.'s nonverbal cognitive functioning was within the lower, delayed range, not the severe range.  AR 0666.  Thus, LISD's claim that E.M. has a severe cognitive disability is unsupported by its own Full and Individual Evaluations.

LISD also claimed that E.M.'s lack of progress on her articulation goals was due to her "severe" cognitive disability.   Specifically, LISD claimed: "Compounding matters, E.M.'s receptive and expressive language is severely impaired and commensurate with her severe cognitive disability.  In fact, as a result of her severe cognitive disability, E.M.'s language is expected to be limited to single words or short phrases."  Doc. 36, pg. 15.  However, when McGlothlin conducted the IEE speech therapy evaluation, E.M.'s cognitive ability did not impact her functional communication.  AR 3621.  In fact, E.M. was able to complete assessment tasks with minimal repetition of instructions or redirection to task.  AR 0687.  E.M.'s communication difficulties are likely due to a combination of CAS and Dysarthria, both motor speech disorders. AR 0688; see also AR 3466.  According to McGlothlin, research shows that motor control and motor learning are not tied to IQ necessarily.  AR 3581.  Furthermore, McGlothlin explained

"[t]he only reason IQ would play any role is if she was unable to follow directions that would facilitate motor learning.  For a child that can follow directions and can participate in therapy, they can continue to make progress."   AR 3581.   E.M could follow directions and therapy directions.  AR 3581.  Thus, the reason E.M.'s language may be expected to be limited to single words or short phrases is because E.M. has CAS and dysarthria, both motor planning issues, not due to an alleged severe cognitive disability.  Therefore, LISD's claim that E.M.'s language is expected to be limited to single words or short phrases because E.M. has an alleged severe cognitive disability is not supported by LISD's own 2011 and 2013 FIE results or by the IEE results.

**DISPUTED FACT**: **E.M.'s special education teacher claimed she could create opportunities in the classroom to practice several proposed high frequency words such as Hi, Mom, Open, Home, Help, Bye, Papa, Bathroom. Doc. 36, pg. 17.**

At the 9/24/2014 ARD meeting, after the due process hearing request was filed, ARDC members proposed an IEP goal to work on eight high frequency words.  AR 0866.  The proposed words were:  Hi, Mom, Open, Home, Help, Bye, Papa, and Bathroom.  AR 0866.  E.M.'s parents, private speech therapists and the speech therapist who conducted the IEE were concerned that the words chosen were not words E.M. would use in her educational environment.  AR 0868; 4398.  E.M.'s parents complained that there would be very few opportunities, if any, to say "Mom," "Papa, or "Home" during the school day.  AR 4398. McGlothlin agreed there would not be opportunities to say words like "home," "Mom," and "Papa" in a functional way and her teacher would have to contrive or "set up" opportunities in the school setting in order to say those words.  AR 3635; 2664-65.  E.M.'s special education teacher claimed she could "set up" opportunities for E.M. to practice these words.  AR 3898. E.M.'s parents were concerned about could happen in contrived situations.  LISD SLP White

testified "Without tying meaning to the word that's produced, it becomes an exercise in familiarity. It doesn't necessarily become incorporated into someone's comprehension, and therefore they don't translate it into spontaneous use later." AR 4399. It was McGlothlin's opinion that the chosen words "need to be high frequency in the school setting." AR 3635. It was also important to E.M.'s parents that the chosen words be meaningful to E.M. For example, the word "Papa" was not meaningful to E.M. because she did not call her father "Papa." AR 4398. E.M.'s speech therapists proposed the following words: "on, help, all done, my, open, book, iPad, phone, move, stop, music, yes, no." AR 1887. It was clear LISD chose words that were not meaningful to E.M. or appropriate at school. In fact, LISD SLP Intern had no idea what E.M. called her father. AR 3523.

