# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| E.M., A MINOR; S.M., NEXT FRIEND; | § | |
| AND C.S., NEXT FRIEND | § | |
| | § | Civil Action No. 4:15-CV-00564 |
| v. | § | Judge Mazzant |
| | § | |
| LEWISVILLE INDEPENDENT SCHOOL | | |
| DISTRICT | | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant Lewisville Independent School District's ("LISD") Motion for Judgment on the Administrative Record (Dkt. #36) and Plaintiff's Motion for Judgment on the Record (Dkt. #37). Having considered the motions and the administrative record, the Court finds that LISD's motion should be granted and Plaintiff's motion should be denied.

## BACKGROUND

Plaintiff E.M. is a student with autism, a speech impairment, orthopedic impairment, and an intellectual disability who is also diagnosed with childhood apraxia of speech and dysarthria. At the time the due process complaint was filed, E.M. was a nine-year-old student in third grade at Independent Elementary School in LISD. However, by the administrative due process hearing below, E.M., was a ten-year-old student receiving private speech therapy and had withdrawn from LISD. At all relevant times E.M. lived with her family in Lewisville, Texas, and LISD was the resident school district for E.M., which was responsible for providing her with a Free Appropriate Public Education ("FAPE") under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA").

## I. 2010–2011 School Year

E.M. first enrolled in LISD as a kindergartner, during the 2010–2011 school year. On April 13, 2011, LISD conducted its first Full and Individual Evaluation ("FIE") for E.M. (AR 2742–2761). This FIE ("2011 FIE") identified that E.M. was a student eligible for special education and related services under the IDEA. The 2011 FIE determined that E.M.'s primary mode of communication was "sign approximations, gestures, single-sound diaphragmatically-supported vocalizations, and eye pointing" and that E.M. "did not demonstrate the use of variable-sound articulation to communicate." (AR 2748). LISD also tested E.M.'s proficiency with an augmentative communication device, which demonstrated E.M. was able to use the device, but was more comfortable using an iPod touch (AR 2748). The 2011 FIE recommended a total communication approach[1] and recommended physical therapy, occupational therapy, speech therapy, small group instruction, social skills training, and a highly structured instructional program for E.M. (AR 2750–2751).

## II. 2012–2013 School Year

During E.M.'s 2nd Grade Year, E.M.'s Admission, Review, and Dismissal Committee ("ARD Committee") convened for its annual ARD meeting ("November 2012 ARD Committee Meeting"). E.M.'s parents were present at the meeting. The ARD Committee used the 2011 FIE during the 2012 ARD Committee Meeting. The ARD Committee also reviewed assessments, such as Classroom Assessment Scoring System ("CLASS") and Verbal Behavior Milestones Assessment and Placement Program ("VB-MAPP"), classroom based assignments, current goals and objectives, parent information, referral data, and teacher observations of student performance.

---

[1] The total communication approach would include the "use of sign language, a voice output device, and vocal approximations" (AR 2747).

The ARD Committee determined that E.M. demonstrated the need for occupational therapy, physical therapy, sign language support, transportation, assistive technology, adapted physical education, parent training, transportation during extended school year services, and speech services. The ARD Committee additionally found that assistive technology was necessary for E.M. for a variety of areas, including: communication; visual; writing; physical; self-care; referring to accommodations; reading; math; and environmental. The ARD Committee decided that "[E.M.] needs a small group ratio of 1:1 to 1:3 ratio for acquisition of new language skills." (AR 2775). The ARD Committee created a variety of goals and objectives and designed a school schedule for E.M., which included 200 minutes of sign language support daily, thirty minutes of direct speech therapy four times a week, and another forty minutes of consult speech therapy a week. These goals and services were all contained in E.M.'s Individualized Education Program ("IEP") the November 2012 ARD Committee Meeting created ("2012 IEP").

After a consensus was reached on the 2012 IEP, LISD added additional reading assessments pursuant to one of E.M.'s private providers Gayle Wayman's request; however, LISD determined that it was difficult to administer a reading assessment because of E.M.'s lack of communication. E.M.'s parents called another ARD Committee meeting to discuss E.M.'s reading goals. The ARD Committee convened on May 23, 2013 ("May 2013 ARD Committee Meeting"). During the May 2013 ARD Committee Meeting, the ARD Committee and E.M.'s parents developed a new reading comprehension goal to be implemented along with the 2012 IEP. Additionally, based on concerns raised by E.M.'s mother, the ARD Committee "increase[d] speech services to 480 minutes and a 20 minute consult for the 6 weeks duration of [extended school year services]." (AR 2838). E.M.'s parents provided a copy of E.M.'s progress summary on her 2012 IEP speech goals, which showed little to no progress on all of her 2012 IEP speech goals.

### III. 2013–2014 School Year

On September 26, 2013, E.M.'s ARD Committee convened for the purpose of the development of the reevaluation of E.M.'s IEP (AR 2859) ("September 2013 ARD Committee Meeting"). E.M.'s ARD Committee requested a new FIE to be completed by November 15, 2013, to include an assessment in speech and language, information from a physician, occupational therapy, physical therapy, adaptive physical education, autism, a functional behavior assessment ("FBA"), cognitive, adaptive behavior, achievement data, assistive technology, functional sign language, CLASS testing, BRIDGE testing, and VB-MAPP updates.

E.M.'s new FIE ("2013 FIE") was completed on November 12, 2013. The 2013 FIE was developed "through a review of records, parent and teacher questionnaires, a parent interview with [E.M.'s] mother, [C.S.], a teacher interview with Ms. Laura Pedersen, and a developmental history form also completed by [E.M.'s] mother." (AR 658). Relevant to the parties' disputes here, the 2013 FIE demonstrated that E.M. was a non-oral communicator, who largely was not understood by listeners (AR 662). Despite articulation therapy since March 2011 with a concentration on development of imitative sounds, E.M.'s articulation sounds remained undeveloped, such that she was unable to participate in a standardized articulation test (AR 664). After an informal test, E.M.'s current intelligibility of vocalizations or word approximations was determined to be poor and vocalizations were only understood with support of non-linguistic context (AR 664, 678). At the time, E.M. did not even attempt word approximation unless prompted (AR 678). Moreover, her potential for intelligible speech was determined to be limited (AR 664).

According to the 2013 FIE, E.M. used "gestures, sign language, and Word Wizard on an iPhone to communicate with various speaking partners. She initially used approximated signs or gestures to communicate, generally producing one to two word phrases." (AR 678). E.M. was

able to produce signs for various words and use modified sign language. While communicating with staff, instructors, and general peers (with prompts), E.M. used signs and assistive technology (AR 681). E.M. "demonstrated success when utilizing a high technology device." (AR 681). In fact, despite her fine motor skills being impacted by her cerebral palsy, E.M. was able to type six words per minute using a computer (AR 667). E.M. also demonstrated extremely low cognitive skills (AR 670–671). However, E.M. was able to follow "100% of verbal directives across all observations from a variety of staff members without sign language interpretation needed. Out of the total directives, E.M. followed 97% of the directives given by various staff members within 3 seconds." (AR 662).

After LISD completed the 2013 FIE, E.M.'s ARD Committee convened for its first meeting of the annual ARD Committee Meeting to discuss E.M.'s 2013 IEP on November 21, 2013 ("November 2013 Meeting of E.M.'s ARD Committee"). Prior to the November 2013 Meeting of E.M.'s ARD Committee, Laura Pederson, E.M.'s classroom teacher, met with E.M.'s mother to review progress on the 2012 IEP goals. Each evaluator discussed their position of the FIE. Specifically, Brooke Wallace, the campus interventionist, discussed E.M.'s use of interpreter support and stated that if E.M. "does not know the sign she needs to use, she will use her iTouch to type two words and will sometimes type two word phrases." (AR 2937). The AI teacher observed E.M. use signs, primarily single signs, but also determined that E.M.'s preferred mode of communication was her iPhone (AR 2937). Heather Brandon, the speech language pathologist, determined that E.M. was nonverbal and had an outside diagnosis of Childhood Apraxia Disorder (AR 2938). Further, Laura Reed, the speech language pathologist who also assisted with assistive technology, explained that E.M. used technology successfully and would frequently use her iPhone

to respond (AR 2938).  The ARD Committee ended the November 2013 Meeting of E.M.'s ARD Committee and agreed to meet again in December.