**DISPUTED FACT: LISD claimed that the IEE evaluator did not recommend direct speech therapy.**

LISD's claim that IEE SLP McGlothlin did not recommend that the District continue direct speech therapy is patently false. In her Speech Language Evaluation, McGlothlin specifically recommended that LISD:

> "Continue speech-language therapy through LISD, targeting total communication skills via:…
> …
> c.    continued support of recently improved speech sound production skills through modeling of core vocabulary and requests for a verbal attempt of words that [E.M.] either types of signs during structured activities
> (i)    Research supports the need for intense and frequent individual therapy for child with CAS (ASHA). http://www.asha.org/policy/TR2007-00278.htm
> (ii)    (ii) Provide multi-modal cueing. Give auditory cues (e.g. overemphasize sounds, provide slow model), visual cues (e.g. watching the speaker's mouth during production attempts), verbal cues (e.g., "close your mouth" when producing bilabials) and tactile and rhythmic cues (e.g., touching the place of articulation, tapping out syllables, and indicating movement of sequential speech production through gestures and sequenced tactile cues)…" AR 0690-91.

Thus, McGlothlin's Speech Language Evaluation specifically recommends that LISD continue speech language therapy to support E.M.'s recently improved speech sound production skills through intense and frequent individual therapy with multi-modal cueing.   Therefore, LISD's claim that McGlothlin did not recommend LISD provide E.M. with direct speech therapy is not supported by the evidence in the record.

**DISPUTED FACT:  LISD SLP Intern claimed E.M.'s IEP speech therapy required her to credit correct sounds only.**

LISD SLP Intern only gave E.M. credit on her IEP speech goals when E.M. produced correct pure sounds in the first five trials.  AR 3454.  Even though LISD SLP Intern agreed that sound approximations were "stepping stones" to pure sound, she claimed that E.M.'s speech goals were written to produce the sound.  AR 3519.  Even though E.M.'s private speech therapist and the LISD ESY SLP therapist gave E.M. credit for sound approximations on the 2ND grade speech goals, LISD SLP Intern "interpreted it this way because we were working towards functional communication with E.M."  AR 3521.   IEE SLP McGlothlin acknowledged that speech production would be difficult for E.M. and a therapist would "have to take a very stepwise approach and teach her all the sounds in different contexts so that she can produce them together in different contexts."  AR 3578-79.  McGlothlin explained that "[she] would never expect her [E.M.] to have accurate productions every time.  Because she presents with dysarthria (damage to the nerve system) as well as apraxia of speech, which limits her ability to execute speech sound production and there's always going to be distortions that are present."  AR 3579.  McGlothlin would not give up on articulation even based on E.M.'s complexity because motor control and neurological maturation continues through adolescence and, according to research, motor learning continues to develop.   AR 3579.   Because the world at large uses verbal communication, and speech production is the easiest way for the world to communicate with

37

E.M., McGlothlin's opinion was that speech production should not be discontinued at this time. AR 3579-80.  She also cited safety issues and quality of life as additional reasons not to discontinue speech production.  AR 3580.  She explained that based on her experience with students like E.M. that have autism, apraxia and dysarthria, students with complex needs,

> "[m]y experience with kids like her is that they ebb and flow in their abilities, different days are better than others.  She may make progress, and then plateau for a while and then make more progress.  Again, that neurological maturation has such a big part of how a child develops and how their motor control develops over time.  And when we provide therapy and we facilitate that, we never know when those periods are going to be.  So it's really hard to make a decision and say, oh, we're done, because we don't know what happening neurologically.  And, you know, as a child continues to make progress, and especially a child with autism, where we're not quite sure what all is in there as far as what she wants to say and what she knows, it's really difficult to make that determination yes or no, you know, she's done or she's not done."  AR 3580

McGlothlin reviewed E.M.'s 2ND grade IEP speech goals implemented during E.M.'s third grade school year as the "stay-put" goals and disagreed with SLP Intern's interpretation of how to score the speech goals.  McGlothlin opined that the way the speech goals were written, the therapist should be taking data on approximations, because the goal did not require data taken on exact sound production. AR 3576-78; AR 0518.

Because E.M. could follow directions and therapy directions, McGlothlin recommended not giving up on the total communication approach and focus solely on one method of communication, like LISD proposed.  McGlothlin testified "especially [since] she has shown us that she can do a lot in a lot of different ways" and "[s]he communicates in a variety of ways fairly successfully."  AR 3581.  McGlothlin sees children like E.M. in her practice "[a]nd [she] really believe[s] and see[s] in [her] practice that when we allow children to communicate in ways that make sense for them that also communicate in ways that allow for more rich communication, we see them make more progress.'' AR 3581.  She testified

"[t]he augmentative communication research is very clear that when we allow children to use alternative methods in place of speech, their speech production improves, because they are motivated to communicate and they feel successful. But the flip side of that is that when children are allowed to use a total communication approach, we can facilitate speech production by having an augmentative communication tool available as well as to augment, which is why it's call that."  AR 3582.