On December 17, 2013, the ARD Committee reconvened to continue the annual ARD meeting ("December 2013 Meeting of E.M.'s ARD Committee").  E.M.'s ARD Committee determined that extended school year services were necessary for E.M. and developed a Behavior Improvement Plan ("BIP"), which was agreed to by all parties involved (AR 2939).  The ARD Committee informed E.M.'s parents that it recommended a discontinuation of a sign language interpreter because E.M. had not increased her use of signs over the past year and she relied heavily on assistive technology to communicate when people did not understand her signs or sign approximations (AR 2939–2940).  Moreover, the ARD Committee noted that E.M. was not hearing impaired and, thus, could be successful in the general education setting without her sign langue interpreter (AR 2940).  As to voice approximations, the ARD Committee also reviewed the private speech and language evaluation from Dr. Vincent J. Carbone, a Board Certified Behavioral Analyst (AR 2940).[2]  Additionally, E.M.'s mother had the opportunity to question E.M.'s speech teacher and classroom teacher about how often they encouraged E.M. to use vocalizations (AR 2940).  E.M.'s mother also requested that the speech therapist who works with E.M. should be trained in apraxia, and the ARD Committee agreed (AR 2940).  The ARD Committee discussed

---

[2] A brief excerpt from the conclusion of Dr. Carbone's  report states:

> [E.M.] has an extraordinary strength with identification of text and spelling.  The use of text on a voice output device . . . resulted in increased responding from [E.M.]. . . . It will be important to continue to develop her mand repertoire through signs however it is recommended that to fully benefit [E.M.] that her response form should also be developed through spelling and the use of a voice output device.  While signing will be more practical and functional for [E.M.] at the moment, as her language becomes more sophisticated a voice output device will enable the complexity of her language skills to be understood by others, enable [E.M.] to fully convey her needs and develop conversational skills and interact with others with more proficiency.

(AR 3249).

the proposed IEP goals and made corrections when necessary in addressing questions by E.M.'s mother (AR 2940). Everyone agreed to implement the new academic IEP goals, which meant that the speech therapist would continue to work on goals agreed to in the November 2013 Meeting of E.M.'s ARD Committee, the classroom teacher would work on integrated speech goals, but the speech language pathologist would not (AR 2940). The ARD Committee agreed to continue the annual meeting until January 2014.

On January 15, 2014, the ARD Committee reconvened to continue the annual ARD meeting ("January 2014 Meeting of E.M.'s ARD Committee"). At the January 2014 Meeting of E.M.'s ARD Committee, E.M.'s mother expressed concern regarding assistive communication goals and Wallace, the behavior interventionist, explained how E.M. would be able to communicate using assistive technology (AR 2941). The board certified behavior analyst did not agree that this was the best way to promote language skills (AR 2941). However, the ARD Committee emphasized that it should focus on E.M.'s primary mode of communication, which it concluded was assistive technology (AR 2941). The ARD Committee continued to discuss functional modes of communication: Pederson expressed concerns regarding the verbal behavior curriculum; Wallace expressed concern about implementing an icon/picture based form of communication; and E.M.'s mother questioned the credentials of the ARD Committee members, but Susan Standish, the Director of Special Education, assured her that the ARD Committee members are trained professionals (AR 2941). The ARD Committee agreed to add the ability for E.M. to use any mode of communication to respond to language art goals (AR 2942). Brandon explained that direct articulation goals were not recommended because of E.M.'s lack of progress in articulation and that instead LISD is only recommending integrated speech goals. (AR 2942). E.M.'s father pointed out that there were discrepancies between progress in the extended school

year reports and the instructional year, but then Brandon explained that E.M.'s progress was limited and was prompt dependent (AR 2942). The ARD Committee continued the meeting until February.

On February 3, 2014, the ARD Committee reconvened for the annual ARD meeting ("February 2014 Meeting of E.M.'s ARD Committee"). The focus of the meeting was E.M.'s speech goals (AR 2943–2944). E.M.'s mother had presented proposed speech goals at the January 2014 Meeting of E.M.'s ARD Committee, which the LISD speech advisory group reviewed (AR 2943). LISD did not recommend accepting the proposed goals, and explained its reasoning. The ARD Committee discussed that E.M. showed limited progress on articulation goals, mainly required prompting, and E.M. used an augmentative device; accordingly, LISD wanted to continue to develop E.M.'s skills on this device (AR 2943). However, the ARD Committee emphasized that the current goals still supported a total communication approach in the classroom. E.M.'s mother questioned the way LISD collected data (AR 2943). The ARD Committee explained the methods by which LISD takes and collects data, but was not able to provide the data to E.M.'s mother when she asked (AR 2943). Standish explained that the 2013 FIE supported discontinuing direct speech therapy and, instead addressing vocalizations in the classroom. Pederson explained how she addresses vocalizations in response to a question from E.M.'s mother (AR 2944). LISD supported its recommendation to discontinue its articulation goals with the American Speech Language Hearing Association's ("ASHA") guideline to discontinue articulation when benefit is not being made (AR 2944). The ARD Committee decided to continue the meeting to another time.

On March 21, 2014, the ARD Committee reconvened to continue the ARD annual meeting ("March 2014 Meeting of E.M.'s ARD Committee"). E.M.'s mother began to question goals that had been previously agreed to be implemented in the December 2013 Meeting of E.M.'s ARD

Committee and then stated concern about data collection and manding[3] based on Dr. Carbone's reports (AR 2945). The ARD Committee reviewed Dr. Carbone's newest information, but determined that it contradicted his previous report (AR 2945).[4] Allison Oeffner, E.M.'s general education teacher discussed E.M.'s interactions in the classroom and E.M.'s mother requested a new goal of spontaneous interaction with peers (AR 2945). Based on this request, LISD agreed to collect data and determine whether such goal is necessary (AR 2945). Wallace again explained how data was collected in this case (AR 2945). LISD also agreed to collect more data regarding E.M.'s mands and to adjust the goal if the data reflects it is necessary. E.M.'s mother additionally requested that a Present Levels of Academic and Functional Performance ("PLAAFP") statement be added to LISD's PLAAFP, to which LISD agreed (AR 2945). E.M.'s mother objected that "Speech Therapy goal #1" did not provide for a 1:1 ratio, but the speech therapist identified that the Autism Supplement suggested a 1:1 to a 1:3 ratio and that a small group setting or direct speech therapy would be successful (AR 2946). E.M.'s father shared information regarding articulation goals for students with apraxia from ASHA. The ARD Committee added an additional accommodation to encourage E.M. to use vocalizations/approximations (AR 2946). E.M.'s parents requested an Independent Educational Evaluation ("IEE") because they disagreed with the 2013 FIE (AR 2947).[5] The ARD Committee agreed to continue the meeting for ten days.

On April 4, 2014, the ARD Committee reconvened to continue the ARD annual committee meeting ("April 2014 Meeting of E.M.'s ARD Committee") (collectively with other committee meetings, "2013–2014 Annual ARD Committee Meeting"). E.M.'s parents suggested changes to

---

[3] "A mand is defined as a request for things, following instructions or complying with the request." (Dkt. #47 at p. 8).
[4] Dr. Carbone wrote a letter to the ARD Committee recommending that "it would be beneficial to continue to target vocal production as an instructional objective for [E.M.]." (AR 729).
[5] E.M.'s parents made the request for the IEE on February 20, 2014, which LISD granted on February 27, 2014 (AR 3096–3099). The IEE was conducted by Jennifer McGlothlin, who completed a report of speech language evaluation (AR 3140, 3164).

accommodations, occupational therapy goals, BIP goals, and the autism supplement, and the ARD Committee agreed to the changes (AR 2948–2949). The 2013–2014 Annual ARD Committee Meeting ended in a non-consensus (AR 2949).