According to McGlothlin, limiting a child to an ACD, although they have other modalities of communication available, "we are not making use of those jumps in progress that happen, that maturation that happens."  AR 3582.  Further, "if a child is going through a motor control spurt, where things are starting to connect and they're able to put more things together verbally, and if we don't facilitate that, we can miss out on some of that."  AR 3582.  McGlothlin believed that to address E.M.'s dysarthria the she had to sit properly in a 90-degree seated position and not slouch in a chair.  AR 3637.  None of LISD "experts" testified, referred or referenced current research nor based their opinions on any research.  They were more concerns about their ethical duties.  AR 0611.  McGlothlin was the only speech therapist who cited to research that was relevant to E.M. – research on motor planning and research in augmentative communication.

**DISPUTED FACT**:   **LISD claimed that McGlothlin incorrectly concluded, without assessment, that E.M. "understands and uses basic sign language" and that incorrect conclusion that sign language is E.M.'s primary mode of communication formed the basis of McGlothlin's opinion that the District should continue the use of a sign language interpreter for E.M. until she is competently communicating with her AAC device.  Doc. 36, pg. 21.**

LISD claimed that McGlothlin concluded that E.M. "understands and uses basic sign language" without any basis and from that incorrect conclusion determined that E.M.'s primary mode of communication was sign language.  McGlothlin reviewed information from records from LISD, Monkey Mouths, Lori Sekhon, SLP, and family report.  AR 0686.  E.M.'s parents reported E.M.'s primary language is English and she understands and uses basic sign language. AR 0686.  Based on her review of the records from various sources, McGlothlin concluded E.M.

was able to comprehend a high percentage of signs and that she had an expressive vocabulary of some signs.  AR 3634.   McGlothlin noted that E.M. correctly identified 168/208 pictures (or 81%) after the sign was given without any word prompting, as reported in the 2013 FIE.  AR 0686.  McGlothlin concluded that "[E.M.] uses gestures, sign language, typing and voice output on her iPad to communicate with varying degrees of competency." AR 0689.   It was that conclusion McGlothlin based her prognoses and recommendations on.

LISD's repeated claim that McGlothlin concluded that sign language is E.M.'s primary mode of communication is false.  Doc. 36, pg. 21.  LISD fails to cite to any page that McGlothlin concluded E.M.'s primary mode of communication is sign language.  Nowhere in her report did McGlothlin state that E.M.'s primary mode of communication is sign language.  AR 0685-92. McGlothlin stated, "…E.M. uses gestures, sign language, typing and voice output on her iPad to communicate with varying degrees of competency."  AR 0689.  Further, "[t]he prognosis of improved total communication via speech production, improved augmentative communication skills (including typing and use of symbols/pictures), more precise sign language skills, and improved spontaneous repair strategies when communication breaks down is good with appropriate intervention and support at school throughout the day."  AR 0690.

LISD's lead SLP Traci White, who never worked with E.M., tried to support this incorrect conclusion.  AR 4396.   White testified, "As I understood Ms. McGlothlin in her recommendation, she indicated that the support with a sign language interpreter, she recognized it as being one of her primary modes of communication; and felt that until other modes were strong enough for her to communicate, that she wanted to make sure that she had a sign language facilitator or interpreter available for access for all of her curriculum within her educational environment."  AR 4396.  In its Motion for Judgment on the Record, LISD cites to White's