On April 14, 2014, Plaintiff filed a special education due process hearing request (the "first due process hearing") with the Texas Education Agency pursuant to the IDEA. The first due process hearing was held before a Special Education Hearing Officer ("SEHO") in March 2015. On May 22, 2015, the SEHO issued a decision finding that the LISD provided Plaintiff with a free appropriate public education as required by the IDEA. On August 20, 2015, Plaintiff filed a complaint with the Court appealing the SEHO's decision (Dkt. #1).

While the first due process hearing was pending, Plaintiff filed a second special education due process hearing request (the "second due process hearing") on March 26, 2015. On August 21, 2015, the SEHO dismissed the second due process hearing, holding that the first due process hearing barred the second due process hearing by collateral estoppel, res judicata, and preclusion. On December 10, 2015, Plaintiff filed an Amended Original Complaint with the Court appealing the dismissal of the second due process hearing (Dkt. #2). Plaintiff filed a Second Amended Original Complaint on May 13, 2016 (Dkt. #14). LISD filed a Motion to Dismiss Part of Plaintiff's Second Amended Original Complaint on May 27, 2016 (Dkt. #15) asking the Court to dismiss claims regarding the second due process complaint because Plaintiff failed to properly exhaust her remedies. The Court granted the motion on January 9, 2017, and dismissed Plaintiff's appeal of the second due process hearing for lack of subject matter jurisdiction (Dkt. #24).

On May 12, 2017, LISD filed a Motion for Judgment on the Administrative Record (Dkt. #36). On June 12, 2017, Plaintiff filed a response (Dkt. #41). On June 30, 2017, LISD filed a reply (Dkt. #43). On July 14, 2017, Plaintiffs filed a sur-reply (Dkt. #47). On May 12, 2017,

Plaintiffs filed a Motion for Judgment on the Record (Dkt. #37). On June 9, 2017, LISD filed a response (Dkt. #38). On July 6, 2017, Plaintiffs filed a reply (Dkt. #45). On July 14, 2017, LISD filed a sur-reply (Dkt. #46).

## LEGAL STANDARD

This case arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482. The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A).

States receiving federal assistance under the IDEA must: (1) provide a "free appropriate public education" ("FAPE") to each disabled child within its boundaries, and (2) ensure that such education is in the "least restrictive environment" ("LRE") possible. *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 247 (5th Cir. 1997); 20 U.S.C. § 1412(a)(1), (5). The FAPE provided must be developed to each disabled child's needs through an "individual education program" ("IEP"). *Michael F.,* 118 F.3d at 247; *see* 20 U.S.C. § 1414(d). In Texas, the committee responsible for preparing an IEP is known as an Admissions, Review, and Dismissal committee. *Michael F.,* 118 F.3d at 247.

"When a parent challenges the appropriateness of an IEP, a reviewing court's inquiry is two-fold." *Hous. Indep. Sch. Dist. v. V.P.,* 582 F.3d 576, 583 (5th Cir. 2009). "The court must first ask whether the state has complied with the procedural requirements of the IDEA, and then determine whether the IEP developed through such procedures was 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* at 583–84 (citation omitted). "If the court finds that the state has not provided an appropriate educational placement, the court may require

the school district to reimburse the child's parents for the costs of sending the child to an appropriate private school or institution." *Id.* at 584 (citations omitted). "Reimbursement may be ordered only if it is shown 'that (1) an IEP calling for placement in a public school was inappropriate under the IDEA, and (2) the private school placement . . . was proper under the Act.'" *Id.* (citation omitted).

The role of the judiciary under the IDEA is limited, leaving the choice of educational policies and methods in the hands of state and local school officials. *White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 377 (5th Cir. 2003) (citing *Flour Bluff Indep. Sch. Dist. v. Katherine M.,* 91 F.3d 689, 693 (5th Cir. 1996)). "Under the IDEA, a federal district court's review of a state hearing officer's decision is 'virtually *de novo*.'" *Adam J. v. Keller Indep. Sch. Dist.,* 328 F.3d 804, 808 (5th Cir. 2003). "The district court must receive the state administrative record and must receive additional evidence at the request of either party." *Id.* The court must reach an independent decision based on a preponderance of the evidence. *Hous. Indep. Sch. Dist. v. Bobby R.,* 200 F.3d 341, 347 (5th Cir. 2000); *Michael F.,* 118 F.3d at 252. However, this requirement "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley,* 458 U.S. 176, 206 (1982). Instead, "due weight" is to be given to the hearing officer's decision. *Id.* Thus,

> courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to the state and local educational agencies in cooperation with the parents or guardians of the child.

*Id.* at 207.

The party seeking relief under the IDEA bears the burden of proof. *Schaffer v. Weast,* 546 U.S. 49, 62 (2005). Specifically, "a party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA." *Michael F.,* 118 F.3d at 252.

## ANALYSIS

Plaintiff argues that the Court should disregard the SEHO's findings and credibility determinations. Further, Plaintiff asserts LISD did not provide E.M. a FAPE under the IDEA and committed both procedural and substantive violations. Plaintiff additionally claims that based on these violations, Plaintiff is entitled to reimbursement and attorneys' fees. LISD counters that it provided E.M. with a FAPE pursuant to the IDEA and, thus, reimbursement and attorneys' fees are inappropriate.

### I.     SEHO Hearing and Findings

The first due process hearing was held before the SEHO in March 2015.[6] On May 22, 2015, the SEHO issued a decision finding that the LISD provided Plaintiff a FAPE as required by the IDEA.

Plaintiff argues that the SEHO's findings of fact[7] do not warrant any deference because the SEHO erroneously gave weight to LISD witnesses whose testimony was not supported by extrinsic, non-testimonial evidence. Plaintiff asserts that the SEHO applied different standards to

---

[6] Several witnesses testified: Heather Brandon, E.M.'s speech language pathologist; Julie Trask, E.M.'s former speech language pathologist; Jennifer H. McGlothlin, E.M.'s independent evaluator; Lori Sekhon, E.M.'s private speech language pathologist, Laura Pederson, E.M.'s communication teacher; Tamilynn Jackson, E.M.'s discovery science teacher, Laura Reed, LISD's speech language pathologist expert; E.M.'s mother; Gail Wayman, executive direct of "The Wayman Center"; E.M.'s father; Bobbye Records, LISD's speech language pathologist expert; Kristi Rollins, speech language pathologist with "Monkey Mouths"; Kriste Fedor, E.M.'s special education communications teacher starting in the fall of 2014; Teri Starks-Graves, the lead teacher for the auditorily impaired; Tracey Lee, E.M.'s sign language facilitator; Kay Shafer, E.M.'s occupational therapist; and Traci White, LISD's lead speech language pathologist.
[7] Plaintiff specifically challenges Finding of Fact Numbers 16, 17, 19, 22–30.

the witnesses and found Plaintiff's witnesses less credible simply because the SEHO agreed with LISD's position.  (Dkt. #37 at pp. 17–18) (citing *K.S. v. Fremont Unified Sch. Dist.*, 545 F. Supp. 2d 995, 1003–04 (N.D. Cal. 2008)).  Plaintiff further asserts that the SEHO ignored testimony of E.M.'s private speech providers and her private Board Certified Behavior Analyst.  LISD maintains that the Court should not disturb the SEHO's findings or credibility determinations.

Under the IDEA, "[t]he district court must receive the state administrative record and must receive additional evidence at the request of either party."  *Id.*  The Court must reach an independent decision based on a preponderance of the evidence.  However, "due weight" is to be given to the hearing officer's decision.  *Rowley,* 458 U.S. at 206 (1982).  While the Court is to give "due weight," such is not necessary "when its own review of the evidence indicates that the [SEHO] erroneously assessed the facts or erroneously applied the law to the facts."  *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993).