mistaken "understanding" of McGlothlin's recommendation to argue that McGlothlin incorrectly concluded that sign language is E.M.'s primary mode of communication and that McGlothlin then based her recommendation to continue the use of a speech facilitator until E.M. is competently communicating on her AAC device on this incorrect conclusion.   However, as noted, McGlothlin never stated that sign language was E.M.'s primary mode of communication. Conversely, LISD staff were the first to state E.M.'s primary mode of communication was sign language.   At the 11/30/12 ARD meeting, the ARDC listed E.M.'s Communication Interventions and stated, "Her primary mode of communication is sign/sign approx./typing and emerging vocal approx."  AR 0507.  In the 2013 FIE, the Current Mode of Communication stated E.M. initially used approximated signs of gestures to communicate, generally producing one-or two-word phrases. AR 0618; 4331.   In the Assistive Technology Section of the 2013 FIE, the LISD assistive technology team reported "[E.M.] uses gestures, sign language, and Word Wizard or an iPhone to communicate with various speaking partners.  She initially uses approximated signs or gestures to communicate, generally producing one- to two- word phrases."   AR 0679. Furthermore, at the Annual ARD meeting held on 11/21/13, when discussing communication interventions, the ARDC reported "Based on FIE and observation, [E.M.] presents with expressive and receptive language impairment.  She requires speech therapy and instructional support within her classroom to increase communication.  Her primary mode of communication is sign/sign approx./typing and emerging vocal approx.  Communication instruction should be facilitated using ABA/Verbal Behavior principles."  AR 0582.

Thus, in each instance LISD listed sign language as E.M.'s primary mode of communication.  It was not until after E.M.'s parents filed a the due process complaint, at the Annual ARD held in November 2014 to plan for E.M.'s 4TH grade school year, without any new

41

evaluation data to support a change, LISD listed typing as E.M.'s primary mode of communication.  AR 2497.

**DISPUTED FACT**:  **Testimony by LISD employees that E.M. did not attend to   her   sign language interpreter.  Doc. 36, pg. 16.**

Prior to filing for this hearing, E.M. received support in her inclusion general education classes from a sign language facilitator.  AR 4335-36.  This is the support LISD sought to discontinue but her parents fought to continue.

Starks-Graves, the LISD lead teacher for the auditorily impaired students, opined that E.M. did not attend to her sign language interpreter.  However, Starks-Grave's opinion was only based on her one observation of E.M. in her self-contained special education classroom.  She did not observe E.M. during morning announcements nor during her inclusion time in the general education classroom – a reading class and her specials classes which were science, art, music and gym, and lunchtime.  AR 4337.  Thus, Starks-Graves did not observe E.M. in any of the settings she was to receive sign language support.

Starks-Graves further testified that no students in E.M.'s special education classroom signed. AR 4330.  She did not observe E.M. with the sign language facilitator nor with a teacher who did not sign.  AR 4328.  Finally, Starks-Graves did not participate in E.M.'s augmentative communication evaluation.  When administering the ACD trials, the assistive technology team noted that "When requesting items, [E.M.] first signed for the desired object, then was prompted to use the device." AR 0679.   LISD's occupational therapist also testified that E.M. communicated with her by sign.  AR 4368.  Starks-Graves shallow opinion was based on one observation of E.M. in her special education classroom with no other signing students who could sign with E.M. and provide information on whether E.M. ignored her sign language facilitator. Starks-Graves opinion is discredited because of her limited, one time observation of E.M. in her

special education classroom that contained no other signing students, her failure to observe E.M. in her inclusion general education classroom with teachers who did not sign, or to participate in the assistive technology evaluation or consult with E.M.'s related service therapists, such as the occupational therapist.

LISD also cited to testimony from Kriste Fedor, E.M.'s fourth grade teacher, to support its argument that E.M. did not attend to the sign language interpreter.  AR 4301-02.  Fedor was E.M.'s teacher during the 2014-15 school year, the school year after E.M.'s parents filed their due process hearing complaint.  AR 4292.  Fedor knew how to sign.  AR 4301.  She was not E.M.'s teacher when the ARDC made the decision to terminate E.M.'s sign language support at the Annual ARD meeting on 11/23/2013.  She did not even meet E.M. until the Fall of 2014, almost a year after the decision to terminate the sign language support was made.  AR 4292. Thus, her opinion carries no probative value concerning E.M.'s need for sign language support because she did not know E.M. when the ARDC proposed to terminate the sign language support.