Plaintiff has cited no supporting authority for her contention that witnesses need to have extrinsic, non-testimonial evidence to support their contentions.  To the contrary, LISD presented case law, albeit outside the Fifth Circuit, to suggest that the SEHO's credibility determinations should not be disturbed unless there is "non-testimonial, extrinsic evidence in the record that would justify a contrary conclusion."  (Dkt. #38 at p. 2) (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995); *McCalister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76–77 (D.D.C. 2014)). Moreover, the Court has previously found that the SEHO has the "opportunity to observe witnesses and make credibility determinations."  *Shafi v. Lewisville Indep. Sch. Dist.*, No. 4:15-cv-599, 2016 WL 7242768, at *9 (E.D. Tex. Dec. 15, 2016).  While the Court is not making a decision on what the correct standard is in the Fifth Circuit, it is not convinced that each witness's testimony must

be supported by extrinsic, non-testimonial evidence. As such, this does not serve as a basis to discredit any witness or the SEHO's decisions.

Further, the case Plaintiff relied on to argue the applied different standards to different witnesses, presented clear findings from the SEHO that demonstrated the SEHO found the plaintiff's witnesses less credible because their testimony contradicted that of witnesses from the district. *K.S.*, 545 F. Supp. 2d at 1004 (detailing the SEHO's findings to be that the plaintiff's testimony was flawed because "they 'contradicted the testimony [that plaintiff made significant progress] of the people who created the records,'" and explaining that relying on witnesses who made the records just because they made the record would eliminate the need for due process hearings).[8] Further, the *K.S.* court determined that the credibility determinations were "based primarily on non-testimonial substantive issues." *Id.*

Here, a majority of the SEHO's credibility determinations were based on testimony as opposed to non-testimonial issues. (AR 10–12) ("An SLP for the district *testified* credibly that the student may develop a core vocabulary of ten to fifteen words but that such acquisition of vocabulary could take as much as fifteen years."; "This conclusion [,the IEE's conclusion that sign language was E.M.'s primary mode of communication,] was not credible because the district established with credible *testimony* that sign language was not the student's primary mode of communication."; "District personnel *testified* credibly that that the drafted goals were appropriate for the student."; "The credible *testimony* of experts for the district supports the district's proposed

---

[8] The Court notes that Plaintiff attempts to discredit Bobbye Records, LISD's expert witness, Laura Reed, assistive technology facilitator, and Traci White, LISD's lead speech pathologist, because they had not spent a significant amount of time with E.M. or had not spent any time with E.M. before making recommendations. Plaintiff contrasted this with the amount of time Jennifer McGlothlin, the independent evaluator, spent with E.M. before making her recommendations. However, in *K.S.*, the court held that the fact that the district witnesses had personal experience with the child did not necessarily make them more credible. *K.S.*, 545 F. Supp, 2d at 1005. The same could be said here and simply because Records, Reed, and White have less experience with E.M. does not automatically make their testimony less credible.

plans for the student.") (emphasis added). Moreover, there is no indication in the record that the SEHO made its credibility determinations simply because a witness agreed or did not agree with LISD's decision. Accordingly, the Court does not find a reason to disregard the SEHO's credibility determinations.

Finally, Plaintiff claims that the SEHO ignored testimony from Plaintiff's witnesses but offers no citation to the place in the record that suggests the SEHO ignored testimony. Even though the Court is not obligated to scour the record, it made an independent review of the SEHO's findings of fact and did not find any indication that the SEHO ignored any testimony or evidence. Therefore, this argument does not provide a reason for the Court to ignore the SEHO's findings.

However, the Court's role is to reach an independent decision based on a preponderance of the evidence. *Bobby R.,* 200 F.3d at 347 (5th Cir. 2000); *Michael F.,* 118 F.3d at 252. Thus, if the Court disagrees with any finding of fact or credibility determination based on the record before it, the Court will address it at the necessary time.

## II.      Free Appropriate Public Education

The SEHO found that Plaintiff failed to demonstrate a violation of the IDEA and that LISD offered E.M. a FAPE (AR 13). Plaintiff contends that this decision was error and that LISD failed to follow appropriate procedural safeguards and did not reasonably calculate E.M.'s Individual Education Program to enable E.M. to receive educational benefits. LISD counters that it fully complied with the IDEA.

States receiving federal assistance under the IDEA must: (1) provide a "free appropriate public education" to each disabled child within its boundaries, and (2) ensure that such education is in the "least restrictive environment" ("LRE") possible. *Michael F.,* 118 F.3d at 247; 20 U.S.C. § 1412(a)(1), (5). The FAPE provided must be developed to each disabled child's needs through

an "individual education program." ("IEP") *Michael F.,* 118 F.3d at 247. In Texas, the committee responsible for preparing an IEP is the ARD Committee. *Id.* at 247.

"The primary vehicle through which a FAPE is provided is a student's IEP, and the determination of whether a student received a FAPE is typically made by evaluating the student's IEP and its implementation." *R.C. ex rel. S.K., D.H. v. Keller Indep. Sch. Dist.*, 958 F. Supp. 2d 718, 730 (N.D. Tex. 2013). "When a parent challenges the appropriateness of an IEP, a reviewing court's inquiry is two-fold." *V.P.,* 582 F.3d at 583. "The court must first ask whether the state has complied with the procedural requirements of the IDEA, and then determine whether the IEP developed through such procedures was 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* at 583–84 (citation omitted).

### A. Procedural Safeguards

Plaintiff argues that LISD's implementation of E.M.'s 2012 IEP as the stay-put placement was a procedural violation[9] of the IDEA, which denied E.M. a FAPE. LISD responds that (1) this issue is not properly before the Court because it was not properly exhausted.

As the Court noted in its order granting LISD's Motion for Partial Dismissal of Plaintiff's Second Amended Complaint (Dkt. #24), the plain language of the IDEA provides that any party aggrieved by the findings and decision of a due process hearing brought pursuant to the IDEA "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). However, "[t]he party bringing the action shall have 90 days from the date of the

---

[9] Plaintiff never specifies that the alleged stay-put violation is a procedural violation; however, upon review of the IDEA and case law, stay-put placement should be addressed as procedural violation as opposed to whether the IEP was reasonably calculated to enable E.M. to receive educational benefits.

decision of the Hearing Officer to bring such an action, or, if the State has an explicit time limitation for bringing such action under this subchapter, in such time as the State law allows." 20 U.S.C. § 1415(i)(2)(B). Texas follows the ninety-day time frame contemplated in 20 U.S.C. § 1415(i)(2)(B). *See* 19 TEX. ADMIN. CODE § 89.1185(o) (Tex. Dep't Educ., Hearing).