LISD cited to Records their expert consultant's testimony that students with cognitive impairments and autism, such as E.M. do not typically have the cognitive ability to pay attention to an interpreter.  AR 4211.  However, LISD misstated her testimony.  Records testified,

> "It's not been my experience with children that have cognitive, autism, oral communication problems that they're going to have the cognitive diligence to pay attention to an interpreter.  I would prefer to see that person be a paraprofessional that's been trained by a speech pathologist to sign to her and sign – and get her to sign back.  I think that's how you teach sign to be a functional mode of communication with kids that have intellectual disability and autism."  AR 4211.

The difference between an interpreter and a trained paraprofessional is that the interpreter would be signing as fast as everyone is speaking thus providing for spontaneous participation.  AR 4211.  Thus, Records never stated E.M. should not have sign language support.  Instead, she

believed that E.M. should be supported by a trained paraprofessional, not an interpreter, because "that's how you teach sign to be a functional mode of communication with kids that have intellectual disability and autism." AR 4211. Thus, the use of a sign language facilitator was recommended not only by McGlothlin and Carbone, but also by Records, LISD's expert consultant. AR 0690; 3249; 4211.

**DISPUTED FACT**:  **LISD argued that the September 24, 2014 ARD meeting supports its proposed termination of articulation in direct speech therapy sessions and support of a sign language facilitator.**

On September 24, 2014, an ARDC discussed the results and recommendations of McGlothlin's IEE. AR 0863-76. Citing to AR 3176, LISD claimed that E.M. "still presented with limited progress, if any, on her articulation goals from her 2012 IEP." Contrary to that claim, McGlothlin "explain[ed] that [E.M.] [has] had a recent growth spurt with sound production..." AR 0867. LISD agreed with McGlothlin that LISD used a total communication approach with E.M., specifically incorporating assistive technology and the LAMP methodology using the Words for Life application. AR 0867. However, LISD did not agree with McGlothlin's recommendation to include a sign language interpreter in E.M.'s IEP "because, as noted, Ms. McGlothlin had inaccurately concluded that sign language was E.M.'s primary mode of communication." Doc. 36, pg. 17. As noted above, McGlothlin did not conclude that sign language was E.M.'s primary mode of communication in her Speech Language Report. As already discussed, it was LISD's FIE results and prior ARD meetings that concluded that sign language was E.M.'s primary mode of communication. At this ARD meeting, school members of the ARDC claimed that E.M. did not require sign language support to access the curriculum. AR 0867. The ARDC failed to consider the general education curriculum in her general education classes.

At the 9/24/2014 ARD meeting, LISD proposed three new speech therapy goals.  AR 0866.  The first proposed goal addressed mastery of using one-word phrases with accepted vocal approximations, the second was to use work prediction strategies on her communication device, and the third goal addressed the mechanics of her communication device – turning the sound on, turning the volume up or down.  AR 0866.  All three goals were "Special Ed Teacher Integrated" which means that these goals would be integrated into E.M.'s instructional day.[3]   AR 3175.  Compare this to the only speech goal proposed at the Annual ARD meeting held on 11/21/2013, prior to E.M.'s parents filing for a due process hearing.  AR 0592.  That one goal was "given an array of 4 pictures and a verbal descriptive sentence (ex. Jane fell and scraped her knee), [E.M.] will select the correct picture with 80% accuracy over 3 consecutive sessions."  AR 0592.  The 11/21/2013 speech therapy goal failed to address E.M.'s use of an assistive communication device or address her articulation needs.  AR 0591.  At the 11/21/2013 ARD meeting (before the due process hearing was filed), the ARDC proposed reducing direct speech therapy services from four 30-minute sessions per week to two 30-minute sessions per week.  AR 0591; 0602.  A year later, the ARDC did not restore her direct speech therapy sessions to four 30-minutes sessions per week at the 11/17/14 ARD meeting, as they claimed.  AR 0867-68.

**DISPUTED FACT**:  **LISD claimed that E.M.'s mother was responsible for negotiations falling apart after the 9/24/14 ARD meeting.**

After the 9/24/2014 ARD meeting ended in disagreement, "[t]he district agreed to work with [E.M.]'s private therapist to develop a goal with agreed upon words and cueing and data collection for the core vocabulary goal. The ARDC also agreed to develop new goals to address [E.M.]'s use of her assistive technology." AR 0868. The reconvened ARD meeting was scheduled for October 3, 2014. *Id.*  After the ARD meeting, SLP Intern recalled she and Sekhon,

---

[5] LISD SLP Intern testified that she was not permitted to work on those integrated speech goals.  AR 3523.  She was only allowed to continue to work with the articulation goals.