Here, on April 14, 2014, Plaintiff filed the first due process hearing and the second due process hearing on March 26, 2015. It was in the second due process hearing that Plaintiff complained of LISD's alleged failure to provide an appropriate stay-put placement (Dkt. #14 at pp. 13–14). On August 21, 2015, the SEHO dismissed the second due process hearing request, holding that the first due process hearing barred the second due process hearing by collateral estoppel, res judicata, and preclusion. Plaintiff filed her Amended Original Complaint appealing the August 21, 2015 decision on December 10, 2015. Plaintiff's appeal of the second due process hearing was thus not brought ninety days from the date of the decision of the hearing officer as required by the IDEA. Accordingly, the Court granted LISD's motion and dismissed Plaintiff's claims regarding the second due process hearing for lack of subject matter jurisdiction, and the issues are no longer before the Court (Dkt. #24).[10]

---

[10] However, if it is properly before the Court, the Court finds that E.M.'s 2012 IEP was the proper stay-put placement. The IDEA stay-put requirement provides that "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child" during the pendency of due process hearings. 20 U.S.C. § 1415(j); *accord* 34 C.F.R. § 300.518. While the Fifth Circuit has not defined "then-current educational placement" in the specific context of stay-put, "'[e]ducational placement', as used in the IDEA, means educational program." *White*, 343 F.3d at 379 (citing *Sherri A.D. v. Kirby*, 975 F.2d 193 (5th Cir. 1992) ("'educational placement' not a place, but a program of services"); *Weil v. Bd. of Elementary & Secondary Educ.*, 931 F.2d 1069 (5th Cir. 1991)). Here, the parties did not reach an agreement and LISD implemented the most recent agreed to IEP. Plaintiff argues that LISD did not work to reach a resolution because it offered Plaintiff an unworkable choice between accepting the 2013 IEP in its entirety or revert back to 2012 IEP. Plaintiff relies on a decision by the Ninth Circuit, which found that a school district's seemingly similar "'take it or leave it' approach contravened the purposes of the IDEA." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1056 (9th Cir. 2012). However, *M.P.* is factually distinguishable and is not controlling authority. In *M.P.*, the Ninth Circuit found a denial of a FAPE when the district "unilaterally postponed any further efforts to develop an updated IEP" until a final decision was to be made. *Id.* at 1052. The court noted that the district could have continued to work with M.P.'s parents to develop an agreeable IEP, but the district "could not simply ignore its affirmative duty under the IDEA by postponing its obligation to revise the outdated IEP." *Id.* at 1056. Here, LISD did not unilaterally terminate efforts to work with E.M.'s parents. Rather, LISD continued to propose modifications to stay-put and E.M.'s IEP. (AR 3172–3199, 3282–3330, 3343–3344). Moreover, despite implementing E.M.'s 2012 IEP, LISD continued to work on new goals to ensure that E.M.

### B. Individual Education Program Reasonably Calculated to Enable the Child to Receive Educational Benefits

Plaintiff contends that LISD failed to provide an IEP that was reasonably calculated to enable E.M. to receive educational benefits. LISD disagrees. The Fifth Circuit developed four factors in evaluating whether an IEP is reasonably calculated to enable the student to receive educational benefits: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) whether positive academic and non-academic benefits are demonstrated. *Michael F.,* 118 F.3d at 253. The Fifth Circuit has treated the factors "as indicators of when an IEP meets the requirements of IDEA, but [has] not held that district courts are required to consider them or to weigh them in any particular way." *Richardson Indep. Sch. Dist. v. Michael Z.,* 580 F.3d 286, 293 (5th Cir. 2009). The Court will consider these four factors in turn.

### 1. Whether the Individual Education Program Is Individualized Based on the Student's Assessments and Performance

Plaintiff contends that the proposed 2013 IEP fails under the IDEA for two reasons: (a) the 2013 IEP was not based on peer-reviewed research; and (b) the 2013 IEP was not particularized for E.M.'s needs. LISD counters that the 2013 IEP complies with the requirements of the IDEA.

### a. Peer-Reviewed Research

Plaintiff asserts that the educational services LISD offered were not based on peer-reviewed research, and in fact were contrary to peer-reviewed research. Plaintiff contends that, regardless of Fifth Circuit precedent, peer-reviewed research is a federal mandate and required by the IDEA. Therefore, Plaintiff argues that LISD's proposed IEP is deficient according

---

continued to move forward (AR 4367, 4383, 4422). Therefore, the Court finds that there was no procedural violation in this case.

to the IDEA. LISD maintains that peer-reviewed research is not a factor that the Fifth Circuit considers. Even so, LISD avers that it acted in accordance with ASHA guidelines because it recommended a discontinuation of speech articulation therapy because there was no benefit from the articulation therapy. (Dkt. #38 at p. 19) (citing AR 2944).

The IDEA states that an IEP must include "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child." 20 U.S.C. § 1414(d)(A)(i)(IV).

While Plaintiff claims that "[t]he Fifth Circuit is simply wrong and is failing to follow federal law," Plaintiff fails to provide legal support for this conclusion. (Dkt. #47 at p. 6). To the contrary, the IDEA explicitly says "to the extent practicable," which in and of itself suggests that peer-reviewed research is not always required. 20 U.S.C. § 1414(d)(A)(i)(IV). Moreover, even though the Fifth Circuit has not weighed in on the necessity of peer-reviewed research, several district courts across the country and the Third Circuit have found that relying on peer-reviewed research is not a requirement because the standard needs to be flexible in order to create an IEP that is individualized to the student's particular needs. *See, e.g.*, *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 277 (3d Cir. 2012) (holding "[w]e will not set forth any bright-line rule as to what constitutes an adequately peer-reviewed special education program; hearing officers and reviewing courts must continue to assess the appropriateness of an IEP on a case-by-case basis, taking into account the available research."); *J.S. v. Clovis Unified Sch. Dist.*, No. 1:16-cv-1319, 2017 WL 1:16-cv-1319, at *33 (E.D. Ca. July 25, 2017) (explaining that an absolute requirement that every IEP be supported by research "is simply not the law. The law requires that an IEP be specifically

individualized for a student's particular needs. . . ."); *Ms. M. v. Falmouth Sch. Dep't*, No. 2:15-cv-16, 2016 U.S. Dist. LEXIS 29811, at *45–*46 (D. Maine Mar. 4, 2016) (quoting Assistance to States, 71 Fed. Reg. at 46665) (noting that the United States Department of Education explained that the directive to use peer-reviewed research "'does not mean that the service with the greatest body of research is the service necessarily required for a child to receive FAPE . . . [or] that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE.'"); *Doe v. Hampden-Wilbraham Reg'l Sch. Dist.*, 715 F. Supp. 2d 185, 201 (D. Mass. 2010) (finding an IEP that did not state it was based on peer-reviewed research was sufficient). Plaintiff has failed to convince the Court that, even if LISD failed to use peer-reviewed research, this results in an automatic denial of FAPE.

### b. Discontinuation of Sign Language Interpreter and Speech Articulation Therapy

Plaintiff challenges the recommendation to discontinue speech articulation therapy and E.M.'s sign language interpreter as not being individualized. First, Plaintiff maintains that E.M. was only observed in her special education classroom by the people making goal recommendations and, thus, the 2013 IEP is not based on present levels of academic achievement and functional performance pursuant to the IDEA. Additionally, Plaintiff contends that the recommendations are contrary to E.M.'s assessments and performance. Finally, Plaintiff argues that while LISD represents the IEP as offering a total communication approach, it falls short of meaningfully including any vocal approximations.[11] LISD asserts that the recommendation to discontinue

---

[11] Plaintiff additionally argues that LISD failed to find E.M. had dysarthria. The IDEA creates an ongoing obligation for agents to "identif[y], locat[e], and evaluat[e]" "all children with disabilities residing in the State" to ensure that they receive needed special education services. 20 U.S.C. §§ 1412(a)(3)(A), 1412(a)(10)(A)(ii). However, Plaintiff has never raised any argument that LISD failed to comply with Child Find obligations until the one sentence in her reply brief (Dkt. #45 at p 9). Thus, this issue is not properly before the Court. Further, Plaintiff argues that once it was determined E.M. had dysarthria, there were no IEP goals proposed to address the characteristics of dysarthria. However, Plaintiff failed to identify what goals LISD should have included or point the Court to the place in the record where Plaintiff requested goals to address dysarthria and LISD failed to include such goals. Indeed, LISD cites to the

E.M.'s sign language interpreter was based on E.M.'s assessments and performance because E.M. was able to listen to directions and was understood without her interpreter. Further, LISD asserts that the recommendation to offer a total communication approach, but shift toward assistive technology, was based on E.M.'s lack of progress on her articulation goals and the fact that assistive technology would be E.M.'s most functional mode of communication.