E.M.'s private speech therapist, emailed each other and spoke trying to come to some agreement over the goal. AR 3471-72; AR 2662-63.  Sekhon responded with suggestions of other words to an email from SLP Intern. AR 3813-14.  The two discussed the appropriateness of the words, and Sekhon followed up the telephone conversation with a long email. AR 3814.  Sekhon never heard back from SLP Intern or any other LISD speech therapist, despite the expressed willingness to work together at the 9/24/2014 ARD meeting.  AR 3815.  Thus, LISD quit collaborating with E.M.'s private speech therapist and there was never agreement on the "high frequency words" speech goal.  The same words LISD chose appeared on the 11/14/2014 IEP speech goal.  AR 2516.

On October 1, 2014, LISD counsel sent draft speech goals to E.M.'s counsel.  AR 3277. On that same day, E.M.'s counsel responded that the LISD and private speech therapists were working on coming up with 7 words for the first speech goal.  AR 3277.  However, the words discussed were not the same words listed in the draft speech goals.  AR 3277.  In the email, E.M.'s counsel made a request on the mother's behalf that the LISD Assistive Communication person collaborate with E.M.'s private SLP providing assistive technology services to develop an assistive technology goal.  AR 3277.  Because there was still much work to be done on the words and the assistive technology goal, E.M.'s mother agreed to waive the scheduled 10 day ARD and requested a Brief ARD be scheduled in the near future to finalize the goals.  AR 3277.

Then, the LISD SLP Intern failed to respond to E.M.'s private SLP's email.  According to LISD Lead SLP White, neither she nor SLP Intern had any further questions that they needed Sekhon to answer, so SLP Intern did not respond.  AR 4401-4402. The Assistive Technology SLPs failed to collaborate.  And, a Brief ARD was never scheduled to implement agreed to

46

speech therapy and assistive technology goals.  Thus, it was LISD staff that failed to collaborate with the process agreed to at the 9/24/2014 ARD meeting.

On October 3, 2014, LISD sent E.M.'s parents a form entitled "Parent Agreement to Change IEP After the Annual IEP Meeting."  AR 3196-3199.  LISD claimed two additional speech therapy goals were presented on this form and Assistive Technology Services was added on a consult basis for 30 minutes.  AR 3199.  However, the "two additional" speech therapy goals were the exact same goals presented at the 9/24/2014 ARD meeting.  Compare AR 0866 with AR 3198.  Further, there were no changes in the seven "functional words" in the first speech therapy goal proposed at the 9/24/2014 ARD meeting.

On October 24, 2014, E.M.'s counsel sent an email to LISD's counsel informing them that E.M.'s private therapists would present draft goals to LISD for consideration in a couple of days.  AR 3200.  On October 25, 2014, LISD's counsel responded to the email and requested that E.M.'s private speech therapist make a video of E.M. making the sounds reported as mastered in private therapy to be helpful to draft new goals.  AR 3200.  She wrote, "I really think it would help resolve any remaining dispute."  AR 3200.

On October 30, 2014, E.M.'s mother sent parent proposed school SLP goals for LISD's review, including the high frequency words her private speech therapists thought were appropriate.  AR 1887-1889.  There was no response from LISD.  The parent proposed speech goals were not discussed at the 11/14/2014 or 12/11/2014 ARD meetings.

**DISPUTED FACT**:  **Implementation of Stay-Put Goals**

At the time E.M.'s parents filed for a due process hearing on 4/14/2014, the disagreement was over the discontinuation of articulation goals in speech therapy.  All other academic and related services 3rd grade IEP goals had been agreed to at the 12/17/2013 ARD meeting and the

47

ARD agreed to implement those goals upon E.M.'s return from the winter holiday in January 2014.  0607.  However, once the parents filed for due process hearing, the LISD insisted on reverting to the previous 2ND grade IEP goals agreed to at the November 2012 ARD and refused to implement the 3rd grade IEP goals.