Initially, the IDEA requires that a school district conduct a Full and Individual Evaluation before formulating an Individualized Education Plan for students with disabilities. *Rockwall Indep. Sch. Dist. v. M.C.*, No. 3:12-cv-4429-B, 2014 WL 12642573, at *12 (N.D. Tex. Feb. 17, 2014) (citing 20 U.S.C. §§ 1414(a)(1)(A)). In order to comply with the IDEA in conducting such evaluation, the district must:

> (A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining--
>
> > . . .
>
> > (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum . . .
>
> (B) not use any single measure or assessment as the sole criterion for determining . . . an appropriate educational program for the child. . . .

20 U.S.C. § 1414(b)(2). After conducting the FIE, the district must then develop an individualized education program.

> The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section that includes--
>
> > (I) a statement of the child's present levels of academic achievement and functional performance, including--

_____

record suggesting it may have not been necessary to have any goals based on dysarthria (AR 3952). As such, this argument is unpersuasive.

(aa) how the child's disability affects the child's involvement and progress in the general education curriculum. . . .

20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa). In developing the child's individualized education program,

the IEP Team . . . shall consider--

(i) the strengths of the child;
(ii) the concerns of the parents for enhancing of their child;
(iii) the results of the initial evaluation or most recent evaluation of the child; and
(iv) the academic, developmental, and functional needs of the child.

20 U.S.C. § 1414(d)(3).

As to Plaintiff's first argument, Plaintiff maintains that "the SLP Intern [Brandon] who recommended discontinuing IEP goals targeting articulation never observed E.M. in her general education classrooms, during lunch or at recess. Thus, SLP Intern's recommendation for E.M[.']s IEP was not based on present levels of academic achievement and functional performance as it failed to consider participation in any general education settings." (Dkt. #47 at p. 9) (citing (AR 3464); 20 U.S.C. § 1414(d)(1)(A)(i)).[12]

While Plaintiff does not directly challenge the 2013 FIE, because she challenges whether general education observations were made in this case, the Court starts its analysis with the 2013 FIE. LISD completed E.M.'s 2013 FIE on November 15, 2013 (AR 657). The examiners included: Robin Dilger, education diagnostic; Kay Sahafer, occupational therapist; Robin Satterla, physical therapist; Jill Littleton, licensed specialist in school psychology; Heather Brandon, speech language pathologist; Kellen Brown, speech language pathologist; Lisa Vaughn, adapted physical education; Teri Starks-Graves, AI teacher; and Brooke Wallace, interventionist (AR 657). The

---

[12] This specific argument was raised in Plaintiff's Sur-Reply (Dkt. #47) and not in her response (Dkt. #41), and is thus untimely. However, the Court notes that Plaintiff has continuously challenged Brandon's recommendations throughout the entirety of the briefing. The Court will thus address the argument even though LISD did not have a chance to respond to this specific argument.

FIE used several assessment procedures and tests, including, but not limited to: record review; classroom/school observations; parent and teacher questionnaires and interviews; Test of Auditory Comprehension of Language, Third Edition; Oral and Written Language Scales, Second Edition; Apraxia Profile; Functional Communication Profile-Revised; Wechsler Nonverbal Scale of Ability; Woodcock-Johnson Tests III Tests of Achievement, Normative Update; Autism Spectrum Rating Scale; and Autism Diagnostic Observation Schedule-Second Edition, Module 1 (AR 657–658).

Even though Brandon did not specifically observe E.M. in her general education setting (AR 3464), Brandon was not the only evaluator of the 2013 FIE. The 2013 FIE was conducted by several people using a variety of techniques. The 2013 FIE included information on E.M. in her general education classroom as well as in her special education classroom (AR 659, 661). Accordingly, the 2013 FIE complied with the IDEA.

As to the IEP, specifically the recommendation for "discontinuing IEP goals targeting articulation,"[13] even though Brandon did not herself observe E.M. in the general education setting, she consulted with those who did. Brandon testified that: "[E.M.'s] teacher, her general ed -- or her special ed teacher observed her in those settings much more than I did and was able to tell me what she was doing there." (AR 3464). As such, her lack of observation, does not necessarily mean that the recommendation was not based on the "child's involvement and progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa). Plaintiff failed to meet her

---

[13] While Brandon "explained that articulation goals are not being recommended due to lack of progress with articulation skills," that does not mean that Brandon is the only person who made that recommendation, or demonstrate that she made the recommendation based only on her own observations. (AR 2942). The FIE contained information regarding E.M. in the general education setting and other ARD Committee members observed E.M. in the general education setting.

burden to show that Brandon's lack of observation in the general education setting resulted in the program not being individualized.

As to Plaintiff's next argument that the recommendations are contrary to the data presented, the Court will address the data as to the recommendation to discontinue E.M.'s sign language interpreter and articulation goals separately. Regarding E.M.'s sign language goals, Plaintiff argues that E.M. frequently demonstrated spontaneous sign language in her general education classroom, which is supported by a "summary of observations" and the autism evaluation. Both are included in the 2013 FIE. While Plaintiff is correct that E.M. used spontaneous signs in the classroom and used signs more than typing with mands and tacts,[14] she predominately typed during her intraverbal communication[15] (AR 662, 666). Further, the FIE concluded that "[o]ut of the 79 total signed responses across all observations and operants, 6 were interpreted for either a paraprofessional or peer (8% of signed responses were interpreted). The teacher did not require any signs to be interpreted." (AR 662). Moreover, "E.M. followed 100% of verbal directives across all observations from a variety of staff members without sign language interpretation needed." (AR 662). Therefore, Plaintiff failed to meet her burden to show that the use of spontaneous signs indicates that the recommendation to discontinue the sign language interpreter was not individualized based on E.M.'s assessments and performance.

Plaintiff's arguments against the discontinuation of articulation goals fit together with the argument that LISD in not offering a total communication approach, as such the Court will address these arguments together. First, the Court finds support in the record that LISD is still offering a total communication approach, and even Plaintiff's witnesses, Jennifer McGlothlin and Lori

---

[14] "A tact is defined as labeling/naming an item, action or property of an item." (Dkt. #47 at p. 8).
[15] "Intraverbal is a form of verbal behavior where the speaker responds to another's verbal behavior (e.g. like in a conversation.)" (Dkt. #47 at p. 8).

Sekhon, agreed that LISD is offering a total communication approach (AR 3587–3588, 3848–3849). Six of her twenty-one proposed goals allowed E.M. to respond with any method of communication and Pederson testified that she "believe[d] that whatever [E.M.] kind of gravitated towards, that that's what we should use." (AR 2918–2923, 3879). While the majority of her goals were not based on articulation, articulation is still included as part of the approach, the focus of the total communication approach simply shifted to the use of assistive technology.

LISD decided to shift its focus toward assistive technology because LISD argues that it is the most functional mode of communication for E.M. going forward based on her assessments and performance. The administrative record demonstrates that E.M. made very little progress in terms of her articulation and that speech as a primary mode of communication was low. E.M.'s IEP progress reports demonstrate that despite working on articulation since E.M. enrolled in LISD in 2011, E.M. showed relatively little progress in this area and her articulation levels were low and prompt dependent (AR 2942–2943). E.M.'s lack of progress can also be demonstrated in the reports submitted by Plaintiff's witnesses. Jennifer McGlothlin, a speech language pathologist and the IEE evaluator, acknowledged that E.M. had a "limited syllable repertoire", "her speech intelligibility was approximately 25% when the context was known", and that "[E.M.'s] communication skills, including articulation, receptive and expressive language, are significantly below normal limits." (AR 3166–3168). Additionally, Dr. Carbone determined that E.M.'s "vocalizations [were] low and the variety of sounds [were] also low and limited mainly to vowel sounds." (AR 3234). Dr. Carbone also identified that E.M. had a weak echoic repertoire (AR 3236).