LISD claimed that the 3RD goals and objectives agreed upon at the 12/17/2013 ARD meeting were not E.M.'s "stay-put" placement.  AR 2486.  However, that claim is false.  On April 21, 2014, a week after the parents filed their due process complaint, LISD's counsel sent an email to E.M.'s attorney seeking application of the stay-put rule.  AR 1601.  LISD counsel acknowledged that E.M.'s parents had been in agreement with many of the 3RD IEP goals at the ARD meeting held on April 4, 2014.  AR 1601.  In response, E.M.'s counsel responded that E.M.'s mother agreed to all the 3RD IEP goals proposed at the 11/21/2013 ARD except for the "Speech Therapy Goal #1."  AR 1602.  LISD counsel responded that she was "unclear" as to whether LISD had agreement to implement the other changes made in the IEP at the annual ARDC meeting.  AR 1602.  Further, she stated that it might be easiest to let her know what goals E.M.'s mother did not agree that LISD implement.  AR 1602.  E.M.'s counsel believed the previous email clearly stated what 3RD grade goals E.M.'s mother wanted implemented and those she did not.  On May 2, 2014, E.M.'s mother emailed E.M.'s teacher and let her know which 3RD grade goals she agreed to implement.  AR 1606.  Some of the 3RD grade IEP goals had already been mastered, according to the 2/28/2014 IEP Progress Report; so there was no need to continue implementation of those goals.  AR 1606.  On May 3, 2014, LISD's attorney rejected E.M.'s mother's agreement to implement the undisputed 3rd grade IEP goals and objectives and stated LISD would continue to follow the previous 2ND grade IEP, in its entirety, unless some agreement could be reached.  AR 1604.  The two options proposed by LISD's attorney were to

continue to implement the 2ND grade IEP goals and objectives, in its entirety, or agree to implement the 2ND grade IEP goals and objectives, in its entirety, with the exception of the implementation of all of the 3RD grade goals and objectives, and implementation of the iPad mini. AR 1604.  That second option would end the articulation therapy and sign language support E.M.'s parents filed a due process hearing request to keep.  Why would they agree to terminating articulation therapy and the sign language support they were complaining of?  The only option LISD offered would require the parents to waive a procedural safeguard right to ensure their child was able to progress educationally, despite agreement at the 12/17/2013 ARD meeting to implement the 3RD grade academic IEP goals.  AR 0607; 1552.  From January 2014 to soon after April 14, 2014, her teachers and the OT were implementing the academic 3RD grade IEP goals and objectives, almost three and a half months.  Because of "stay-put," LISD would not implement the 3rd grade IEP goals and objectives and E.M.'s teachers and related services reverted to her 2nd grade IEP goals and objectives from the 11/30/2012 Annual ARD

**DISPUTED FACT**:  **LISD claimed that E.M.'s ARD committee proposed increasing E.M.'s direct speech therapy back to four 30-minute sessions per week, in addition to the 20 minutes per week of consultation with staff.**

ARD meetings on November 14 and December 14, 2014 did not document an increase in E.M.'s direct speech therapy services.  AR 2529-33.  The Schedule of Service page states direct speech therapy services would be provided two 30-minute sessions per week, *not* four 30-minute sessions per week as LISD claimed.  AR 2527.  LISD claimed the copy of the ARD meeting E.M.'s mother received was a draft copy.  AR 4420-21.  This was the final ARD meeting to plan for E.M.'s 4th grade school year.  E.M.'s mother received the copy of the ARD meeting directly from the LISD's diagnostician after the ARD meeting in an email after the ARD meeting was held.  AR 4455-56. There is no documentary evidence supporting this claim.  AR 4449-51.