Moreover, the 2013 FIE identified that "her potential for intelligible speech is considered to be limited" (AR 664). This determination was similar to that of McGlothlin, who determined

26

that speech alone would not be a likely form of communication for E.M.: "the prognosis for speech as a primary mode of communication . . . is poor." (AR 3169). However, Dr. Carbone did notice that E.M. "has an extraordinary strength with identification of text and spelling. The use of text on a voice output device . . . resulted in increased responding from [E.M.] across the verbal operants than these VB[-]MAPP assessments indicated."[16] (AR 3249). Dr. Carbone continued on to recommend that "[i]t will be important to continue to develop her mand repertoire through signs however it is recommended that to fully benefit [E.M.] that her response form should also be developed through spelling and the use of a voice output device." (AR 3249). Dr. Carbone noted that "as her language becomes more sophisticated a voice output device will enable the complexity of her language skills to be understood by others. . . ." (AR 3249). Additionally, McGlothlin noted that, although her prognosis for speech as the primary mode of communication was poor; however, "the prognosis for improved total communication via speech production, improved augmentative communication skills (including typing and use of symbols/pictures), more precise sign language skills, and improved spontaneous repair strategies when communication breaks down is good with appropriate intervention and support at school throughout the day." (AR 3169).[17]

The Court finds by a preponderance of the evidence that the administrative record demonstrates that the ARD Committee considered the strengths of the child, the concerns of the parents for enhancing of their child,[18] the results of the initial evaluation or most recent evaluation

---

[16] Dr. Carbone observed that E.M. "has additional skills in the areas of tacting and intraverbals to those indicated on the assessment [but she] lack[ed] a functional response form with which to demonstrate these skills." (AR 3235).

[17] The Court notes that these are small excerpts from Dr. Carbone and McGlothlin's reports and that Dr. Carbone submitted an additional recommendation to continue articulation therapy. However, at this stage, the Court is to determine whether LISD individualized the IEP to E.M. based on her assessments and performance and is to leave questions of methodology for the States. *Rowley*, 458 U.S. at 208. Whether or not LISD followed the exact method or approach recommended by McGlothlin or Dr. Carbone to implement a total communication approach and to develop E.M.'s most functional mode of communication, does not affect whether or not LISD individualized the program to E.M. based on her assessments and performance.

[18] LISD added speech articulation to IEP goals based on the parents' concerns and McGlothlin's recommendations.

of the child, and the academic, developmental, and functional needs of the child. Plaintiff has failed to carry her burden to show that LISD did not individualize E.M.'s 2013 IEP based on her assessments and performance.

## 2. Whether the Individual Education Program Is Administered in the Least Restrictive Environment

Plaintiff contends that if E.M.'s sign language support is discontinued, her IEP would not be administered in the LRE. Specifically, Plaintiff asserts if E.M.'s sign language facilitator were removed, E.M. would not be as engaged with her peers outside of the special education classroom. In response, LISD argues that Plaintiff fails to meet her burden to prove that the 2013 IEP was not administered in the LRE.[19]

The IDEA requires that

> to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in the regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

---

[19] LISD has two additional arguments: (1) discontinuation of a sign language facilitator is not the proper focus of the LRE inquiry; and (2) Plaintiff has waived her argument with respect to E.M.'s sign language facilitator and the LRE. Both arguments are unpersuasive. First, while the focus is whether the student "attended his normally assigned school and was mainstreamed with his peers as much as possible," it does not follow that the student is mainstreamed with the student's peers, if that student has no way to meaningfully communicate with peers. *See Pace v. Bogalusa City Sch. Bd.*, 325 F.3d 609, 620 (5th Cir. 2003), *vacated on other grounds by* 403 F.3d 272, 289. Therefore, the discontinuation of E.M.'s sign language interpreter is relevant to the inquiry. As to the second argument, although Plaintiff did indicate during a pretrial hearing for the first due process hearing that there was no issue with E.M.'s educational placement in the classroom in terms of the LRE, Plaintiff also indicated there was an issue with the LRE, specifying Plaintiff had an issue with the level of speech therapy. Judicial estoppel applies when "the position of the party to be estopped is clearly inconsistent with its previous one; and [second,] that party must have convinced the court to accept that previous position." *Hall v. GE Plastic P. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000)). Here, counsel's concern with discontinuing support of the sign language facilitator is not "clearly inconsistent" with Plaintiff's concern regarding E.M.'s level of speech therapy—a broad concern. *See id.* Therefore, Plaintiff is not judicially estopped from bringing LRE claims with respect to E.M.'s sign language facilitator.

20 U.S.C. § 1412(a)(5)(A).  Thus, "'least restrictive environment' denotes 'not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied peers' to the maximum extent possible."  *Teague*, 999 F.2d at 128 n.2 (quoting *Sherri A.D. v. Kirby*, 975 F.2d 193, 207 n.23 (5th Cir. 1992)).

Plaintiff's arguments are belied by Tracy Lee, E.M.'s sign language facilitator.  Lee, who spent 200 minutes every day with E.M., testified that E.M. "never would look at me when I was interpreting, whether I'd be standing next to the person or right in front of her." (AR 4337–4338).  Moreover, Lee testified that signing did not come natural to E.M. and was difficult for her because "she did not have the mobility in her hands to make the signs clearly (AR 4339).  Lee testified that E.M. used her device as the primary mode of communication to communicate with Lee (AR 4339–4340).  Lee observed that E.M.'s most functional mode communication was her device (AR 4340–4341).  This is further supported by Pederson's testimony that she observed E.M. at recess and testified that she would communicate with her peers using the AAC device on the playground and in the general education setting "because her peers understood that."  (AR 3876, 3884).  E.M. also was able to understand instructions from her teachers without the help of her sign language facilitator (AR 662).

Therefore, the Court finds by a preponderance of the evidence that the record indicates that E.M. had the ability to meaningfully and effectively communicate with her teachers and peers through the use of her AAC device.  Thus, the Court agrees with LISD that Plaintiff did not meet her burden to prove that E.M.'s IEP was not administered in the least restrictive environment.

### 3. Whether the Services Are Provided in a Coordinated and Collaborative Manner

Plaintiff's argument regarding this factor centers mainly on the lack of coordination and collaboration as to E.M.'s stay-put placement, which is not an issue for the Court to decide at this

juncture. *See* Section II.A.1. However, Plaintiff also maintains that the development of the 2013 IEP was not coordinated or collaborative because the ARD Committee and Brandon did not consider reports from E.M.'s private therapists and because E.M.'s mother requested data, which LISD never provided. LISD contends that the evidence in the record suggests LISD collaborated with E.M.'s parents and there is no evidence of bad faith exclusion or a refusal to listen to E.M.'s parents' input.

The IDEA provides that the IEP team consist of the parents, at least one regular education teacher of the student, at least one special education teacher of the student, a representative of the school district who is qualified to provide specially designed instruction and is sufficiently knowledgeable about the general education curriculum and availability of resources, and an individual who can interpret the instructional implications of evaluation results. 20 U.S.C. § 1414(d)(1)(B). In addition, at the parents' or agency's discretion, the team may include other individuals who have knowledge or special expertise regarding the student. *Id*

While the IDEA gives the parents the right to provide meaningful input, this right "is simply not the right to dictate the outcome and obviously cannot be measured by such." *White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 380 (5th Cir.2003). "If a student's parents want him to receive special education under IDEA, they must allow the school itself to reevaluate the student and they cannot force the school to rely solely on an independent evaluation." *Andress v. Cleveland Indep. Sch. Dist.,* 64 F.3d 176, 178 (5th Cir.1995). A parent who disagrees with the school's evaluation has the right to have an independent evaluation conducted, and the evaluation must be considered by the school district. *Id.*; 34 34 C.F.R. § 300.503. The Fifth Circuit has found adequate coordination and collaboration "absent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the [parents'] input." *White*, 343 F.3d at 380.