49

## SUMMARY

In summary, LISD has failed to provide E.M. the appropriate speech therapy services she is entitled to under the Individuals with Disabilities Education Act.  Based on peer-reviewed research and evidence based practices, LISD proposed to abandon articulation therapy based on a speech evaluation conducted by an inexperienced SLP Intern who had only begun to work with E.M. and failed to adopt recommendations from E.M.'s three private experienced speech therapists, her private BCBAs, all who had worked with E.M. for several years and, most importantly, the speech language therapist who performed the independent education speech evaluation.  All recommended total communication that included continued articulation speech therapy and sign language support for E.M.  By failing to consider evidence based practices and peer reviewed research, LISD's decision to discontinue articulation speech therapy and sign language support denied E.M. a free appropriate public education.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs E.M. and her parents requests judgment as follows:

(1)     That the Court enter an order granting E.M.'s Motion for Judgment on the Record and reverse the findings in the Decision of the Hearing Officer, issued on May 22, 2015;

(2)     That the Court enter an order finding the Hearing Officer failed to conduct an analysis under the standards established in *Michael F*., *Rowley*, and *Endrew F*. and a finding that E.M was denied a FAPE;

(3)     That the Court find that LISD denied E.M. a FAPE by failing to individualize her educational program regarding speech services based on appropriate assessment and performance data, and national practices and guidelines set by ASHA;

(4)     That the Court find that LISD denied E.M. a FAPE because the key stakeholders failed to work in a coordinated and collaborative manner;

(5)     That the Court find that the Hearing Officer made significant errors of fact in his Findings of Fact and are not supported by non-testimonial and extrinsic evidence in the record and such errors were critical and affected substantive issues in this case, leading to errors in his Conclusions of Law, thus denying E.M. a FAPE;

(6)     That the Court find the Hearing Officer's credibility determinations do not warrant due deference;

(7)     That the Hearing Officer made significant errors of law that were critical to the procedural issues in this case and thus denied E.M. a FAPE;

(8)     That the Court enter an order that E.M. was denied a FAPE and an award of compensatory services is an appropriate form of relief for such a denial;

(9)     That the Court enter an order the E.M. was denied reimbursement for private services provided during the relevant period of the due process hearing;

(10)    That the Court grant E.M. party status and grant an award of reasonable attorneys' fees and costs for this action and the administrative proceedings against LISD in an amount determined at the discretion of this Court as authorized by 20 U.S.C. §1415(i)(3)(B); and,

(11)    That the Court grant E.M. such other, further, and additional relief as the Court may deem just, proper and appropriate.

Respectfully submitted,

By:     _/s/Yvonnilda Muñiz_____

YVONNILDA MUÑIZ
Attorney-in-Charge
TEXAS BAR NO. 24007717

LAW OFFICE OF YVONNILDA MUÑIZ, P.C.
P.O. BOX 92018
Austin, TX  78709
Tel.  (512) 288-4279
Fax  (888) 398-8808
E-mail:  ymuniz@austin.rr.com
MR. MARTIN J. CIRKIEL
TEXAS BAR NO. 00783829

CIRKIEL & ASSOCIATES, P.C.
1901 E. Palm Valley Blvd
Round Rock, Texas  78664
(512) 244-6658 (Tel.)
(512) 244-6014 (Fax)
marty@cirkielaw.com [Email]

ATTORNEYS FOR PLAINTIFFS

51

**CERTIFICATE OF SERVICE**

On June 9, 2017, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel of record electronically.

Meredith Prykryl Walker
Nona Mathews
Walsh Gallegos Treviño
 Russo & Kyle, P.C.
105 Decker Court Suite 600
Irving, Texas  75062

/s/Yvonnilda Muñiz
Yvonnilda Muñiz


**CERTIFICATE OF CONFERENCE**

On June 9, I sent Meredith Prykryl Walker, lead counsel for Lewisville ISD, an electronic email requesting an extension on the page limitations.  Ms. Walker responded and agreed to a two page extension over the 50 page limitation.

/s/Yvonnilda Muñiz
Yvonnilda Muñiz


**CERTIFICATE OF COMPLIANCE**

Pursuant to the Scheduling Order dated April 28, 2016, the Court extended the page limitations for responses to dispositive motions to 50 pages, excluding attachments.  (Dkt. 13). Plaintiff E.M. conferenced with Ms. Walker who agreed to two pages for the 50 page limitation. Plaintiff E.M.'s response brief is 52 pages which exceeds the page limitation set by the Court but complies with Ms. Walker's agreed to two page extension, excluding the Cover Page, Table of

Contents, Table of Authorities, counsel's signature block, and the Certificates of Service, Conference, and Compliance.

/s/Yvonnilda Muñiz
Yvonnilda Muñiz