Here, the administrative record shows that the ARD Committee met on multiple occasions during the 2013–2014 ARD Committee Meeting, included all required and relevant individuals, (AR 2950, 2952, 2954, 2956, 2958, 2960) and considered all reports from Plaintiff's private therapists (AR 2940, 2945, 3498–3499). While E.M.'s mother did request data regarding E.M.'s articulation goals and progress during the February 2014 ARD Committee Meeting and the data was not provided,[20] it was not done so for any improper purpose (AR 610). Simply put, "bringing a year's worth of data to an ARD was inappropriate," which Susan Standish, LISD's Special Education Director, explained to E.M.'s mother during the ARD Committee meeting[21] (AR 610). However, Standish did explain that the IEP goals were based on that data, and Brandon explained how the data was collected and that it also formed the basis of the 2013 FIE (AR 610). Accordingly, LISD did not, in bad faith, exclude E.M.'s mother from appropriately participating in the meeting. *See White*, 343 F.3d at 380. While E.M.'s mother did not have the data, she did receive E.M.'s 2013 FIE and the proposed IEP goals.

Plaintiff has not met her burden of demonstrating the LISD did not offer services in a coordinated and collaborative fashion. That E.M.'s parents disagree with the conclusions of the ARD Committee does not mean that the services were not offered in a coordinated and collaborative fashion. Accordingly, the Court finds by a preponderance of the evidence that the services are provided in a coordinate and collaborative manner.

---

[20] The parents' right to examine and review all records related to their child is actually a procedural safeguard provided the IDEA. 20 U.S.C. § 1415(b)(1). Therefore, Plaintiff would also need to prove that the procedural violation "'resulted in a loss of educational opportunity or infringed [E.M.'s] parents' opportunity to participate in the IEP process.'" *Shafi*, 2016 WL 7242768, at *7 (quoting *Adam J.*, 328 F.3d at 812). As identified above, Plaintiff has failed to make such a showing.

[21] Plaintiff initially also cites to a letter that E.M.'s mother sent to Teddie Winslow, Principal of Independence Elementary School, requesting "IEP data from all of [E.M.'s] LISD teachers and therapists, or any other district employees, since [E.M.] was enrolled in the district in January 2011." (AR 1586). However, in Plaintiff's reply, Plaintiff only refers to E.M.'s mother's request of the data at the February 2014 ARD Committee meeting (Dkt. #47 at pp. 15–16). Moreover, even in Plaintiff's response, when this argument was initially raised, there is no record cite to a response denying this request from any LISD employee (Dkt. #41 at p. 17).

**4.** **Whether Positive Academic and Non-Academic Benefits Are Demonstrated**

Plaintiff argues that E.M. did not make educational progress in any subject area and that, in fact, she was regressing or remaining stagnant on her goals. LISD counters that the record reflects progress academically and socially. The Fifth Circuit emphasized that this is "[p]erhaps one of the most critical factors." *Hous. Indep. Sch. Dist. v. Juan P.*, 582 F.3d 576, 588 (5th Cir. 2009). However, the core of the IDEA is to provide access to educational opportunities and requires only the "basic floor of opportunity," and some meaningful educational benefits more than de minimis, not a perfect education and not the maximum of E.M.'s potential. *Id.* at 583 (quoting *Rowley*, 458 U.S. at 201).

While the administrative record does show that E.M. regressed on some IEP goals during the 2013–2014 school year,[22] the record also reflects that E.M. showed academic and non-academic benefits. Academically, E.M. progressed in a variety of subjects. Pederson testified that E.M. was progressing in her ability to read and spell appropriately for her grade level, which during the 2013–2014 school year was 3rd grade; however, Pederson acknowledged that E.M. struggled with reading comprehension (AR 3911–3912). Further, E.M. showed progress in her writing abilities (AR 4366). Pederson also testified that E.M. progressed on her math skills as she was only able to count to five consistently[23] when she first started, whereas by the end of the year she was able to count to thirteen consistently and started working on addition[24] in the 2013–2014

---

[22] Plaintiff argues that the progress report are the only way to measure E.M.'s academic and non-academic benefits; however, has provided no legal authority for this contention.

[23] Plaintiff points out that according to the November 2013 proposed IEP, E.M. could already count up to eleven objects (AR 584). Even if she was already able to count to eleven, E.M. still progressed, however slight such progression may be, to be able to count to thirteen (AR 3920–3921).

[24] Plaintiff contends that the baseline for E.M.'s short-term objectives for the 2014–2015 school year was 0/5 and 1/5 for her addition skills (AR 2512). However, this is not inconsistent with the testimony Pederson provided regarding E.M.'s addition skills, as she stated, "she was starting to learn the skill. It just wasn't quite -- we were still progressing on it." (AR 3921).

school year (AR 3920–3921). Moreover, E.M.'s VB-MAPP scores demonstrate that E.M. scored slightly better on each test she took, aside from the "Language Barriers Scoring Form," which stayed the same (AR 3279–3281).[25]

Although the disputed school year is 2013–2014, E.M. continued to show progress in 2014. E.M.'s special education communications teacher beginning in the fall of 2014, Kriste Fedor ("Fedor") noticed that E.M. needed to work on her listening skills and so Fedor began to focus on that, which led to E.M. showing progress in that area (AR 4923–4294). E.M. also demonstrated progress in her reading and communication with peers using the AAC device while she was in Fedor's classroom (AR 4294). Moreover, E.M.'s teachers continued to work on E.M.'s math skills, and her work sample from November 18, 2014 and November 21, 2014, show that she was making progress on her ability to solve addition problems (AR 2728–2729).

As to E.M.'s non-academic goals, E.M. again showed progress in a variety of areas. According to E.M.'s 2012 PLAAFP, E.M. was able to type 3.5 words per minute (AR 2768). E.M. improved to 6 words per minute by November 2013 (AR 2917), and according to her teachers, was able to inconsistently type 10 words per minutes, which was not far below the average for children E.M.'s age (AR 3922, 4296–4297). Further, Pederson testified that E.M. began making progress using her AAC device, stating that when she started she was able to put one word up, but she continued to progress to using two or even three words when responding or asking for things and progressed all the way up to incomplete sentences (AR 3899, 4297). E.M. also progressed socially with her AAC device as her teachers observed that initially E.M. wanted nothing to do with her peers, but that E.M. began her AAC device with her peers (AR 3876–3877, 3903, 4297–4299).

---

[25] The Court notes that even though LISD had implemented the stay-put placement, E.M.'s teachers continued to work with E.M. to ensure she was progressing appropriately (AR 4367, 4383, 4422).

Considering E.M.'s academic and social progress evidenced in the administrative record, the Court concludes by a preponderance of the evidence that E.M. gained measurable educational benefits sufficient to comply with the IDEA. While the 2013 IEP may not have provided the maximum amount of benefits to E.M., it certainly provided a "basic floor" to meaningful education.

Having examined this case under all four of the *Michael F.* factors, the Court concludes by a preponderance of the evidence that LISD's 2013 IEP for E.M. was reasonably calculated to enable her to receive meaningful educational benefits and thus provided her with a FAPE in accordance with IDEA.

### III.    Reimbursement and Attorneys' Fees

The IDEA allows plaintiffs to receive reimbursement for any private placement "if the court or hearing officer finds that the agency had not made a free appropriate education available to the child in a timely manner." 20 U.S.C. § 1412(a)(C)(ii). The IDEA also allows plaintiffs to receive reasonable attorneys' fees if they can show they are the prevailing party. 20 U.S.C. § 1415(i)(3)(B)(i). Since the Court found LISD provided E.M. with a FAPE, Plaintiff is not entitled to attorneys' fees or reimbursement.

### CONCLUSION

Based on the foregoing, the Court finds that Plaintiff failed to satisfy her burden to show that E.M.'s IEP was inappropriate under the IDEA. The Court finds the decision of the SEHO is **AFFIRMED**.

It is therefore **ORDERED** that Defendant Lewisville Independent School District's Motion for Judgment on the Administrative Record (Dkt. #36) is hereby **GRANTED** and Plaintiff's Motion for Judgment on the Record (Dkt. #37) is hereby **DENIED**.

**SIGNED this 27th day of March, 2018.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE